ORIGINAL

FILED
SEP 26 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

INFRASTRUCTURE DEFENSE TECHNOLOGIES, L.L.C.
Plaintiff,

v.

THE UNITED STATES OF AMERICA, DEFENSE LOGISTICS AGENCY
Defendant.

No: 07-695 C

Judge: ____________

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Rules of the Court of Federal Claims, and 28 U.S.C. § 1491(b), Plaintiff Infrastructure Defense Technologies, LLC ("Infrastructure Defense") moves this Court for preliminary injunction against Defendant, The United States of America, acting by and through the Defense Logistics Agency ("DLA"), in this action protesting the modification of Contract No. SPM500-04-D-0239, awarding a sole source contract to Hesco Bastion Ltd. ("Hesco"). Infrastructure Defense requests that the preliminary injunction remain in effect until this Court can decide the merits of the Complaint, filed herewith.

Respectfully submitted,

Date: September 26, 2007

C. Joel Van Over
Randall M. Levine
David J. Prieto
2020 K Street NW
Washington, DC 20006
(202) 373-6000 telephone
(202) 373-6001 facsimile

Attorneys for Plaintiff Infrastructure Defense Technologies

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

INFRASTRUCTURE DEFENSE TECHNOLOGIES, L.L.C.
Plaintiff,

v.

THE UNITED STATES OF AMERICA, DEFENSE LOGISTICS AGENCY
Defendant.

No: ______________

Judge: ____________

**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Date: September 26, 2007

C. Joël Van Over
David J. Prieto
Randall M. Levine
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
(202) 373-6000 telephone
(202) 373-6001 facsimile

Attorneys for Plaintiff, Infrastructure Defense Technologies LLC

TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 2
II. QUESTION PRESENTED ..... 2
III. STATEMENT OF THE CASE ..... 2
IV. JURISDICTION AND STANDING ..... 7
A. Infrastructure Defense is a "Prospective Offeror" ..... 7
B. Infrastructure Defense has a Direct Economic Interest in the Procurement, and was Prejudiced by DLA's Conduct ..... 8
V. ARGUMENT ..... 9
A. Infrastructure Defense Will Likely Prevail on the Merits of its Complaint ..... 10
1. DLA Violated CICA And Procurement Regulations By Issuing a Modification Constituting a Cardinal Change ..... 10
a. The value of the contract is materially increased ..... 12
b. The quantity of product called for under the modification is materially increased ..... 12
c. The amount of time in which to produce the requirements is materially reduced ..... 13
d. The modification materially changes the contract type from IDIQ to firm fixed price ..... 13
2. DLA Violated CICA And Procurement Regulations by Engaging in Sole Source Procurement Without Justification ..... 14
3. DLA Failed to Engage in Statutorily Mandated Advanced Planning ..... 16
4. DLA's Sole Source Modification Exceeds the Government's Minimum Needs ..... 17
5. DLA Violated CICA and Procurement Regulations By Failing to Develop and Issue Functional, Performance Specifications and Design Requirements That Permit Full and Open Competition ..... 20
B. Infrastructure Defense Will Suffer Irreparable Harm if the Procurement is Not Enjoined, Because DLA's Conduct Deprives Infrastructure Defense of the Opportunity to Fairly Compete for the Contract ..... 22
C. Infrastructure Defense' Harm Outweighs the Harm to the Government and Third Parties ..... 23
D. An Injunction is in the Public Interest Because DLA Violated the Statutes and Regulations Intended to Promote Full and Open Competition ..... 24
VI. CONCLUSION ..... 25

TABLE OF AUTHORITIES

Page

**United States Statutes**


10 U.S.C. § 2304 (2000)....................2, 15, 16, 17, 20

10 U.S.C. § 2305 (2000)....................16, 17, 20, 21

10 U.S.C. § 2319 (2000....................17

15 U.S.C. § 637 (2000)....................20

28 U.S.C. § 1491 (2000)....................7, 9

41 U.S.C. § 416 (2000)....................20


**Code of Federal Regulations**


48 C.F.R. § 5.207 (2006)....................21

48 C.F.R. § 6.001 (2006)....................14

48 C.F.R. § 6.101 (2006)....................2, 17

48 C.F.R. § 6.102 (2006)....................17

48 C.F.R. § 6.301 (2006)....................17

48 C.F.R. § 6.302-1 (2006)....................20

48 C.F.R. § 7.105 (2006)....................16

48 C.F.R. § 9.202 (2006)....................17

48 C.F.R. § 9.204 (2006)....................17

48 C.F.R. § 9.205 (2006)....................17

48 C.F.R. § 9.206-1 (2006)....................17

48 C.F.R. § 11.002 (2006)....................17,20

TABLE OF AUTHORITIES

Page

**Cases**

*Aeroplate Corp. v. U.S.*, 67 Fed. Cl. 1 (2005) .......... 9

*ATA Defense Indus., Inc. v. U.S.*, 38 Fed. Cl. 489 (1997) .......... 23

*AT&T Comms. Inc. v. Wiltel, Inc.* 1 F.3d 1201 (Fed. Cir. 1993) .......... 10

*Banknote Corp. of America, Inc. v. U.S.*, 365 F.3d 1345 (Fed. Cir. 2004) .......... 7

*Cardinal Maintenance Serv., Inc. v. U.S.*, 63 Fed. Cl. 98 (2004) .......... 10, 12

*CCL Inc. v. U.S.*, 39 Fed. Cl. 780 (1997) .......... 7, 10, 11

*Cubic Defense Systems, Inc. v. U.S.*, 45 Fed. Cl. 239 (1999) .......... 8, 9

*CW Gov't Travel v. U.S.*, 61 Fed. Cl. 559 (2004) .......... 14

*Edward R. Marden Corp. v. U. S.*, 442 F.2d 364 (1971) .......... 12

*Filtration Dev. Co., LLC v. U.S.*, 60 Fed. 371 (2004) .......... 18, 19, 20

*FMC Corp. v. U.S.*, 3 F.3d 424 (Fed. Cir. 1993) .......... 9

*Galen Med. Assocs. v. U.S.*, 369 F.3d 1324 (Fed. Cir. 2004) .......... 9

*Hospital Klean of Texas, Inc. v. U.S.*, 65 Fed Cl. 618 (2005) .......... 15

*Impresa Construzioni Geom. Domenico Garufi v. U.S.*, 238 F.3d 1324 (Fed. Cir. 2001) .......... 8

*KSD, Inc. v. U.S.*, 72 Fed. Cl. 236 (2006) .......... 8

*Krygoski Const. Co., Inc. v. U.S.*, 94 F.3d 1537 (Fed. Cir. 1996) .......... 12

*Magnavox Elec. Sys. Co. v. U.S.*, 26 Cl. Ct. 1373 (1992) .......... 9, 22, 23, 24, 25

*Metcalf Const. Co., Inc. v. U.S.*, 53 Fed. Cl. 617 (2002) .......... 22

*Moore's Cafeteria Servs. v. U.S.*, 77 Fed Cl. 180, (2007) .......... 15

*Northrop Grumman Corp. v. U.S.*, 50 Fed. Cl. 443 (2001) .......... 10, 12, 13

*OTI America, Inc. v. U.S.*, 68 Fed. Cl. 646 (2005) .......... 23

*Quality Transp. Servs., Inc. v. U.S.*, 12 Cl. Ct. 276 (1987) .......... 22

TABLE OF AUTHORITIES

Page

*Rex Serv. Corp. v. U.S.*, 448 F.3d 1305 (Fed. Cir. 2006) .......... 7

*SAI Indus. Corp. v. U.S.*, 60 Fed. Cl. 731 (2004) .......... 24

*United States Ass'n of Importers of Textiles and Apparel v. U.S.*, 413 F.3d 1344 (Fed. Cir. 2005) .......... 9

**Comptroller General Opinions**

*Design Pak, Inc.*, B-212579, 83-2 CPD ¶ 336 .......... 18

*HEROS, Inc.*, B-292043, 2003 CPD ¶ 111 .......... 16

*Laidlaw Environmental Services (GS), Inc.*, B-249452, 92-2 CPD ¶ 366 .......... 10

*New Breed Leasing Corp.*, B-274201, 96-2 CPD ¶ 202 .......... 16

*Pacific Sky Supply, Inc.*, B-225420, 87-1 CPD ¶ 206 .......... 20

*Pacific Sky Supply, Inc.*, B-228049, 87-2 CPD ¶ 504 .......... 17

*Sabreliner Corp.*, B-288030, B-288030.2, 2001 CPD ¶ 170 .......... 21

*Techno-Sciences, Inc.*, B-257686, 94-2 CPD ¶ 164 .......... 10

The Plaintiff, Infrastructure Defense, L.L.C. ("Infrastructure Defense"), by and through counsel, hereby moves the Court to grant its motion for a preliminary injunction under Rule 65 of the Rules of the Court of Federal Claims against the Defendant, the United States of America, acting by and through the Defense Logistics Agency ("DLA"). In this action, Infrastructure Defense protests a contract modification extending a sole source contract awarded to Hesco Bastion Ltd. ("Hesco") that exceeds the scope of the original contract, and was awarded in a manner that circumvents a currently pending pre-award protest before this Court, *Infrastructure Defense Technologies, LLC v. United States Defense Logistics Agency*, No. 07-582C (Merow, J.) (the "First IDT Protest"), concerning the sole source procurement of the same products at issue in this protest. In fact, this protest concerns not the *same types* of products, but the *exact products* themselves that are involved in the First IDT Protest. The only relevant difference is that the contract at issue in this protest is for the procurement of vastly larger quantities, at a higher contract value, over a dramatically shorter period than the procurement at issue in the First IDT Protest. In sum, the contract protested here merely accelerates and increases the size of the procurement protested in the First IDT Protest.

The contract modification protested here cannot be justified as a sole source award and like the procurement protested in the First IDT Protest violated statute and regulations and is an egregious example of arbitrary and capricious conduct. Infrastructure Defense requests that this preliminary injunction remain in effect until this Court decides the merits of Infrastructure Defense's Complaint, filed herewith. Infrastructure Defense also files herewith a motion to consolidate this protest with the First IDT Protest pending before Judge Merow.

## I. INTRODUCTION

Infrastructure Defense seeks to enjoin performance of DLA's modification of a sole source contract for "Concertainer" security barriers awarded to Hesco, as this modification exceeds the scope of the original procurement, and constitutes a sole source procurement that cannot be justified as mandated by statute and regulation. DLA's modification of the sole source contract despite available competition, its refusal to seek offers for competing products, including from Infrastructure Defense, under a solicitation defining its actual functional or objective requirements, violates the Competition in Contracting Act ("CICA"), 10 U.S.C. §§ 2304 et. seq., and 48 C.F.R. § 6.101 (FAR), and other federal acquisition regulations implementing competitive requirements.

## II. QUESTION PRESENTED

This Court must determine whether Infrastructure Defense is entitled to a preliminary injunction based on the DLA's failure to comply with applicable statutes and regulations in connection with its modification of a sole source contract to Hesco.

## III. STATEMENT OF THE CASE

**<u>The First IDT Protest</u>**

Plaintiff Infrastructure Defense offers and sells various force protection products- barrier walls, used for bunkers and revetments that withstand blasts and direct impacts to protect military assets and personnel. Since mid-2005, Infrastructure Defense has communicated with DLA concerning its interest in competing for procurements of force protection barrier products. Infrastructure Defense has on numerous occasions demonstrated to DLA that it offers products that are competitive with the force protection materials that DLA has procured sole source from

the Hesco for many years. Infrastructure Defense's products are sold under the trade name "Metalith." Hesco's barrier products are sold under the trade name Concertainer. Both products are earth-filled barriers.

Despite its knowledge that Infrastructure Defense produces competitive products, on April 3, 2007 DLA issued a CBD notice of sole source procurement for a new sole source contract to Hesco for its barrier products. The contemplated sole source contract is for five (5) years, with an estimated value of $250,000,000. "). Exhibit A ("The April 2007 Sole Source Notice").

On August 9, 2007, Infrastructure Defense filed a protest complaint and motion for preliminary and permanent injunction with the Court of Federal Claims, *Infrastructure Defense Technologies, LLC v. U.S., Defense Logistics Agency*, No. 07-582 C, ("the First IDT Protest") to enjoin a sole source award to Hesco.

The protest at issue here is intimately related to the First IDT Protest. In the First IDT Protest, DLA agreed to stay the award of the proposed sole source contract pending resolution of Infrastructure Defense's protest. In the First IDT Protest, Infrastructure Defense seeks a permanent injunction from the award of a sole source contract to Hesco and a Declaration by the Court that DLA is required to hold a competitive procurement under a request for proposals that provides for its actual minimum needs through a performance based functional specification.

During this initial stage of the First IDT Protest, DLA through its counsel asked if Infrastructure Defense would agree to a three month bridge contract with Hesco to provide for the supply of security barriers required to cover actual customer need, if any, during the pendency of the First IDT Protest. Infrastructure Defense agreed not to pursue a preliminary injunction at that time on the condition that a three month contract would only meet the actual

minimum needs of the customer, if any, during the three month period until the merits of the protest were resolved. It was understood that this short term, limited quantity contract would preserve the status quo in lieu of a preliminary injunction, while permitting DLA to procure Hesco barriers to the extent there was any *bona fide* need. In reliance on DLA's representation, Infrastructure Defense did not pursue its Motion for Preliminary Injunction in the First IDT Protest. However, DLA did not abide by its representations, and has subverted the purpose and intent of a limited bridge contract.

**The Purported "Bridge Contract"**

On or about September 14, 2007, DLA awarded a purported sole source bridge contract to Hesco. This purported bridge contract was effected through a modification to contract SPM500-04-D-0239, a sole source contract awarded to Hesco in 2004, and extended in February 2007 for an additional eight (8) month period, until October 2007. The sole source modification ("the purported bridge contract") is attached hereto as Exhibit A. The February 2007 eight (8) month extension of the contract, which the purported bridge contract modifies, has a contract value of $150,000,000. Exhibit B (Fedbizops notice).

The purported bridge contract is a firm fixed price contract with economic price adjustments, with a base period of three (3) months, from September 17 to December 17, 2007. Exhibit C. The purported bridge contract also includes two option periods of 90 days each, for a total potential term of nine (9) months. Exhibit C. The "estimated maximum value" of the three month base period of the purported bridge contract is $327,000,000. The two option periods are for sums of $195,000,000 each. The total value of the purported bridge contract is $717,000,000. Significantly, even though Judge Merow ordered DLA to file a status report concerning any contract, DLA disclosed none of this information to the Court.

The purported bridge contract is *not* a bridge contract designed to meet the urgent, compelling or actual minimum needs of the customer for a three month period. To the contrary, this purported bridge contract provides for a sole source purchase of Hesco Concertainer security barriers that, in its first three months alone, has a total value that is more than the value of the full five-year contract protested in the First IDT Protest.

Further, the purported bridge contract, in the first three months alone, far exceeds the amount that DLA has ever purchased from Hesco in a one (1) year period. The total value of the purported bridge contract, $717,000,000 obligates DLA to purchase more barrier products from Hesco than it has purchased over the past seven years combined. Exhibit D. Notwithstanding this extraordinary purchase, the contracting officer, Leslie Fuller, has admitted that no government customer has requested further supplies of Hesco barriers.

The Department of Defense Class IV Council, designated as the government body charged with developing a plan for barrier material products such as security barriers, has not authorized DLA's extraordinary purchase. Nor has DLA advised the Class IV Council, nor sought the Class IV Council's views prior to its extraordinary purchase of Concertainer security barriers, even though Class IV Council members represent the armed forces, the ultimate customers for such barrier products.

By purchasing vastly more security barriers under the purported bridge contract than was contemplated under the entire five-year contract that is the subject of the First IDT Protest, DLA has engaged in self-help to tactically avoid any consequences arising from a potential adverse decision in the First IDT Protest. The purported bridge contract will render Infrastructure Defense's First IDT Protest practically moot, by obviating DLA's need to issue the five-year contract. DLA has already effectively awarded this contract simply by changing the name to

"bridge contract" and accelerating performance. Thus, DLA's actions will deprive the Court of any ability to fashion an effective remedy in the First IDT Protest.

The purported bridge contract is a flawed sole source procurement for the same reasons that the proposed five year sole source procurement is flawed, as alleged in Infrastructure Defense's First IDT Protest. For example:

(a) DLA failed to justify its continued sole source procurement from Hesco under *any* of the statutory exceptions to the Competition in Contracting Act's ("CICA") requirement of full and open competition;

(b) DLA failed to develop performance based functional specifications for the Hesco products, preventing potential competitors from making offers;[1]

(c) During at least the past three years, DLA has engaged in no assessment of the actual minimum needs of its ultimate customers for earth-filled security barriers, and so has failed to engage in statutorily mandated advanced planning; and,

(d) By failing to assess its actual minimum needs, DLA's decision to issue restrictive procurements far in excess of its actual minimum needs is without any rational basis.

In sum, DLA has attempted an end run around Infrastructure Defense's First IDT Protest. In effect, DLA has awarded the contract protested in the First IDT Protest as a modification to a contract that by its terms was to expire in February 2007. The purported bridge contract is for a much larger quantity and much higher contract value, and is to be performed in a much shorter time period than the procurement under protest in the First IDT Protest. This accelerated purchase is arbitrary, capricious, and irrational and its audacity shocks the conscience.

[1] Admiral Ginman, Competition Advocate in the DOD, Office of Acquisition and Technology requested that IDT provide him with a draft neutral performance based functional specification, and IDT did so. While such a neutral performance based specification is straightforward, it requires knowledge of the ultimate customer's actual needs. Upon information and belief, DLA has not evaluated these needs, but has assumed that Hesco barriers meet *all* needs for barriers in all environments.

Accordingly, the purported bridge contract must be preliminary and permanently enjoined from performance.

## IV. JURISDICTION AND STANDING

This Court has jurisdiction pursuant to 28 U.S.C. § 1491(b), which expressly provides this Court with jurisdiction to "render judgment on an action by an interested party objecting to… any alleged violation of statute or regulation in connection with a procurement or proposed procurement." Infrastructure Defense has alleged numerous violations of statute and regulation by the DLA in connection with an illegal and out of scope modification of a sole source procurement.

### A. Infrastructure Defense is a "Prospective Offeror"

Infrastructure Defense is an "interested party" within the meaning of the statute because Infrastructure Defense is a prospective offeror with an economic interest in the outcome of the solicitation. *See Rex Serv. Corp. v. U.S.,* 448 F.3d 1305 (Fed. Cir. 2006) ("[T]o come within the Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [plaintiff] is required to establish that it: (1) is an actual or prospective offeror, and (2) possesses the requisite direct economic interest"); *Banknote Corp. of America, Inc. v. U.S.,* 365 F.3d 1345 (Fed. Cir. 2004) ("We therefore construed the term "interested party" in accordance with the CICA definition and held that standing under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract").

Infrastructure Defense is a "prospective offeror" because the purported bridge contract should have been the subject of a competitive solicitation. If the purported bridge contract had

been the subject of a competitive solicitation, Infrastructure Defense would have competed for the procurement. *See CCL, Inc. v. U.S.*, 39 Fed. Cl. 780, 789 (1997). Infrastructure Defense has an economic interest in the procurement, and was prejudiced by DLA's violations of the procurement statutes and regulations, because but for DLA's failure to competitively solicit the subject matter of the modification, Infrastructure Defense would have submitted an offer, and if the bid process were made competitive Infrastructure Defense could compete for the contract. *Impresa Construzioni Geom. Domenico Garufi v. U.S.*, 238 F.3d 1324, 1334 (Fed. Cir. 2001) (where the plaintiff claims that the government is obligated to rebid the contract, to establish prejudice the plaintiff need only establish that it could compete for the contract if the bid process were made competitive); *KSD, Inc. v. U.S.*, 72 Fed. Cl. 236, 247 (2006) ("when the government's actions wrongfully prevent a bidder from qualifying or bidding on a solicitation, the government cannot use the contractor's failure to qualify or bid on the solicitation as grounds for a finding of a lack of standing"). Accordingly, Infrastructure Defense was prejudiced by the DLA's wrongful conduct of the procurement, and is an interested party with a direct economic interest in the award of the contract.

**B. <u>Infrastructure Defense has a Direct Economic Interest in the Procurement, and was Prejudiced by DLA's Conduct</u>**

Infrastructure Defense has an economic interest in the procurement, because "but for" DLA's improper conduct of the procurement Infrastructure Defense would have competed for the contract, and if Infrastructure Defense's protest is successful DLA will be obligated to conduct a fair and open competition to satisfy its force protection barrier material requirements in which Infrastructure Defense has established that it will be able to compete. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (holding that to establish prejudice "where the plaintiff claims that the government was obligated

to rebid the contract...the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive...."); *Cubic Defense Systems, Inc. v. U.S.*, 45 Fed. Cl. 239, 248 (1999) (holding that the plaintiff had an economic interest in a procurement because "but for" the Government's anticompetitive conduct it would have competed for the contract). As part of the "direct economic interest" requirement, a protestor must show that any alleged errors caused the protestor "prejudice." *See Galen Med. Assocs. v. U.S.*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). If excluded from competition, Infrastructure Defense will lose a contract in a field in which it is a competitor, and thus will be prejudiced by award of the sole source procurement to Hesco. *See Cubic Defense Systems*, 45 Fed. Cl. at 248.

Accordingly, Infrastructure Defense has standing, and this Court has jurisdiction to consider Infrastructure Defense's objections to the proposed sole source procurement, and may grant an appropriate remedy "including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

## V. ARGUMENT

When considering a motion for preliminary injunctive relief, the court must weigh four factors: "(A) immediate and irreparable injury to the movant; (B) the movant's likelihood of success on the merits; (C) the public interest; and (D) the balance of the hardship on all of the parties." *Aeroplate Corp. v. U.S.*, 67 Fed. Cl. 1, 2 (2005); *United States Ass'n of Importers of Textiles and Apparel v. U.S.*, 413 F.3d 1344, 1347-48 (Fed. Cir. 2005). No single factor is determinative, and "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. U.S.*, 3 F.3d 424, 427 (Fed. Cir. 1993). Plaintiff must prove each element by clear and convincing evidence. *Magnavox Elec. Sys. Co. v. U.S.*, 26 Cl. Ct. 1373, 1378 (1992). Applying these factors to the circumstances of this case, Infrastructure Defense is entitled to injunctive relief.

### A. Infrastructure Defense Will Likely Prevail on the Merits of its Complaint

The first factor requires the Court to consider whether Infrastructure Defense will likely prevail on the merits of its complaint. Infrastructure Defense will likely succeed on the merits of its complaint because: (1) DLA's modification is beyond the scope of the original procurement, and is an unjustified sole source procurement in violation of the Competition in Contracting Act of 1984 ("CICA") and numerous procurement regulations; (2) DLA's conduct is arbitrary and capricious and without rational basis as the purported bridge contract does not reflect the ultimate customers' actual minimum needs, is for a quantity that cannot be justified, and circumvents the First IDT Protest.

#### 1. DLA Violated CICA And Procurement Regulations By Issuing a Modification Constituting a Cardinal Change

DLA Violated CICA and relevant procurement regulations implementing full and open competition by modifying a sole source contract in a way that materially changes the nature of performance under the contract. DLA should have either competed the requirements embodied in the purported bridge contract, or complied with the statutory requirements for engaging in other than competitive procedures.

When a contract extension is beyond the scope of the contract period, it effectively constitutes a new procurement and must be justified as a noncompetitive procurement under CICA. *Techno-Sciences, Inc.*, B-257686, 94-2 CPD ¶ 164; *Laidlaw Environmental Services (GS), Inc.*, B-249452, 92-2 CPD ¶ 366. CICA states that "the head of an agency in conducting a procurement for property or services ... shall obtain full and open competition through the use of competitive procedures." 10 USC § 2304(a)(1)(A). CICA's requirements "cannot be avoided by using the device of contract modification." *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 791 (1997). "CICA, however, does not prevent modification of a contract by requiring a new bid

procedure for every change. Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement." *AT&T Comms. Inc. v. Wiltel, Inc.* 1 F.3d 1201, 1205 (Fed. Cir. 1993).

"Contract modifications may not materially depart from the scope of the original procurement; otherwise the modification prevents the complaining party (and other potential bidders) from competing for what is, in reality, a new and different contract." *CCL*, 39 Fed. Cl. at 791. CICA does not contain a standard for determining whether a modification falls within the scope of the original contract. To address this problems, courts look to the "cardinal change" doctrine by analogy. *See Cardinal Maintenance Serv., Inc. v. U.S.*, 63 Fed. Cl. 98, 106 (2004). "Factors important to the cardinal change analysis include modifications to the type of product or service being delivered or performed, the quantity of the product or service, the performance period, and the cost between the solicitation as competed and the contract as modified." *Northrop Grumman Corp. v. U.S.*, 50 Fed. Cl. 443, 466 (2001).

On September 17, 2007, DLA issued Modification P00014 ("the purported bridge contract"), extending an expiring sole source contract with Hesco for a base period of three months. The estimated value of the three month base period is $327,000,000, and the total value of the nine month contract is $717,000,000. The purported bridge contract is vastly and materially different from the original procurement, constitutes a cardinal change, and should have been the subject of a competitive solicitation.

The purported bridge contract is materially different from the original procurement because: (a) the value of the contract is materially increased; (b) the contemplated production is materially increased; (c) the amount of time in which to produce the requirements is materially

reduced; (d) the type of contract is changed from indefinite delivery, indefinite quantity to firm fixed price.

**a. The value of the contract is materially increased.**

Courts look to the value of the original procurement and the value of the contract as modified in determining whether a modification constitutes a cardinal change. *See Northrop Grumman Corp.*, 50 Fed. Cl. at 466. For example, this Court held in *Cardinal Maintenance Serv., Inc. v. U.S.*, that modifications made after award resulting in a net 80% increase in price were beyond the scope of the initial procurement, amounting to an improper circumvention of the competition statutes. *Cardinal Maintenance*, 3 Fed. Cl. at 106. Here, the purported bridge contract represents a roughly 481% increase in contract value over the previous contract extension. The purported bridge contract increases the contract's estimated value per month from $18.75 million per month to $109 million per month.

**b. The quantity of product called for under the modification is materially increased.**

Courts also look to the quantity of product or work called for under the modification in determining whether it constitutes a cardinal change. *Northrop Grumman*, 50 Fed. Cl. at 466. For example, in *Krygoski Const. Co., Inc. v. U.S.*, the Federal Circuit held that a modification increasing a category of work from 10% to 50% of the total value of a contract constituted a change outside the scope of the contract. 94 F.3d 1537, 1544 (Fed. Cir. 1996). Additionally, in *Edward R. Marden Corp. v. U. S.*, the government modified a contract obligating the contractor to rebuild a demolished building, doubling the contract price. 442 F.2d 364, 370 (1971). The Claims Court held that even though the final product that the government was requiring had not changed, the "sheer magnitude" of the increase in work constituted a cardinal change. *Id.*

Here, the purported bridge contract contemplates a material increase in the quantity of security barriers to be produced. The purported bridge contract far exceeds the $250,000,000 estimated value of the proposed five year sole source contract that is the subject of the First IDT Protest. The purported bridge contract therefore contemplates purchasing more than five years worth of requirements for security barriers, over the course of three months. The total value of the purported bridge contract, $717,000,000 obligates DLA to purchase more Concertainer products from Hesco than it has purchased over the last seven years combined. *See* Exhibit D (Graph) (The sources of the data for this graph are www.dla.gov and www.governmentcontractswon.com).

**c. The amount of time in which to produce the requirements is materially reduced.**

Courts will also look to changes in the period of performance when determining whether a modification constitutes a cardinal change. *Northrop Grumman*, 50 Fed. Cl. at 466. Here, the purported bridge contract condenses $327,000,000 worth of production requirements, far more than the total production requirements of the proposed five year IDIQ contract for the same products, into only three months. Under the purported bridge contract, Hesco must deliver more product in less time, raising its monthly burden of performance. Thus, the risks to the contractor created by the modification are beyond the bounds contemplated by the original IDIQ contract. Partly as a result of the accelerated production schedule, Hesco will also receive an enormous increase in revenue, exceeding $100,000,000 per month during the period of the purported bridge contract, whereas it currently receives less than $20,000,000 per month. The acceleration of the time for performance is so drastic that the purported bridge contract represents a materially different performance from that contemplated by the original contract. For these reasons, the purported bridge contract's reduced period of performance is a material change.

**d. The modification materially changes the contract type from IDIQ to firm fixed price.**

The purported bridge contract's change in payment structure from an IDIQ contract to a firm fixed price contract is a cardinal change, because the resulting shift of risk from the contractor to the government constitutes an "impermissible shift of risk." *See CW Gov't Travel v. U.S.*, 61 Fed. Cl. 559, 576-77 (2004). Under the previous IDIQ payment structure, the government accepted very little risk because it did not commit itself to purchasing any more product than it required under the various delivery orders. If circumstances changed and the government no longer required the product, under an IDIQ payment structure the government is protected. Under the firm fixed price contract in place under the purported bridge contract, the government agrees to shoulder the full risk of a $717,000,000 contract. This is a material change in the contract, because it places the contractor in a materially different risk position, and is exactly the sort of opportunity for which prospective bidders would seek to compete.

**2. DLA Violated CICA And Procurement Regulations by Engaging in Sole Source Procurement Without Justification**

A modification to a sole source contract must comply with CICA and applicable regulations when the modification is not adequately covered by the justification and approval issued for the original contract. FAR § 6.001(e)(2). The purported bridge contract is not adequately covered by the justification and approval issued for the original contract, because the original contract term has expired, and while there may not have been available competitors when DLA issued the first justification and approval, DLA is now aware that Infrastructure

Defense is a viable competitor for force protection barriers. DLA was therefore obligated to comply with CICA and applicable regulations when issuing the purported bridge contract.[2]

Under CICA and its implementing regulations, an agency may use procedures other than competitive procedures only when certain enumerated statutory exceptions are met, including for example, when: (1) the supplies or services are available from only one responsible source and no other supplies or services satisfy the minimum needs of the agency; (2) the agency's need for the supplies or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals; (3) it is necessary to award the contract to a particular source to maintain a facility, or essential engineering, research or development capability, *etc*; and (4) the terms of an international treaty or agreement require the use of other than competitive procedures; (5) the disclosure of the agency's needs would compromise national security unless the number of sources solicited is limited. 10 U.S.C. § 2304(c).

An agency may not invoke a statutory exception to CICA and use other than competitive procedures unless it justifies the use of a specific statutory exception to CICA in writing, identifies the agency's needs and the applicable statutory exception in the justification, lists the sources that expressed an interest in writing, describes and market survey conducted, certifies the accuracy and completeness of the justification, and obtains approval of the justification. 10 U.S.C. § 2304(f)(1) and (f)(3). In the case of a contract exceeding $75,000,000, as in the present procurement, the use of other than competitive procedures must be approved by the designated senior procurement executive of the agency or his delegate. 10 U.S.C. § 2304(f)(1)(B).

[2] To the extent DLA argues that Hesco barriers are the only barrier suitable for expeditionary use, the need for this use is relatively small, as DLA's customers need barriers for many circumstances, and the qualities of IDT's Metalith are superior for most uses. Further, DLA violates the applicable procurement regulations when it "bundles" such requirements, and in any event has not acknowledged its bundling, nor complied with bundling regulations. *e.g.*, 48 C.F.R. § 7.107

Here, DLA states that its purported bridge contract constitutes a "bridge contract" for the "continued support" of "24 NSNs..." The purported bridge contract is manifestly *not a bridge contract.* A bridge contract under any reasonable definition is used to cover immediate minimum agency needs while a bid protest or other action is pending, or to cover a transition period between competitive procurements. *See e.g., Hospital Klean of Texas, Inc. v. U.S.*, 65 Fed Cl. 618, 619 (2005) ("[T]he Army awarded a 'bridge contract' to secure these critical services during the pendency of the protest."); *Moore's Cafeteria Servs. v. U.S.*, 77 Fed Cl. 180, 183 (2007) ("While the GAO protest was ongoing . . . [contractor] continued to perform through a series of month long bridge contracts.").

Here, DLA has used the device of a so called "bridge contract" not to "bridge" but to avoid the potential consequences of the First IDT Protest. The procurement contemplated by the purported bridge contract is far greater than DLA's previously planned five year $250,000,000 IDIQ award to Hesco that IDT has protested before Judge Merow. Rather than meeting DLA's immediate minimum needs, if any even exist, the purported bridge contract will result in DLA's single largest procurement of Hesco materials ever.

DLA offers no other justification for its failure to engage in competitive procedures before issuing the purported bridge contract, or for its failure to comply with the procedural requirements of CICA before engaging in noncompetitive procurement.

### 3. DLA Failed to Engage in Statutorily Mandated Advanced Planning

CICA and procurement regulations require that federal agencies "use advanced planning" in preparing for the procurement of property and services in order to develop specifications and solicit bids "in a manner designed to achieve full and open competition for the procurement." 1 0

U.S.C. § 2305(a)(1)(A) (i)-(ii); 41 U.S.C. § 253(f)(5)(A); *see, e.g.*, 48 C.F.R. § 7.105. Under no circumstances may noncompetitive procedures be used due to a lack of advanced planning by contracting officials. 10 U.S.C. § 2304(f)(5)(A); *HEROS, Inc.*, B-292043, 2003 CPD ¶ 111; *New Breed Leasing Corp.*, B-274201, 96-2 CPD ¶ 202. As with all procurement actions taken by an agency, the advanced planning must be reasonable. *HEROS, Inc.*, B-292043, 2003 CPD ¶ 111.

DLA should have engaged in advanced planning to determine its actual minimum needs for the period that Infrastructure Defense's bid protest is pending, and tailored its modification to meet those minimum needs, if any exist. Furthermore, DLA should have engaged in advanced planning to determine the salient physical and functional specifications of Hesco's products, so that other prospective offerors could participate in the procurement.

DLA violated CICA and the FAR as evidenced by its failure to determine its actual, immediate minimum needs, and by its failure to specify the salient characteristics of the security barrier products procured. These failures caused Infrastructure Defense prejudice and violate 10 U.S.C. §2319, 10 U.S.C. § 2304 *et. seq.*, 48 C.F.R. 9.202, 48 C.F.R. 9.204, 48 C.F.R. 9.205, 48 C.F.R. 9.206-1, and 48 C.F.R. § 6.101.

#### 4. DLA's Sole Source Modification Exceeds the Government's Minimum Needs

As discussed above, CICA and its implementing regulations require federal agencies to develop and solicit proposals and award contracts in a manner designed to "obtain full and open competition through the use of competitive procedures." 10 U.S.C. § 2304(a)(1)(A); *see, e.g.*, 48 C.F.R. §§ 6.101, 6.102, 6.301 ("contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contracts."). To achieve these ends,

an agency may only engage in noncompetitive procurement "to the extent necessary to satisfy the needs of the agency." 10 U.S.C. § 2305(a)(1)(B)(ii); 48 C.F.R. § 11.002(a)(1)(ii).

The magnitude of the contract value far exceeds the agency's minimum needs, if any even exist. The value of the purported bridge contract is particularly excessive in light of the fact that DLA had previously admitted that it has no specific current need for the products. 10 U.S.C. § 2305(a)(1)(B)(ii); 48 C.F.R. § 11.002(a)(1)(ii); *Pacific Sky Supply, Inc.*, B-228049, 87-2 CPD ¶ 504 (protest against sole source award of a 5 year requirements contract sustained where the justification provides no reason for either the broad range or the extended term of the contract award).

The $327,000,000 sole source award to Hesco will deny Infrastructure Defense the opportunity to compete to supply the government with force protection materials for many years. DLA's decision to contract on a sole source basis for such a massive quantity of product appears at best to be intended for the administrative convenience of DLA which cannot justify the use of other than competitive procedures. *Design Pak, Inc.*, B-212579, 83-2 CPD ¶ 336 ("administrative expediency or convenience by itself provides no basis for restricting competition and the agency must reasonably attempt to ascertain the existence of alternative sources.").

DLA has not justified its sole source procurement under the purported bridge contract. However, DLA represented to counsel for Infrastructure Defense that DLA required a bridge contract to cover the DLA's immediate needs, if any exist. This suggests that DLA believes the purported bridge contract is justified by the "unusual and compelling urgency" exception to full and open competition enumerated under CICA. Even if DLA does have an unusual and compelling urgent need to procure force protection materials from Hesco for the duration of the

First IDT Protest, DLA's procurement of materials over and above that need violates CICA and merits injunctive relief. *See, Filtration Dev. Co., LLC v. U.S.*, 60 Fed. 371, 383-84 (2004) (Exhibit E).

In *Filtration Development Co.*, Flutey, J., the Army justified a sole source procurement of "engine inlet barrier filter" systems (sold in kits) on the ground that there was an unusual and compelling, urgent need for these products in Iraq. David J. Harrington, present counsel for DLA in the First IDT Protest, served as counsel for the Army in *Filtration Development Co.* The court held that the Army had engaged in advanced planning and had concluded that its actual minimum needs, reflecting the immediate emergency, constituted a need for "183 A kits" and "150 B kits." *Id.* at 384. Notwithstanding the Army's determination of its immediate, emergency, minimum needs, the Army sought to procure its *entire* estimated need for the product, constituting 240 of each kit, sole source, pursuant to its unusual and compelling urgency justification. Protestor challenged the award on multiple grounds, ultimately prevailing on the argument that the Army's sole source procurement exceeded its minimum needs, and could not be justified by the unusual and compelling urgency justification.

The court held that a distinction "must be drawn between the Army's overall needs and the needs necessary to satisfy the current emergency." *Id.* at 383. The court further held that the Army's sole source procurement "must reflect its immediate emergency need and must be temporally limited." *Id.* The court granted the protestor's request for injunctive relief, ordering that "[a]ny procurement in excess of" the agency's minimum, emergency needs, "must be conducted on a competitive basis, unless an independent justification for invoking an exception to full and open competition is provided." *Id.* at 389.

The *Filtration Development* case is instructive in the present case for three reasons. First, the court holds that if an agency justifies a sole source contract on the basis of unusual and compelling urgency, the agency must "accurately determine its needs and describe them." *Id.* at 383. Here, DLA has never accurately determined its needs for force protection materials, and has never described its needs in any other fashion than by description of Hesco's brand name products. Second, the court holds that when an agency has defined its needs under an unusual and compelling urgency exception, the agency cannot procure any more than those needs absent a separate justification under CICA. *Id.* at 383-84. Here, while the agency has never defined its minimum emergency needs, a $327,000,000 procurement must exceed them, because this amount exceeds even the agency's pre-determined needs under a proposed *five year contract.* Third, the court concluded that where a prospective offeror challenges an agency's excessive procurement under an unusual and compelling needs justification, injunctive relief is appropriate. *Id.* at 387-88.

DLA's award of a $327,000,000 three month sole source contract with a total value of $717,000,000 is not in response to any present agency let alone any urgent or compelling need, and even if there is some need, the procurement far exceeds the agency's minimum needs, and therefore is arbitrary and capricious and in violation of 10 U.S.C. § 2304(c)(1), 10 U.S.C. § 2305(a)(1)(B)(ii), and 48 C.F.R. § 6.302-1 and 48 C.F.R. § 11.002(a)(1)(ii).

**5. DLA Violated CICA and Procurement Regulations By Failing to Develop and Issue Functional, Performance Specifications and Design Requirements That Permit Full and Open Competition**

CICA and applicable procurement regulations require DLA to "specify the agencies needs," "develop specifications," and solicit bids and proposals "in a manner designed to achieve

full and open competition." 10 U.S.C. § 2305(a)(1)(A); 48 C.F.R. § 11.002(a)(1). To this end, the procurement regulations require that "to the maximum extent practicable an agency should ensure that a procurement states requirements in terms of "functions to be performed;" "performance required;" or "essential physical characteristics." 48 C.F.R. § 11.002(a)(2).

The FAR requires publication of a synopsis of a sole-source procurement in accordance with the Small Business Act, 15 U.S.C. § 637(e), and the Office of Federal Procurement Policy Act, 41 U.S.C. § 416. A synopsis must provide an "accurate description" of the property or services to be purchased and must be sufficient to allow a prospective contractor to make an informed business judgment as to whether to request a copy of the solicitation. 41 U.S.C. § 416(b); 15 U.S.C. §. 637(f); see also *Pacific Sky Supply, Inc.*, B-225420, Feb. 24, 1987, 87-1 CPD ¶ 206 at 4-5 (protest sustained where a sole-source synopsis identified only 2 of 15 items included in the solicitation, thereby failing to provide an "accurate description" of the procurement, as required by the Small Business Act). In addition, the FAR requires that the description of the supplies or services be "clear and concise." FAR § 5.207(c), (d).

Contrary to the mandate of CICA and these regulations, DLA failed to set forth functional, performance or design requirements and specifications such that an offeror would have sufficient knowledge to offer a product that was functionally equivalent to Hesco's products. 10 U.S.C. § 2305(a)(1)(B). Instead, in the agency's synopsis of its sole source award, its needs were identified solely by stating that it seeks to continue support of 24 unidentified NSNs, without any description of the salient functional, performance, or design requirements for each of these products. The only description of the 24 NSNs by DLA is Hesco's brand name -- "Concertainer Defense Walls." (Exhibit F)

Accordingly, DLA violated CICA and the procurement regulations by failing to prepare a synopsis or specifications that facilitate and permit full and open competition by describing the functions, performance required, or essential physical characteristics of the 24 NSNs DLA intends to procure on a sole source basis. *See Sabreliner Corp.*, B-288030, B-288030.2, Sept. 13, 2001, 2001 CPD ¶ 170 at 6-7.

Without the required qualification standards and functional specifications, Infrastructure Defense is prevented from proposing alternate products. By failing to issue compliant specifications, DLA denied Infrastructure Defense the opportunity to compete, prejudicing Infrastructure Defense.

**B. Infrastructure Defense Will Suffer Irreparable Harm if the Procurement is Not Enjoined, Because DLA's Conduct Deprives Infrastructure Defense of the Opportunity to Fairly Compete for the Contract**

Infrastructure Defense will be irreparably injured if the purported bridge contract is not enjoined, because DLA's purported bridge contract assures a sole-source award to Hesco of such magnitude that it will eliminate DLA's future need for force protection products for years to come. The purported bridge contract will therefore also likely render Infrastructure Defense's pending First IDT Protest moot, and further deny Infrastructure Defense the opportunity to compete for the award and have its products fairly considered. Moreover, if DLA had competitively solicited the requirements embodied in the purported bridge contract, Infrastructure Defense would have competed for the contract.

Infrastructure Defense offers a product competitive with the products that DLA plans to sole source from Hesco. Infrastructure Defense informed DLA of its intent to compete for procurements of these items multiple times. DLA was aware of Infrastructure Defense's intent,

and assured Infrastructure Defense that it would have the opportunity to compete. However, DLA's purported bridge contract eliminates Infrastructure Defense not only from competition for this procurement, but also from having its day in court on its pending protest. If this Court does not issue a preliminary injunction preventing DLA from moving forward with the purported bridge contract sole-source procurement, Infrastructure Defense will lose the opportunity to compete altogether. "Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its 'lost opportunity to compete.' This is an irreparable injury." *Magnavox*, 20 Cl. Ct. at 1379, citing *Quality Transp. Servs., Inc. v. U.S.*, 12 Cl. Ct. 276, 282 (1987); *see also Metcalf Const. Co., Inc. v. U.S.*, 53 Fed. Cl. 617, 645 (2002) (holding that the plaintiff showed irreparable harm where it would be "injured in the form of a lost opportunity to fairly compete for and perform the work under the contract"); *OTI America, Inc. v. U.S.*, 68 Fed. Cl. 646, 659 (2005) ("A loss of potential profits stemming from a lost opportunity to compete" is "sufficient to constitute irreparable harm.")

Without an equitable remedy, the only relief which can be granted to a bid protestor is damages in the amount of bid preparation costs. *Magnavox* 20 Cl. Ct. at 1379. Here, due to DLA's restrictive procurement, Infrastructure Defense was not able to prepare a proposal, and accordingly Infrastructure Defense has no proposal preparation costs. In the absence of possible monetary relief, if the Court denies Infrastructure Defense injunctive relief, the Court denies Infrastructure Defense any relief at all. *Id.* Therefore, there is no other remedy at law available to Infrastructure Defense, and Infrastructure Defense will be irreparably harmed if the Court does not enjoin the purported bridge contract. *Id.*

### C. Infrastructure Defense' Harm Outweighs the Harm to the Government and Third Parties

Neither DLA nor any third party will suffer harm if the Court enjoins DLA from proceeding with the proposed sole source purported bridge contract, because there is no present need for the required products, and the need to acquire the products is not urgent. Rather, DLA is stockpiling Concertainer. Where "the [agency] has the tools at hand to ensure that any reprocurement does not result in any significant harm to the [agency] or the public...." the Court should grant an injunction to prevent harm to the protestor. *ATA Defense Indus., Inc. v. U.S.*, 38 Fed. Cl. 489, 509 (1997).

The slow pace of the procurement to date evidences that DLA will not be harmed by a further minor delay, while the Court evaluates the merits of Infrastructure Defense's protest. The delay resulting from the injunction will therefore not unreasonably delay the procurement process, and will allow the Court sufficient time to carefully consider and address the merits of the case.

### D. An Injunction is in the Public Interest Because DLA Violated the Statutes and Regulations Intended to Promote Full and Open Competition

By issuing a sole source procurement to Hesco without any plausible justification, by failing to engage in any advanced planning to determine its actual minimum needs, by failing to provide functional specifications for its requirements, and by issuing an unreasonably large, $327,000,000 sole source procurement far exceeding the government's minimum needs, DLA has violated numerous procurement statutes and regulations, and failed to achieve free and open competition. "Violation of the procurement statutes and regulations negatively impact the entire procurement process." *Magnavox*, 20 Cl. Ct. at 1384. Granting this injunction will "ensure that

this procurement is conducted according to all applicable procurement laws and regulations," and will "uphold the integrity of the procurement process," *SAI Indus. Corp. v. U.S.*, 60 Fed. Cl. 731, 747 (2004); *Magnavox*, 20 Cl. Ct. at 1384. This is especially significant here, where the products sought are for the protection of the warfighter. Our warfighters deserve the best products.

Further, an injunction may allow Infrastructure Defense the opportunity to compete, which will provide the government with the opportunity to purchase the product that best meets its needs. "The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts. *SAI Indus. Corp.* 60 Fed. Cl. at 747 (2004). The purpose behind the Competition in Contracting Act is to ensure that the procurement officials keep the public interest in mind-- "by preserving the integrity of the procurement process and promoting competition for Government contracts." *Magnavox* 20 Cl. Ct. at 1385. Issuing a preliminary injunction will further these overriding and predominating public concerns. *Id.*

## VI. CONCLUSION

For the reasons set forth above, Plaintiff Infrastructure Defense hereby requests that the Court issue a preliminary injunction preventing DLA from awarding a sole source contract to Hesco pending resolution of this action, and any other relief that the Court deems just and equitable.

Respectfully submitted,

Date: September. 26, 2007

C. Joël Van Over
Randall M. Levine
David J. Prieto
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
(202) 373-6000 telephone
(202) 373-6001 facsimile
Attorneys for Plaintiff Infrastructure Defense Technologies

**CERTIFICATE OF SERVICE**

I hereby certify that on this day of September 26, 2007 a true and correct copy of the foregoing Motion for Preliminary Injunction and Brief in Support of the Motion for Preliminary Injunction was served by hand delivery upon:

Eley Bondurant
Trial Attorney
United States Department of Justice
Commercial Litigation Branch
8th Floor, 1100 L St. NW
Washington, DC 20530

David J. Harrington
Trial Attorney
United States Department of Justice
Commercial Litigation Branch
8th Floor, 1100 L St. NW
Washington, DC 20530

Douglas C. Proxmire
Counsel for Awardee, Hesco Bastion Ltd.
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037

September 26, 2007

Randall Mark Levine

Vendors
Federal Business Opportunities

# 56 -- 56- - Wall, Protective, Rapid Deployment

---

---

## General Information

| | |
|---|---|
| Document Type: | Presolicitation Notice |
| Solicitation Number: | SPM8E6-07-R0001 |
| Posted Date: | Apr 03, 2007 |
| Original Response Date: | |
| Current Response Date: | |
| Original Archive Date: | |
| Current Archive Date: | |
| Classification Code: | 56 -- Construction & building materials |
| Naics Code: | 332312 -- Fabricated Structural Metal Manufacturing |

## Contracting Office Address

Defense Logistics Agency, Logistics Operations, Defense Supply Center Philadelphia - Construction & Equipment, 700 Robbins Avenue, Philadelphia, PA, 19111-5096, UNITED STATES

## Description

The Defense Supply Center Philadelphia (DSCP) is a Primary Level Field Activity (PLFA) and Inventory Control Point (ICP) of the Defense Logistics Agency (DLA), Department of Defense (DoD). DSCP intends to issue a Request For Proposal (RFP) for the acquisition of 25 NSN?s (National Stock Numbers), Federal Stock Class (FSC) 5680, sole source to Hesco Bastion Ltd., Leeds, West Yorkshire, England, collectively referred to as ?Concertainer Defense Walls? under solicitation number SPM8E6-07-R-0001. The total estimated contract value for the proposed five years is $250,000,000.00. Hesco Bastion Ltd. possesses an internationally recognized design

patent for these items, which are described by reference to Hesco Bastion Ltd., part numbers only. The proposed contract will be an Indefinite Delivery Indefinite Quantity (IDIQ) type contract with a two year base period and three one-year options in support of the Army and Marines. Technically acceptable proposals will be evaluated for price reasonableness and award will be made to the lowest priced technically acceptable offeror. This acquisition is subject to the Trade Agreements Act of 1979 [see Numbered Note 12]. The solicitation will contain the DLAD clause entitled, ?Conditions for Evaluation and Acceptance Of Offers For Part Numbered Items?. Alternate offers, if submitted, will be forwarded to the Army Corps of Engineers, the Engineering Support Activity for technical evaluation [see Numbered Note 22]. An award is anticipated no later than June 12, 2007. The solicitation will be made available on www.DIBBS.BSM.DLA.MIL. From the home page, select ?Solicitations?, then search the RFP/IFB Database for the subject acquisition.

POC: Lesley F. Fuller, Acquisition Specialist, Phone 215.737.3911, Fax 215.737.2612, Email Lesley.Fuller@dla.mil

**Point of Contact**

Lesley Fuller, Contract Specialist, Phone (215) 737-3911 , Fax (215) 737-8609, Email Lesley.Fuller@dla.mil - Mary Ryan, Contract Specialist, Phone 215-737-0301, Fax 215-737-8283, Email Mary.Ryan@dla.mil

**Place of Performance**

Address: Hesco Bastion Ltd Leeds LS9 0NP United Kingdom
Country: UNITED KINGDOM

Register to Receive Notification

---

Government-wide Numbered Notes
**You may return to Business Opportunities at:**

- DLA J3 listed by [Posted Date]
- DLA Agencywide listed by [Posted Date]

---

[Home] [SEARCH synopses] [Procurement Reference Library]

# 56- -Concertainer Defense Wall

Government Loan
$150,000 loan for $381/month. Apply online today!
Refinance.Low.com

GSA Contract Services
25+ yrs experience, friendly staff $2,995 complete, no hidden charges
www.gsaproposal.com

Dell™ State & Local Gov't
Get Gov't Pricing on Powerful Dell™ Powered by Intel® Centrino® Duo
www.Dell.com

Ads by Goooooogle

Advertise

# 56- -Concertainer Defense Wall

## General Information

| | |
|---|---|
| Document Type: | SNOTE |
| Posted Date: | Jan 23, 2007 |
| Category: | Construction and Building Materials |
| Set Aside: | N/A |

## Contracting Office Address

Defense Logistics Agency, Logistics Operations, Defense Supply Center Philadelphia - Construction & Equipment, 700 Robbins Avenue, Philadelphia, PA, 19111-5096, UNITED STATES

## Description

The Defense Supply Center Philadelphia (DSCP) is a Primary Level Field Activity (PLFA) and Inventory Control Point (ICP) of the Defense Logistics Agency (DLA), Department of Defense (DoD). DSCP intends to extend contract SP0500-04-D-0239, for a period not to exceed eight months from its terminal date while the new unrestricted initiative is pending. The contract will be extended from February 11, 2007 to October 11, 2007. The Hesco contract is an indefinite quantity contract for the supply of various items, collectively referred to as ?Concertainer Defense Walls? in support of the Army and Marines. Based on available data from the effective date of contract, the estimated value for the extension is $150,000,000. Hesco Bastion, Ltd. is the incumbent and will be retained for the extension based on the existing requirement to supply these items without interruption. POC: Lesley F. Fuller, Contract Specialist, Phone 215.737.3911, Fax 215.737.2612, Email Lesley.Fuller@dla.mil

## Original Point of Contact

## Place of Performance

**Address:**
HESCO BASTION, LTC., UNIT 37 KNOWSTHORPE GATE, CROSS GREEN INDSTL

EST, LEEDS LS9 0NP, UNITED KINGDOM
, UNITED KINGDOM

**Bookmark This Notice**

## AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF PAGES 1

2. AMENDMENT/MODIFICATION NO.: P000014
3. EFFECTIVE DATE: 07 Sep 17
4. REQUISITION/PURCHASE REQ. NO.:
5. PROJECT NO. (If applicable):

6. ISSUED BY — CODE SPM5E1

DEFENSE SUPPLY CENTER PHILADELPHIA
DSCP-PEPCBE2 (L.F.FULLER)
700 ROBBINS AVENUE
PHILADELPHIA, PA 19111-5096

7. ADMINISTERED BY (If other than Item 6) — CODE SUK12A

DCMA Northern Europe United Kingdom
PSC 836 BOX 55
FPO AE 09420-0055
US

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

HESCO BASTION LTD
UNIT 37 KNOWSTHORPE GATE
LEEDS LS9 ONP

CODE | FACILITY CODE

(X) | 9A. AMENDMENT OF SOLICITATION NO.
☐ 9B. DATED (SEE ITEM 11)
☒ 10A. MODIFICATION OF CONTRACT/ORDER NO.: SPM500-04-D-0239
10B. DATED (SEE ITEM 13): Feb 13, 2004

### 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment your desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

### 13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| ☐ | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| ☐ | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| ☒ | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: 43.103 |
| ☐ | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

This modification establishes a bridge contract for the continued support of 24 NSNs collectively known as "Concertainer Defense Walls". The effective period of this bridge contract is from 17 September 2007 through 16 December 2007. This bridge contract also contains provisions for two 90-day extensions in the amount of $195,000,000.00 each. Total maximum value of this bridge contract including the two options is $717,000,000.00.

All other terms and conditions remain the same.

The estimated maximum value of this bridge contract is $327,000,000.00.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print): PATRICIA LAIDLER - GENERAL MANAGER
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): LESLEY F. FULLER, CONTRACTING OFFICER

15B. CONTRACTOR/OFFEROR: [signature] (Signature of person authorized to sign)
15C. DATE SIGNED: 14.9.07
16B. UNITED STATES OF AMERICA: Lesley F. Fuller (Signature of Contracting Officer)
16C. DATE SIGNED: 09/14-07

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243

**Average Quarterly Purchases of HESCO BASTION by DLA**



**Document Retrieval Result** Westlaw.

Filtration Development Co., LLC v. U.S.
60 Fed.Cl. 371
Fed.Cl.,2004.
Apr 27, 2004

60 Fed.Cl. 371

**Motions, Pleadings and Filings**

United States Court of Federal Claims.
FILTRATION DEVELOPMENT CO., LLC, Plaintiff,
v.
The UNITED STATES, Defendant.
No. 03-2835C.
Originally Filed Under Seal April 13, 2004.
Reissued For Publication April 27, 2004.

**Background:** Disappointed offeror filed post-award bid protest against the United States.

**Holdings:** On cross-motions for judgment on the administrative record, as well as plaintiff's request for a permanent injunction, the Court of Federal Claims, Futey, J., held that:
(1) actual organizational conflict of interest (OCI) existed where contractor performed systems engineering and technical direction (SETA) tasks for procurement in which one of its divisions received sole source contract award for supply of helicopter engine filter kits;
(2) Army properly invoked "unusual and compelling urgency" exception to the full and open competition requirement of the Competition in Contracting Act (CICA) to make sole-source procurement of 183 "A kits" and 150 "B kits"; and
(3) Army would be enjoined to conduct any procurement in excess of those amounts on a competitive basis unless an independent justification for invoking an exception to full and open competition was provided.

Motions granted in part and denied in part.

West Headnotes

[1] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.60 Judicial Remedies and Review, Disappointed Bidders
393k64.60(3) Scope and Standards of Review or Inquiry
393k64.60(3.1) k. In General. Most Cited Cases

393 United States KeyCite this headnote
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.60 Judicial Remedies and Review, Disappointed Bidders
393k64.60(3) Scope and Standards of Review or Inquiry
393k64.60(4) k. Rationality or Reasonableness; Arbitrariness or Capriciousness.

Most Cited Cases

A bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.

[2] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.60 Judicial Remedies and Review, Disappointed Bidders
393k64.60(3) Scope and Standards of Review or Inquiry
393k64.60(4) k. Rationality or Reasonableness; Arbitrariness or Capriciousness.
Most Cited Cases

In bid protest, to determine whether the agency has acted arbitrarily and capriciously, the court must determine whether: (1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes and regulations were violated.

[3] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.40 Acceptance or Rejection
393k64.40(1) k. In General; Evaluation Process. Most Cited Cases

With respect to an agency's procurement action, the agency is given wide discretion in the application of procurement regulations.

[4] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.60 Judicial Remedies and Review, Disappointed Bidders
393k64.60(3) Scope and Standards of Review or Inquiry
393k64.60(3.1) k. In General. Most Cited Cases

In procurement matter, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions.

[5] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.60 Judicial Remedies and Review, Disappointed Bidders
393k64.60(3) Scope and Standards of Review or Inquiry
393k64.60(4) k. Rationality or Reasonableness; Arbitrariness or Capriciousness.
Most Cited Cases

As long as a rational basis is articulated, and relevant factors are considered, an agency's procurement actions must be upheld.

[6] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.60 Judicial Remedies and Review, Disappointed Bidders
393k64.60(3) Scope and Standards of Review or Inquiry
393k64.60(4) k. Rationality or Reasonableness; Arbitrariness or Capriciousness. Most Cited Cases

The disappointed bidder in a bid protest action bears a heavy burden of showing that the award decision had no rational basis.

[7] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.55 Rights and Remedies of Disappointed Bidder
393k64.55(1) k. In General. Most Cited Cases

When a bid protestor is asserting a violation of regulation or procedure, the protestor must show a clear and prejudicial violation of applicable statutes or regulations.

[8] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.55 Rights and Remedies of Disappointed Bidder
393k64.55(1) k. In General. Most Cited Cases

To prevail in a bid protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.

[9] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.55 Rights and Remedies of Disappointed Bidder
393k64.55(1) k. In General. Most Cited Cases

To establish prejudice, a bid protestor must demonstrate that but for the alleged error, there was a substantial chance it would have received the award.

[10] KeyCite this headnote

393 United States
393III Contracts

393k64 Proposals or Bids for Contracts
393k64.15 k. Preferences; Conditions and Restrictions on Bidders. Most Cited Cases

Determination of contracting officer (CO) regarding whether an acquisition involves a significant organizational conflict of interest will be overturned only on a showing of unreasonableness. 48 C.F.R. § 9.504.

[11] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.15 k. Preferences; Conditions and Restrictions on Bidders. Most Cited Cases

Actual organizational conflict of interest (OCI) existed where contractor performed systems engineering and technical direction (SETA) tasks for procurement in which one of its divisions received sole source contract award for supply of helicopter engine filter kits, and presumption of harm to the procurement process and prejudice arose from contractor's dual role which was not rebutted by existence of unsigned and unapproved mitigation plans contractor submitted to contracting officer (CO). 48 C.F.R. §§ 9.505-1(a), 9.508(a).

[12] KeyCite this headnote

393 United States
393III Contracts
393k64 Proposals or Bids for Contracts
393k64.10 k. Necessity for Submission to Competition. Most Cited Cases

Army properly invoked the "unusual and compelling urgency" exception to the full and open competition requirement of the Competition in Contracting Act (CICA) to make sole-source procurement of helicopter engine filter kits based on urgent need to acquire filters for helicopters deployed to Iraq during Operation Iraqi Freedom; however, Army through its actions revealed that emergency situation encompassed only 183 "A kits" and 150 "B kits." 10 U.S.C.A. § 2304(c)(2).

[13] KeyCite this headnote

212 Injunction
212II Subjects of Protection and Relief
212II(E) Public Officers and Entities
212k86 k. Unauthorized or Fraudulent Improvements or Contracts. Most Cited Cases

To obtain injunctive relief, a bid protestor must succeed on the merits and prove that: (1) it will suffer irreparable harm if the injunction is not awarded; (2) granting relief serves the public interest; and (3) the harm it will suffer outweighs the harm to the government and third parties.

[14] KeyCite this headnote

212 Injunction
212II Subjects of Protection and Relief
212II(E) Public Officers and Entities
212k86 k. Unauthorized or Fraudulent Improvements or Contracts. Most Cited Cases

Bid protestor who prevailed on merits of claim that Army procurement of helicopter engine

filters did not adhere to organizational conflict of interest (OCI) requirements and exceeded permissible bounds of the unusual and compelling urgency exception of the Competition in Contracting Act (CICA) was not entitled to injunctive relief with respect to 183 "A kits" and 150 "B kits" for which funding had been allocated and delivery schedule had been set, as that order was justified by needs of Operation Iraqi Freedom; however, Army would be enjoined to conduct any procurement in excess of those amounts on a competitive basis unless an independent justification for invoking an exception to full and open competition was provided. 10 U.S.C.A. § 2304(c)(2).

***372** Robert S. Metzger, Washington, D.C., attorney of record for plaintiff, and Bryan Arnold and Mary Ita Snyder, of counsel.

David A. Harrington, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant. David M. Cohen, Director, and Robert E. Kirschman, Jr., Assistant Director.

Mike Lonsberry, U.S. Department of the Army, of counsel.

## *OPINION and ORDER*

FUTEY, Judge.

This post-award bid protest case is before the court on the parties' corresponding cross-motions for judgment on the administrative record, as well as plaintiff's request for a permanent injunction. Difficult questions pertaining to balancing the level of deference that should be afforded to military decisions with the enforcement of statutory and regulatory procurement laws are addressed herein. In this regard, the parties have raised numerous persuasive and thought provoking arguments which can be categorized into three predominate sections. First, the parties dispute whether the contracting officer ***373** (CO) adhered to pertinent Organizational Conflict of Interest (OCI) regulations. Second, the United States Department of the Army's (Army) compliance with the requirements applicable to the invocation of the unusual and compelling urgency exception to the Competition in Contracting Act (CICA) has been placed in question. Third, the parties dispute whether plaintiff has clearly and convincingly demonstrated its entitlement to the extraordinary remedy of a permanent injunction.

*Factual Background* [FN1]

FN1. The facts of this case were discussed in detail in the court's previous opinion on defendant's motion to dismiss. See *Filtration Dev. Co., LLC v. United States,* 59 Fed.Cl. 658, 659-60, 2004 WL 223988, at *1-2 (Fed.Cl. Feb.3, 2004). The undisputed factual assertions are repeated herein and supplemented where necessary to provide additional information pertinent to this opinion.

Throughout the opinion, repeated references are made to engine inlet barrier filter (IBF) systems and so-called "A kits" and "B kits" which comprise the bulk of the system. The Army, defendant, has been on notice for several years, and it is undisputed, that the installation of a filter system significantly reduces damage caused by the ingestion of sand and foreign particles. The Army has twice sought to develop a solution, but both attempts proved unsuccessful. In this context, the IBF is attached to the UH-60 Blackhawk helicopter engine. The UH-60 helicopters to which the filter system will be attached are primarily scheduled to head toward the harsh desert terrain in Iraq. The helicopters being replaced in the combat theater were heavily damaged by the conditions. The "A kits" and "B kits" will work in tandem to counter the corrosive and deteriorating effects of sand particles. Each helicopter is first fitted with an "A kit," which serves a dual purpose: (1) it is the hardware to which the filter system is mounted, and (2) it permits monitoring of the filter system. The "B kit" is the actual interchangeable filter. The filtration system, therefore, requires both an "A kit" and a "B kit."

Pursuant to a previously awarded contract, No. DAAH23-02-C-0006 (Blackhawk Production Contract), Sikorsky Aircraft Company (Sikorsky) is responsible for designing, developing and

manufacturing the UH-60 Blackhawk helicopter. On July 23, 2003, under a different contract, Sikorsky was directed to conduct an engine filtration trade study. The trade study contemplated that Sikorsky would evaluate, in addition to two concepts chosen at its discretion, a design concept developed by Aerospace Filtration Systems (AFS), a division of Westar Corporation (Westar). In August 2003, however, the trade study was suspended and Sikorsky was directed to immediately begin incorporating the AFS design.

The parties contest two factual aspects of the August 2003 decision. First, the parties dispute whether Sikorsky was specifically directed to use the AFS design. In this regard, while the December 2003 contract modification does not expressly acknowledge such a requirement, two separate statements in the administrative record lead to an opposite conclusion. [FN2] Second, the parties dispute how the suspension came about. In the same statements referenced above, defendant contends that the decision to suspend the trade study was the result of an Army directive requiring that the acquisition of IBFs be expedited. As plaintiff correctly points out, however, the actual August 2003 directive is not included in the administrative record.

FN2. Administrative Record (AR) Exhibit (Ex.) A ¶ 3; AR Ex. O at 2.

October 2003 proved to be an extremely important month in the context of this procurement. On October 9, 2003, a directive was issued in which the Army concluded that "installation of BLACK HAWK main engine barrier filters was required for ... deployment not later than [March 2004] to ensure required readiness in theater." [FN3] Further, the CO attended several meetings with Utility Helicopters Project Management Office (UHPMO) personnel and it was estimated that the number of aircraft scheduled for ***374** deployment, and in turn, the number of IBF kits needed, was 240. [FN4]

FN3. Supplemental Administrative Record (SUP AR) at 0003.

FN4. AR Ex. A ¶ 3.

The Army invoked the unusual and compelling urgency exception to full and open competition to procure the IBFs. [FN5] 10 U.S.C. § 2304(c)(2); 48 C.F.R. § 6.302-2(a)(2). The Justification and Approval (J & A) executed on November 5, 2003, and approved on November 10, 2003, provided that the United States Army Aviation Missile Command "propose[d] to acquire, utilizing an acquisition method other than full and open competition, 240 IBF Desert Kits." [FN6] The J & A also noted, *inter alia,* that (1) the kits would substantially reduce engine deterioration, (2) Sikorsky was the only contractor that could complete the assignment within the requisite time frame, and (3) "[s]ince these operations began, 400 engines have been removed/replaced at an approximate cost of $300 [million]." [FN7] In addition, the J & A provided that the IBF kits will be labeled "Special Mission Kits and ... will be flown under an Airworthiness Release (AWR)." [FN8] The total cost of the procurement was estimated at $40.8 million.

FN5. *Id.* Ex. C ¶ 4.

FN6. *Id.* Ex. C ¶ 3.

FN7. *Id.* Ex. C ¶ 5(d).

FN8. *Id.* Ex. C ¶ 7.

As these events occurred, antecedent and parallel events giving rise to plaintiff's OCI claim were also taking form. In May 2000, Westar was the recipient of an Omnibus 2000 contract (O2K). Under the contract's Statement of Work, Westar was responsible for performing systems engineering and technical direction (SETA) tasks. [FN9] Westar's contemplated responsibilities under the O2K specifically included "Propulsion Systems/Technology." [FN10] In addition, according to plaintiff, Westar has received four task orders under the O2K in connection with the propulsion system for the UH-60 Blackhawk helicopter. Task Order 23 has drawn the most attention from the parties. Although the particulars of Task Order 23 are laid out in detail in the administrative record, defendant has conceded that the "scope of work under Task Order 23 includes '[p]ropulsion systems support' with respect to 'engine barrier filters.' " [FN11] Defendant's main objection to both the O2K and the accompanying task orders is not premised on the scope of work, rather defendant argues that the documents do not show the work that was actually tasked or performed under the contract. [FN12]

FN9. *Id.* Ex. S ¶ 2.0 (General Technical Requirements), ¶ 3.19 (Systems Engineering).

FN10. *Id.* Ex. S ¶ 3.17.

FN11. Compare Plaintiff's Statement Of Facts ¶ 46 with Defendant's Counter-Statement Of Facts ¶ 46.

FN12. Defendant's Counter-Statement Of Facts ¶¶ 38-40; see AR Ex. Y.

In a report dated May 16, 2003, Westar noted that it had "[p]repared for and participated in meetings to generate Propulsion-related project ideas. Explored Westar capabilities and problem areas in the Army aircraft fleet to plan future projects." [FN13] Plaintiff argues that what occurred next was a result of the above-mentioned work, whereas defendant maintains that the proximity of the two events was pure coincidence. On May 27, 2003, AFS made a presentation to the Army concerning "Inlet Barrier Filter (IBF) Systems for the H-60 Helicopter Main Engine Inlet." [FN14]

FN13. SUP AR 0086.

FN14. *Id.* 0015-0033.

Returning to the fall of 2003, the various COs' actions in response to OCI concerns warrant attention. After the trade study was suspended in August 2003, a CO for the O2K apparently recognized the conflict and sought to implement precautionary measures. The extent of the CO's actions are reflected in the administrative record through two unsigned and unapproved mitigation plans. [FN15] The CO for the IBF contract, following correspondence from plaintiff's counsel, twice discussed the allegations of an OCI with Army personnel. The CO was informed that the Army had recognized the ***375** conflict and that the appropriate measures were in place. On the basis of these representations, the CO concluded that a significant potential OCI

did not exist.

FN15. *Id.* 0133-0140, 0142-0147.

On December 15, 2003, the Army executed a contract modification to Sikorsky's Blackhawk Production Contract and procured, *inter alia,* 183 "A kits" and 150 B kits. [FN16] The deliveries are scheduled to take place from March through July of 2004, with an incentive for accelerated deliveries. As of the date of this opinion, several developments have transpired. The IBF kit design was finalized and an airworthiness release certificate was issued. [FN17] In addition, although it does not appear that the overall delivery schedule will be affected, the initial deliveries have been pushed back approximately three weeks due to unexpected engineering difficulties. [FN18]

FN16. AR Ex. K.

FN17. Transcript of Oral Argument (Tr.) at 38-39.

FN18. *Id.*

Prior to the December 15, 2003, contract modification being finalized, plaintiff had met with Army officials on several occasions to express its interest in providing IBF systems for the UH-60 Blackhawk helicopter. Despite the inquiries, meetings, phone calls, and emails, its efforts were to no avail. Plaintiff filed suit in this court on December 18, 2003. The court immediately placed the matter on an expedited schedule. After the parties completed their briefings, the court held oral argument on defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Given the need for an expeditious resolution of the matter, defendant filed the administrative record on January 28, 2004. On February 2, 2004, the court denied defendant's motion to dismiss reasoning that it could exercise jurisdiction over plaintiff's allegations of procedural violations of CICA as well as OCI regulations. Defendant supplemented the administrative record on February 24, 2004. The parties filed simultaneous cross-motions for judgment on the administrative record on February 26, 2004. The parties filed their responses on March 4, 2004, and their replies on March 11, 2004. The court held oral argument on March 31, 2004.

In the interim, on March 2, 2004, plaintiff filed an amended complaint. In its prayer for relief, plaintiff, in pertinent part, asks the court for: (1) declaratory judgment that the procurement was in contravention of law and regulation; (2) permanent injunction limiting the current procurement to only the minimum amount necessary to satisfy the current emergency situation; (3) permanent injunction directing defendant to procure any amount over the minimum on a competitive basis; (4) permanent injunction preventing defendant or Sikorsky from awarding any subsequent contracts to either Westar or its affiliates for a time period no shorter than the duration of Westar's current O2K; and (5) permanent injunction precluding AFS from participating in the re-instituted trade study. [FN19]

FN19. Amended Complaint (Amend.Compl.) at 17.

*Discussion*

Motions for judgment on the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; see *Nickerson v. United States,* 35

Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. ***376** *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It, therefore, does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992)).

[1] Congress amended the Tucker Act in 1996 by granting this court jurisdiction to hear post-award bid protest actions. 28 U.S.C. § 1491(b)(4). The court reviews the challenged agency decisions according to the standards set out in the Administrative Procedures Act (APA), 5 U.S.C. § 706. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001) (citations omitted). In particular, the court must determine whether the agency's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). A bid award may be set aside, therefore, "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa,* 238 F.3d at 1332 (citations omitted).

[2] In determining whether the agency has acted arbitrarily and capriciously toward plaintiff, the court must consider four factors. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974). Specifically, the court must determine whether: (1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes and regulations were violated. *Id.;* see also *Aero Corp., S.A. v. United States,* 38 Fed.Cl. 739, 749 (1997). There is, however, "no requirement or implication ... that each of the factors must be present in order to establish arbitrary and capricious action by the government." *Prineville,* 859 F.2d at 911. The court must also "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3).

[3][4][5] When reviewing agency action, the APA requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415-16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In examining an agency's procurement action, the agency is given wide discretion in the application of procurement regulations. *Bellevue Bus Serv., Inc. v. United States,* 15 Cl.Ct. 131, 133 (1988); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable

minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). Indeed, "[t]he court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." ***377** *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). As long as a rational basis is articulated, and relevant factors are considered, the agency's actions must be upheld. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285-86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

[6][7][8][9] The "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.' " *Impresa,* 238 F.3d at 1333 (citing *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994)). When a protestor is asserting a violation of regulation or procedure, "the disappointed bidder must show a 'clear and prejudicial violation of applicable statutes or regulations.' " *Id.* (citing *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973); *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)). Moreover, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). To establish prejudice, a protestor must demonstrate that but for the alleged error, there was a substantial chance it would have received the award. *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996).

I. Organizational Conflict of Interest

Plaintiff advances a litany of arguments purporting to demonstrate violations of OCI regulations. Plaintiff maintains that the CO failed to adhere to procedural requirements. Plaintiff asserts that the CO did not take any actions to address the OCI until after plaintiff's counsel brought the issue to her attention. Plaintiff contends that the CO's determination that no significant potential OCI existed was unreasonable. Further, plaintiff avers that the CO cannot abdicate her responsibilities under the Federal Acquisition Regulations (FAR) simply because government personnel represented that the conflict had been addressed through the submission of mitigation plans. In this regard, plaintiff maintains that the mitigation plans were inadequate and that there is no evidence that the mitigation plans were executed. Building upon its argument that a significant OCI existed, plaintiff contends that the CO failed to obtain approval for a mitigation plan from the appropriate personnel.

Defendant asserts that the CO fully complied with her responsibilities under the FAR. Defendant contends that the CO was only required to act before the time of contract award, which she did. Defendant maintains that the CO properly consulted government personnel first in examining a possible conflict. Defendant also avers that because the government personnel had implemented appropriate precautionary measures, the CO's conclusion that no significant conflict of interest existed was reasonable. Further, defendant asserts that once the CO determined that no significant OCI was present, no further action was required on her part.

[10] The responsibility for ascertaining whether an actual or potential conflict of interest exists generally rests with the CO. 48 C.F.R. § 9.504(a). The CO is instructed to "[i]dentify and evaluate potential organizational conflict of interest *as early in the acquisition process as possible* ...." *Id.* § 9.504(a)(1) (emphasis added). For assistance in making this determination, the CO "should obtain the advice of counsel and the assistance of appropriate technical specialists ...." *Id.* § 9.504(b); see also *id.* § 9.506(a) (explaining that the CO "first should seek the information from within the Government ..."). The CO is not required to take additional steps if there is a determination that no significant conflict exists. *Id.* § 9.506(b); see also *id.* § 9.504(d) ("The [CO's] judgment need be formally documented only when a substantive issue concerning potential [OCIs] exists."). If the CO determines that a significant potential OCI may be present, however, certain steps must be taken before a solicitation is issued. *Id.* § 9.506(b). Amongst these steps, the CO must proffer a "recommended course of action for avoiding, neutralizing, or mitigating the conflict" to the head of the contracting activity or the chief of the contracting office. *Id.* § 9.506(b)(1); see also *id.* § 9.504(c). The conflict must be resolved in the appropriate fashion prior to the contract being awarded. *Id.* §§ 9.506(d)(3), 9.504(a)(2); see also ***378** *LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham,* 347 F.3d 315, 321 (D.C.Cir.2003). A CO's determination regarding whether the acquisition involves a significant conflict will be overturned only on a showing of unreasonableness. *Informatics Corp. v. United*

*States,* 40 Fed.Cl. 508, 513 (1998).

[11] The identification of the OCI in this case did not occur "as early in the acquisition process as possible ...." 48 C.F.R. § 9.504(a)(1). There was no recognition of any conflict in May 2003 when the Army began its discussions with AFS, despite clear signs that AFS was a division of Westar. [FN20] Likewise, in August 2003, noticeably lacking were any conflict concerns when UHPMO suspended the trade study and directed Sikorsky to "immediately begin design activity to incorporate the AFS filter system onto UH-60 aircraft." [FN21] Although defendant argues that the CO complied with her obligations because she determined that a significant OCI did not exist prior to the contract modification being executed, defendant overlooks that Sikorsky was incorporating AFS's design from August 2003 until October 2003 without any properly approved OCI safeguards. Contrary to defendant's assertions, such an assessment concerning any possible significant OCI would not have been overly premature. The FAR expressly contemplates that when analyzing significant potential OCIs, the determination occur prior to a solicitation being issued. 48 C.F.R. § 9.506(b). Further, the multiple unsigned mitigation plans contained in the administrative record do little to support defendant's position that the conflict was resolved prior to contract award.

FN20. SUP AR 0015-0033.

FN21. AR Ex. A ¶ 3.

The CO's determination that a significant OCI did not exist is contradicted by the record. The CO did properly contact other government personnel to apprise her of the situation. 48 C.F.R. § 9.506(a). Those personnel informed her that they recognized the potential for a conflict of interest. [FN22] Their conclusion was buttressed by Westar's submission of at least two proposed mitigation plans. It is, therefore, safe to conclude that all those involved recognized the significant conflict. The CO, however, exceeded her authority by concluding that the appropriate safeguards were in place to eliminate the conflict. According to the FAR, that is not a decision the CO is empowered to make. 48 C.F.R. § 9.506(b). The authority to "[a]pprove, modify, or reject the [recommended course of action for avoiding, neutralizing, or mitigating the conflict]" rests with the chief of the contracting office. *Id.* § 9.506(b)- (d). Accordingly, the CO failed to abide by the procedures set forth in § 9.506.

FN22. SUP AR 0001.

Plaintiff also maintains that Westar, through AFS, is precluded from providing the IBF kits because Westar provides SETA services under its O2K. Plaintiff contends that Westar possesses an unfair competitive advantage through its access to information not available to other bidders, in particular source selection information. Further, plaintiff avers a significant OCI exists in light of Westar's vested interest in having AFS supply the IBF kits. Plaintiff also asserts that prejudice is presumed upon a finding of an actual OCI.

Defendant avers that there is no significant OCI because Westar never actually performed any work under either the O2K or the task orders in connection with the UH-60 Blackhawk helicopter or its propulsion system. Relying on the same line of reasoning, defendant argues that an actual OCI did not arise. Defendant also maintains that plaintiff's "unfair competitive advantage" argument is based on nothing more than speculation and borders on frivolous.

Given the "highly influential and responsible position" of contractors performing systems engineering and technical direction, 48 C.F.R. § 9.505- 1(b), the FAR contains the following explicit prohibition:

A contractor that provides systems engineering and technical direction for a system but does not have overall contractual responsibility for its development, its integration, assembly, and

checkout, or its production *shall not* (1) be awarded a contract to supply the system or any of its major ***379** components or (2) be a subcontractor or consultant to a supplier of the system or any of its major components.

*Id.* § 9.505-1(a) (emphasis added); see also *Vantage Assocs., Inc. v. United States,* 59 Fed.Cl. 1, 10 (2003). Defendant appears to concede that Westar contracted to provide SETA services for the UH-60 propulsion system, but devotes significant attention to arguing that Westar did not perform any work pertaining to IBFs under the O2K. Specifically, defendant maintains that Task Order 23 only enumerates the work that could have been performed and does not enumerate the work that was actually performed. Defendant also submits a declaration that provides that Westar "did not received [sic] any taskings under their O2K contract task orders to provide any support, analysis, evaluation, development, or any other effort in connection with Engine [IBFs] on the UH-60 Blackhawk aircraft." [FN23] Defendant's argument misses the point.

FN23. AR Ex. Y.

The FAR prohibits a SETA contractor, as either a prime contractor or a subcontractor, from supplying any of the system's major components, without regard to whether work was performed as to that particular component. 48 C.F.R. § 9.508(a). The FAR's prohibition is clarified in the following illuminating example: "Company A *agrees to provide* systems engineering and technical direction for the Navy on the powerplant for a group of submarines .... *Company A should not be allowed to supply any powerplant components.*" 48 C.F.R. § 9.508(a) (emphasis added). Westar agreed to provide SETA services concerning UH-60 propulsion systems under its O2K. [FN24] For example, Westar "[p]repared for and participated in meetings to generate Propulsion-related project ideas. Explored Westar capabilities and problem areas in the Army aircraft fleet to plan future projects." [FN25] Westar also "[p]rovided input on the rewrite of the Airworthiness Impact Statement" [FN26] and "[r]eviewed Standard Operating Procedures on the new Airworthiness Impact Statement Document." [FN27] Applying the reasoning of § 9.508(a), Westar or its affiliates were categorically precluded from supplying any propulsion system components. Simply put, Westar was improperly "in a position to make decisions favoring its own products or capabilities." 48 C.F.R. § 9.505-1(b). Through its contractual obligation to provide SETA services and through AFS's contractual obligations to provide IBFs, Westar as an entity occupied an impermissible dual role and an actual OCI, therefore, arose. *Matter of: Aetna Gov't Health Plans, Inc.*, B-254397.15, 95-2 CPD ¶ 129, at 18, 1995 WL 449806, at *11 (Comp.Gen. July 27, 1995) (explaining that the entity's "dual role [ ] placed it in an actual organizational conflict of interest because of the prospect that it would be unable to render impartial advice ..."). [FN28]

FN24. *Id.* Ex. S ¶ 3.17; *Id.* Ex. V ¶ 3.2.2.

FN25. SUP AR 0086.

FN26. *Id.* at 0085.

FN27. *Id.* at 0091.

FN28. Decisions of the Comptroller General in procurement cases are not binding on this court, nevertheless, the court may consider and adopt their reasoning in recognition of the Comptroller General's expertise and role in the resolution of contested procurement

decisions. *Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 308 n. 14 (2002).

Plaintiff is, therefore, entitled to benefit from the presumption of harm/prejudice. *Id.* at 12, 1995 WL 449806, at *11 (citing *NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 376 (Fed.Cir.1986), *Compliance Corp. v. United States,* 22 Cl.Ct. 193 (1990), *aff'd,* 960 F.2d 157 (Fed.Cir.1992)); see also *Matter of: DZS/Baker LLC,* B-281224, 99-1 CPD ¶ 19, at 7, 1999 WL 46706, at *4 (Comp.Gen. Jan.12, 1999) ("[W]e note that there is a presumption of prejudice ... where a conflict of interest, other than a de minimis or insignificant matter is not resolved."). Although defendant maintains that the presumption can be rebutted through the implementation of adequate safeguards, the argument loses its persuasiveness given the court's conclusion concerning Westar's mitigation plans. While the court does not question the credibility or integrity of Westar to voluntarily comply with the recommended precautionary measures, the court cannot allow an unsigned ***380** and unapproved mitigation plan to stand. Therefore, a presumption of harm to the procurement process and prejudice accompanies Westar's dual role.

Several of plaintiff's remaining contentions deserve attention. First, plaintiff alleges that an OCI exists because of Westar's vested interest in ensuring that AFS remains a financially sound institution and because of the possibility that Westar obtained information from the Army that was not available to other bidders. Plaintiff's allegations appear to be considerations that would be encompassed within 48 C.F.R. § 9.505-1(a). These concerns would be present in any instance where a contractor is providing SETA services and an affiliate at the same time provides the underlying major component.

Second, the court does not believe that plaintiff has satisfied 48 C.F.R. § 9.505(b)(1)-(2). The United States Court of Appeals for the Federal Circuit (Federal Circuit) has made clear that conflict violations must be established through "hard facts." *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1582 (Fed.Cir.1983). [FN29] Plaintiff has not provided any factual basis upon which to conclude that Westar possessed "[p]roprietary information that was obtained from a Government official without proper authorization." 48 C.F.R. § 9.505(b)(1). Next, besides stating that Westar had "potential access to source selection information," [FN30] plaintiff has provided no "hard facts" that Westar possessed said material. 48 C.F.R. § 9.505(b)(2). Accordingly, this argument fails.

FN29. Consistent with the court's holding concerning the presumption of prejudice, "hard facts" are only required to "establish the existence of the [OCI], [but] not the specific impact of that conflict." *Aetna,* B-254397.15, 95-2 CPD ¶ 129, at 18, 1995 WL 449806, at *12.

FN30. Plaintiff Filtration Development Company's Motion For Judgment On The Administrative Record (Pl.'s Mot.) at 15.

II. Unusual and Compelling Urgency

[12] Plaintiff asserts that defendant improperly invoked CICA's unusual and compelling urgency exception. Plaintiff maintains that the actual reasons behind the exception's invocation were a lack of advance planning and funding concerns. Plaintiff avers that the J & A does not adequately justify a sole source award to AFS. Further, plaintiff contends that the J & A does not adequately address the harm to the government. Plaintiff also questions the timing of the J & A. In addition, plaintiff asserts that defendant did not "request [offers] from as many potential sources as is practicable under the circumstances." [FN31] Plaintiff maintains that defendant procured more than the "minimum quantity needed to satisfy the immediate urgent requirement." [FN32] Plaintiff avers that the invocation of the unusual and compelling urgency exception must be temporally limited to the impending emergency period and that the current

procurement in its entirety has exceeded that time frame. Lastly, plaintiff contends that defendant failed to conduct market research.

FN31. *Id.* at 25 (quoting 10 U.S.C. § 2304(e)).

FN32. *Id.* (quoting *Matter of: Signals & Sys., Inc.,* B-288107, 2001 CPD ¶ 168, at 12, 2001 WL 1150705, at *9 (Comp.Gen. Sept.21, 2001)).

Defendant asserts that plaintiff conceded in its complaint that there is an urgent need for the filters. Defendant nevertheless maintains that the current emergency was caused by the harsh desert conditions encountered in Operation Iraqi Freedom. Defendant also avers that the J & A was approved in a timely fashion. In addition, defendant contends that the substance of the J & A adequately addresses the need for the filters and the possible harm from any delay in procurement. Defendant also asserts that it was impracticable to seeks offers from other sources given the time constraints and Sikorsky's qualifications. Defendant maintains that authorization for the procurement of 240 IBF kits is based on an estimate of the number of aircraft to be deployed in the next troop rotation and, therefore, does not exceed the minimum amount necessary to satisfy the current emergency. Defendant also maintains that the full amount of funding for ***381** the IBF kits has not yet become available due to statutory constraints.

CICA requires an agency to conduct its procurements through "full and open competition." 10 U.S.C. § 2304(a)(1)(A). As with most rules, the mandate is not absolute and is subject to several exceptions. Most pertinent to the present controversy is the unusual and compelling urgency exception. *Id.* § 2304(c)(2). Specifically, the exception reads as follows:

The head of an agency may use procedures other than competitive procedures only when ... (2) the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals.

*Id.;* 48 C.F.R. § 6.302-2(a)(2). Noticeably, the provision only allows an agency the option of "limit[ing] the number of sources;" it does not permit the agency to simply disregard competition. The preference for optimizing competition is further reiterated in § 2304(e), which provides, in pertinent part, that "[t]he head of an agency using procedures other than competitive procedures ... by reason of the application of subsection (c)(2) ... shall request offers from as many potential sources as is practicable under the circumstances." 10 U.S.C. § 2304(e); 48 C.F.R. §§ 6.301(d), 6.303- 2(c)(2); see also *Aero Corp. v. Dep't of the Navy,* 540 F.Supp. 180, 207 (D.D.C.1982). In addition, invocation of the unusual and compelling urgency exception may not be "justified on the basis of (1) a lack of advance planning by the requiring activity or (2) concerns related to the amount of funds available (e.g., funds will expire) to the agency or activity for the acquisition of supplies or services." 48 C.F.R. § 6.301(c); 10 U.S.C. § 2304(f)(5).

Several inherent limitations as to scope and duration have also been acknowledged. The court has recognized that "the agency [must] take reasonable steps to accurately determine its needs and describe them." *Filtration Dev. Co., LLC v. United States,* 59 Fed.Cl. 658, 663-64 (2004) (quoting *Matter of: Signals & Sys., Inc.,* B-288107, 2001 CPD ¶ 168, at 12, 2001 WL 1150705, at * 9 (Comp.Gen. Sept.21, 2001)). The court also emphasized that "the urgency justification cannot support the procurement of more than a minimum quantity needed to satisfy the immediate urgent requirement." *Id.* In addition, the Comptroller General has held that invocation of the exception "should not continue for more than a minimum time." *Matter of: Tri-Ex Tower Corp.,* B-239628, 90-2 CPD ¶ 221, at 5, 1990 WL 278490, at *4 (Comp.Gen. Sept.17, 1990).

At the outset, plaintiff indicates in its reply brief that "[n]ever has [plaintiff] questioned that the Army has a need to equip the UH-60 aircraft in Iraq with IBF kits." [FN33] This concession

echoes the representations in plaintiff's amended complaint: "[plaintiff] recognizes that the Army has an urgent need to acquire IBF devices as a result of operations in Iraq ...." [FN34] While plaintiff pays lip service to its concession, plaintiff nevertheless challenges substantive aspects of the J & A and, in turn, the invocation of the unusual and compelling urgency exception. Plaintiff, however, may not have it both ways. The Federal Circuit has held that "pleadings are judicial admissions and a party may invoke the language of the opponent's pleading to render the facts contained therein indisputable." *E.C. McAfee A/C Bristol Metal Indus. of Canada, Ltd. v. United States,* 832 F.2d 152, 154 n. * (Fed.Cir.1987). The proposition that the justification behind the invocation of the unusual and compelling urgency exception is "the urgent need to acquire IBF devices as a result of operations in Iraq" is indisputable and plaintiff is precluded from now raising any arguments to the contrary.

FN33. Plaintiff Filtration Development Company's Reply Brief In
Support Of Its Motion For Judgment On The Administrative Record (Pl.'s Reply) at 1.

FN34. Amend. Compl. ¶ 3; see also Tr. at 15-16.

Assuming *arguendo* that plaintiff's concession somehow does not extend to arguments concerning "lack of advance planning" and "funding concerns," the court rejects those arguments on the merits. Plaintiff maintains ***382** that the Army has been aware of the detrimental effects of sand for over a decade. The Army, contrary to plaintiff's suggestions, did take actions to implement a solution. In 1991 and 1995, the Army attempted to develop a filter system, but both attempts were deemed failures. [FN35] Further, the Army had instituted a trade study in July 2003 to develop an acceptable solution. Accordingly, the Army reasonably sought to address the problem, albeit unsuccessfully, and the court refuses to equate unsuccessful attempts to address a problem as a "lack of advance planning."

FN35. AR Ex. E ¶ 1.1(a).

In addition, "funding concerns," as contemplated by the FAR, did not drive the invocation of the exception. The J & A states that the Army expended $300 million to remove and replace approximately 400 engines. [FN36] The Army's October 9, 2003, directive also sought to equip all UH-60 Blackhawk helicopters with the IBF kits beginning in March 2004. That same directive provided that this course of action was necessary to "ensure required readiness in theater." [FN37] The court would be required to simply disregard this evidence to hold that the Army's decision to procure the IBF kits without full and open competition was based on "funding concerns." The court declines to do so.

FN36. The court also finds that this monetary justification is sufficient in and of itself to justify the invocation of the exception and to demonstrate harm to the government. 48 C.F.R. § 6.302-2(a)(2) ( "delay in award of a contract would result in serious injury, *financial or otherwise,* to the Government." (emphasis added)); see also *id.* § 6.303- 2(a)(9)(iii).

FN37. SUP AR 0003.

Plaintiff argues more forcefully that the Army failed to "request offers from as many potential sources as is practicable under the circumstances." 10 U.S.C. § 2304(e). Defendant counters

that the urgent time constraints coupled with Sikorsky's qualifications made it impracticable to seek offers from other sources. Stated another way, defendant avers that its conclusion that Sikorsky was the only source capable of meeting its requirements was reasonable. Defendant maintains that it only selected Sikorsky and, in turn, Sikorsky independently selected AFS. Plaintiff, on the other hand, asserts that the Army should not be permitted to hide behind its prime contractor.

While the contract modification did not specifically direct Sikorsky to utilize AFS's design, the administrative record in two separate instances provides that Sikorsky was directed to incorporate AFS's design in August 2003. [FN38] The fact that the contract modification did not expressly reference AFS in December 2003, after Sikorsky had spent at least three months incorporating the AFS design, does little to dispel the notion that the Army selected AFS as the IBF kit provider in August 2003. Defendant's mere subjective satisfaction, however, with either Sikorsky's or AFS's performance or capabilities would not justify an abandonment of CICA's mandate for full and open competition. *Matter of: TeQcom, Inc.,* B-224664, 86-2 CPD ¶ 700, at 5, 1986 WL 64514, at *4 (Comp.Gen. Dec.22, 1986). Rather, the inquiry in this context is slightly more stringent and focuses on whether the Army's conclusion that only Sikorsky or AFS could perform the required work within the abbreviated time period was reasonable.

FN38. AR Ex. A ¶ 3; *Id.* Ex. O at 2.

Plaintiff does not contest Sikorsky's qualifications, [FN39] and the court turns to the Army's assessment of AFS's qualifications. Defendant attempts to demonstrate the reasonableness of the Army's determination by arguing that on December 15, 2003, the date of Sikorsky's contract modification, AFS and plaintiff were not on equal footing. As was discussed above, defendant's reliance on the contract modification date is again misplaced. The decision concerning whether requesting offers from other sources was practicable, as well as whether competitive alternatives were feasible, should have been made in August 2003. [FN40] At this point, several observations are warranted. While it is known that a trade study was partially completed, the ***383** number of participants in that trade study, or any other particulars for that matter, remain a mystery. Plaintiff also advances a colorable claim that if the Army had approached the procurement with the mind-set of achieving limited competition it would have been able to meet the Army's requirements. Defendant, on the other hand, directs the court's attention to portions of the administrative record which characterize plaintiff's design as: (1) "very conceptual (hand sketches) with no real supporting information such as aircraft measurements, models, etc." [FN41] and (2) "lack[ing] sufficient information and detail in areas [making] feasibility difficult to assess." [FN42] After careful consideration of the parties' contentions, the court finds that given the ultimate disposition in this case it need not conclusively decide this issue.

FN39. Pl.'s Reply Brief at 10.

FN40. See AR Ex. A ¶ 3; see also *id.* Ex. O at 2.

FN41. *Id.* Ex. A ¶ 4.

FN42. *Id.* Ex. C ¶ 9(b).

On the other hand, the court can conclude that the Army has "[taken] reasonable steps to

accurately determine its needs and describe them." *Filtration,* 2004 WL 223988, at *5 (quoting *Matter of: Signals & Sys., Inc.,* B-288107, 2001 CPD ¶ 168, at 12, 2001 WL 1150705, at *9). On October 9, 2003, the Army determined that the filters were to be installed on the helicopters prior to their deployment to Iraq beginning in March 2004 "to ensure required readiness in theater." [FN43] Although the Army initially estimated that its needs would be satisfied through the procurement of 132 filters, in a series of meetings in October 2003, the Army subsequently revised its estimate to 240. [FN44] Because each unit has a certain number of UH-60 helicopters assigned to it, the Army arrived at the 240 figure by examining the number of units being deployed to Iraq. [FN45] Government officials are presumed to act in good faith, *Am-Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239 (Fed.Cir.2002), and the Army was undoubtedly in the best position to make that assessment. The court, therefore, will not second-guess the Army's estimate. *North Dakota v. United States,* 495 U.S. 423, 443, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990); *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988).

FN43. *Id.* Ex. C ¶ 10(a); SUP AR 0003.

FN44. AR Ex. A ¶ 7.

FN45. Tr. at 47.

A subtle distinction, however, must be drawn between the Army's overall needs and the needs necessary to satisfy the current emergency. Although some leeway must be factored into the equation, the Army's December 15, 2003, procurement must reflect its immediate emergency need and must be temporally limited. *Filtration,* 2004 WL 223988, at *5; *Tri-Ex,* B-239628, 90-2 CPD ¶ 221, at 5, 1990 WL 278490, at *4. Defendant has allocated funding for 80 "A kits" and 80 "B kits," but defendant seeks to have the procurement ultimately yield 183 "A kits" and 150 "B kits." [FN46] While plaintiff maintains that the former quantity represents defendant's true needs, [FN47] defendant was statutorily prohibited from obligating an amount equivalent to the contract price. 10 U.S.C. § 2326(b) (setting a ceiling on the percentage of the contract price that can initially be obligated under an undefinitized contract). Defendant certainly cannot be faulted in this respect. The delivery schedule for the 183 "A kits" and 150 "B kits," without accounting for minimal delays, extends from late March 2004 until July 2004. It does not appear, however, that funding has been allocated in excess of that necessary to procure the 183 "A kits" and 150 "B kits," and consequently, there is no time frame in which those units are to be delivered. Unlike the current obligation of funds which must comply with 10 U.S.C. § 2326, there is no indication as to when the additional funds will be forthcoming. Similarly, a delivery schedule has not been implemented. In light of these uncertainties, the court is unwilling to condone an indefinite extension of the unusual and compelling urgency" exception. Such an endorsement would be inconsistent with the exception's overt and inherent limitations. The court, therefore, holds that the Army ***384** through its actions has revealed that its current emergency situation encompasses only 183 "A kits" and 150 "B kits."

FN46. AR Ex. K.

FN47. Tr. at 21, 29.

III. Permanent Injunction

[13] To obtain injunctive relief, plaintiff must succeed on the merits and prove that: (1) it will suffer irreparable harm if the injunction is not awarded; (2) granting relief serves the public interest; and (3) the harm it will suffer outweighs the harm to the government and third parties. *Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 323 (2002); *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 323 (1998) (citing *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993)); *ATA Def. Indus., Inc. v. United States,* 38 Fed.Cl. 489, 505 n. 10 (1997) (explaining that the factors for a permanent injunction are essentially "the same as those considered for a preliminary injunction"). Injunctive relief is an extraordinary remedy and plaintiff must demonstrate its entitlement to such relief by clear and convincing evidence. *CACI,* 719 F.2d at 1581 (noting that the court should only interfere with the procurement process in "extremely limited circumstances"); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 266, 268 (1997). No one factor is dispositive, however, a weakness in one factor may be overcome on balance by the strength of others. *FMC Corp.,* 3 F.3d at 427.

[14] Plaintiff's request for injunctive relief falls into two categories. The first category of injunctive relief deals with enjoining the procurement of any IBF kits above the number for which funding is currently available, and directing that the procurement of any IBF kits over that number be conducted on a competitive basis. The second category involves future events and procurements. In particular, plaintiff seeks an injunction preventing Westar or any of its affiliates from being awarded a filter contract as long as Westar is providing SETA services, and an injunction prohibiting AFS from participating in the re-instituted trade study.

A. *Actual Success on the Merits*

Plaintiff has demonstrated actual success on the merits. There is no need in this subsection to expand on the parties' arguments as they merely offer an abbreviated synopsis of their substantive contentions. Defendant, in its procurement of IBF kits, did not adhere to OCI requirements. The CO improperly usurped the authority granted to the chief of the contracting office. Lacking his approval or his signature, the proposed mitigation plans cannot be given binding effect. An actual OCI exists because of Westar's O2K work. Moreover, defendant has exceeded the permissible bounds of the unusual and compelling urgency exception. As evidenced in the J & A, the Army may indeed have concluded that its overall needs encompassed 240 IBF kits. The Army's true emergency needs are discerned from within the procurement; the most recent delivery schedule extends only until July 2004 and the most recent allocation of funds only contemplates the procurement of 183 "A kits" and 150 "B kits." Accordingly, the resolution of this factor weighs in plaintiff's favor.

B. *Irreparable Harm*

Plaintiff asserts that it has demonstrated irreparable harm because it was not permitted to compete for the IBF kits. Plaintiff also maintains that it was deprived of lost profits. Further, plaintiff contends that its irreparable harm will be compounded because this procurement will provide AFS with an advantage in the procurement for the fully qualified IBF kits. Plaintiff also avers that Westar continues to occupy a highly influential position.

Defendant asserts that plaintiff will not be irreparably harmed because the current procurement is only a temporary solution. Defendant maintains that the IBF kits installed under an airworthiness release will be removed after the completion of military operations and that the engines will be returned to their original configuration. Defendant also contends that plaintiff will be able to participate in the re-instituted trade study and will have an opportunity to compete for the fully qualified IBF system.

The court has held that the opportunity to compete for a contract and to secure any resulting profits generally has been recognized ***385** to constitute significant harm. *United Int'l,* 41 Fed.Cl. at 323. This court has also given credence to an argument based on the awardee gaining a competitive advantage in a future procurement. *ATA,* 38 Fed.Cl. at 505 (considering any advantage the awardee of the current contract would have in future upgrade procurements). Although the concern that AFS would derive a competitive advantage is slightly mitigated by the fact that the current procurement is temporary in nature and only requires an airworthiness certification, defendant has already acknowledged that the two companies are no longer on equal footing. The second factor, therefore, likewise tilts in plaintiff's favor. [FN48]

FN48. At oral argument, it was brought to the court's attention that plaintiff was only interested in providing "B kits." *Id.* at 43. Although the court sought clarification on this point, plaintiff's counsel could only assure the court of his "underst[anding]" that plaintiff would provide both the "A kits" and the "B kits." *Id.* at 53.

C. *Balance of Harm & Public Interest*
The public interest factor, not surprisingly, was the most heavily contested by the parties. Plaintiff asserts that the public has an interest in ensuring that government procurements are conducted in an open and fair fashion. Plaintiff also maintains that the public has an interest in "minimizing the costs of federal procurements." [FN49] Further, plaintiff avers that defendant's national security and national defense arguments should properly be characterized as concerns about maintenance and repair costs. In the alternative, plaintiff then espouses a "sliding scale" national defense argument. Plaintiff argues that any national defense concerns are eviscerated after the first 80 "A kits" and 80 "B kits" are delivered. Plaintiff also asserts that, in the event the court refuses to enjoin any portion of the current procurement, national defense concerns would not affect future IBF kit acquisitions.

FN49. Plaintiff Filtration Development Company's Opposition To Defendant's Cross-Motion For Judgment On The Administrative Record at 16 (citing *Vanguard Sec. Inc. v. United States,* 20 Cl.Ct. 90, 113 (1990)).

Defendant maintains that the procurement was conducted fairly and in accordance with statutory and regulatory provisions. Defendant also avers that the cost of competition as well as the cost associated with any delay would dramatically increase the cost of the procurement. Lastly, but most importantly, defendant contends that an injunction would have an adverse impact on national defense. In particular, defendant avers that an injunction would result in delay and disruption as well as compromise military performance and readiness.
The Tucker Act instructs the court to "give due regard to the interests of national defense and national security" when considering bid protests. 28 U.S.C. § 1491(b)(3). The court proceeds well aware that it "must give serious consideration to national defense concerns and arguably should err on the side of caution when such vital interests are at stake, [but that] allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public." *ATA,* 38 Fed.Cl. at 506.
The record contains evidence that the driving force behind the procurement was both national defense needs and financial concerns. In the brief period since operations in Iraq began, the Army has expended approximately $300 million to remove and replace 400 engines. [FN50] In a letter to plaintiff dated November 13, 2003, the Army indicated that it "is no longer able to keep up with the demand" of providing replacement engines. [FN51] That letter also explained that "[t]he lack of replacement engines threatens availability of aircraft to support current overseas operations." [FN52] Although the court would hesitate to hinge its decision entirely on a letter to plaintiff's counsel, it does not encounter this concern today. In the October 9, 2003, directive, the Army concluded installation of IBF kits "was required for ... deployment not later than [March 2004] *to ensure required* ****386*** *readiness in theater.*" [FN53] Further, the J & A provided that the IBF kits were necessary to "meet the urgent need for kits *to support the war effort* ...." [FN54] The court finds no appropriate or legitimate basis to challenge these conclusions. *North Dakota,* 495 U.S. at 443, 110 S.Ct. 1986 ("When the Court is confronted with questions relating to ... military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."); *Orloff,* 345 U.S. at 93, 73 S.Ct. 534 ("[J]udges are not given the task of running the Army."); *Voge,* 844 F.2d at 779 ("Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense.").

FN50. AR Ex. C ¶ 5(d).

FN51. *Id.* Ex. O at 1.

FN52. *Id.*

FN53. SUP AR 0003 (emphasis added).

FN54. AR Ex. C ¶ 9(b) (emphasis added).

The recognition that the IBF kits are necessary to ensure combat readiness does not stem solely from defendant's correspondence, an Army directive, and the J & A. Prior to this suit being filed, plaintiff acknowledged that "[a]side from the obvious advantages, it would seem also prudent for the the [sic] Government to evaluate several alternative solutions (such as FDC's design), *considering the fact that the overall design is critical to flight performance, mission safety/reliability, maintainability, and costs.*" [FN55] In this regard, it appears disingenuous for plaintiff to argue that the IBF kits are necessary to "flight performance" and "mission safety/reliability" when it seeks to provide them, but that these concerns suddenly disappear when the Army seeks to acquire them.

FN55. SUP AR 0034 (emphasis added).

Plaintiff attempts to analogize its situation to cases which plaintiff asserts lacked " 'true' national security considerations." [FN56] Plaintiff's argument, however, is unconvincing. Plaintiff's characterization of those cases as lacking " 'true' national security considerations" understates the reasoning in those cases. Noticeably absent from *Irvin* and *Informatics* was any analysis whatsoever regarding national defense. *Irvin Indus. Canada, Ltd. v. United States Air Force,* 924 F.2d 1068 (D.C.Cir.1990) (enjoining a contract for parachute rip cord releases without any analysis as to national security or national defense considerations); *Informatics Corp. v. United States,* 40 Fed.Cl. 508 (1998) (analyzing the public interest factor solely on minimizing the cost to government and without reference to either national security or national defense). And, the plaintiff in *Scopus* only "generally" argued that the M17 tank periscopes were a "critical defense item" without any argument that "setting aside the contract would jeopardize any national defense." *Scopus Optical Indus. v. Stone,* 1990 WL 95518, at *6 (D.D.C.1990). In addition, none of the plaintiffs in *Informatics, Irvin,* or *Scopus* argued that the items procured would immediately be deployed to or used in an actual conflict/hostility area. It is no wonder then that the courts in those cases did not hesitate to invalidate or enjoin the procurements.

FN56. Pl.'s Mot. at 38.

On the other hand, plaintiff fails to provide a substantive basis on which to distinguish bid protest decisions where genuine national defense considerations have been raised. In *CSE,* this court refused to issue an injunction where the Army argued that upgrading two firing ranges in Missouri was critical to training soldiers under modern standards. *CSE Constr. Co., Inc. v. United States,* 58 Fed.Cl. 230, 263 (2003). Similarly, in *Al Ghanim,* this court refused to issue an injunction for housing quarters which were to be constructed in Kuwait in support of Operation Iraqi Freedom. *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56

Fed.Cl. 502, 521-22 (2003). In *Gentex,* this court refused to grant an injunction preventing the procurement of aircrew masks which would protect against chemical or biological warfare. *Gentex Corp. v. United States,* 58 Fed.Cl. 634, 655-56 (2003). Likewise, in *Cincom,* the court declined to issue an injunction preventing the United States Department of Defense (DOD) from procuring software for reparables management at DOD maintenance depots. *Cincom,* 37 Fed.Cl. at 269. Specifically, the court reasoned, taking national defense interests into account, that the software would help ensure that the armed forces will have the capability ***387** to efficiently maintain weapons and equipment in good working order. *Id.*

The case before the court likewise raises national defense considerations which lead to the same conclusion. At this juncture, it is important to keep in mind that plaintiff must show its entitlement to the extraordinary remedy of injunctive relief by clear and convincing evidence. *CACI,* 719 F.2d at 1581; *Cincom,* 37 Fed.Cl. at 268. Putting aside both the Army directive as well as the J & A, and assuming that an overlap between monetary and national defense concerns exists, the court cannot simply disregard the national defense implications. The UH-60 Blackhawk helicopter serves many purposes in supporting the military's operations in Iraq. It is the primary helicopter employed for transporting troops, and it is also used to evacuate injured personnel as well as transport supplies. [FN57] It is undisputed that the harsh desert conditions in that region caused significant damage to its engines and engine components. As a result, a large number of engines have been replaced at an enormous cost. Due to the sheer volume of replacements, the Army is unable to keep up with the demand.

FN57. Tr. at 44.

The obvious and unavoidable conclusion which follows from these facts is that a failure to immediately meet the demand would jeopardize the helicopters availability to provide critical support to Army operations. The Army should not be placed in a compromising position that would require it to operate the helicopters with deteriorated and corroded replacement engines that have been subjected to the abusive wear and tear of desert terrain. The Army is unquestionably entitled to the means to operate its combat zone helicopters at peak performance levels. Upon reviewing the arguments that plaintiff proffers to support its position against this backdrop, and "giv[ing] due regard to the interests of national defense," the court holds that this factor weighs heavily in defendant's favor; so much so, it conclusively tilts the scale against granting permanent injunctive relief for the 183 "A kits" and 150 "B kits" for which funding has been allocated and a delivery schedule has been set.

The court, however, reaches a contrary conclusion with respect to any kits in excess of 183 "A kits" and 150 "B kits." From the record, it is unascertainable whether and when funding for the additional kits will be available and when the kits would be delivered. Defendant represented at oral argument that the cost of procuring 183 "A kits" and 150 "B kits" has decreased to approximately $30 million. [FN58] It is, therefore, possible that 240 IBF kits could be procured under the original $40.8 million allocation of funds. On the other hand, defendant has admitted that no delivery schedule is in place beyond July 2004. [FN59] In addition, there is no indication that Sikorsky's contract with the Army has been altered to reflect the production and delivery of additional IBF kits.

FN58. *Id.* at 37.

FN59. *Id.* at 40.

Defendant should not be permitted to extend the current emergency indefinitely. More than half a year has passed since Sikorsky was directed to incorporate AFS's design. It is unclear if any additional steps, besides representations that a trade study for fully qualified IBF kits will be

conducted, have been taken to promote competition. The court will take the opportunity to endorse, and ensure compliance with the proposition that "[c]ontracting officials must act affirmatively to obtain and safeguard competition; they cannot take a passive approach and remain in a noncompetitive position where they could reasonably take steps to enhance competition." *Matter of: Signals & Sys., Inc.,* B-288107, 2001 CPD ¶ 168, at 12, 2001 WL 1150705, at *11. The Army has had since May 2003, when discussions with AFS first took place, and will have until at least July 2004, the time period in which the 183 "A kits" and 150 "B kits" will be produced and delivered, to enhance competition for additional IBF kits. The court holds that national defense considerations in this case cannot justify an indefinite extension of the unusual and compelling urgency exception and, therefore, enjoins the Army from procuring under the current J & A any quantity ***388** in excess of the 183 "A kits" and 150 "B kits."
Lastly, the court declines to enter a permanent injunction precluding AFS from future competition for engine filters. Defendant argues that the court's review in bid protest cases is limited to applying the APA standard of review to the administrative record. Defendant, however, overlooks the fact that the basis for the future injunction would be a finding that the current procurement created an OCI on a future acquisition. The FAR expressly contemplates such review and indicates that "some restrictions on future activities of the contractor may be required." 48 C.F.R. § 9.502(c). Nevertheless, this is not the only provision in the FAR which guides the resolution of the issue. The FAR provides the following instruction: "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract." *Id.* § 9.505. Further, the FAR permits the CO, after finding that it is in the best interest of the United States to do so, to award the contract despite the OCI upon obtaining a waiver from the head of the agency or a designee. *Id.* §§ 9.503, 9.504(e). Given that the court can envision a situation where such an option could be exercised, a permanent injunction excluding AFS from the re-instituted trade study and from future competition is inappropriate.

*Conclusion*

For the above-stated reasons, plaintiff has shown that the Army violated OCI regulations and exceeded the permissible bounds of 10 U.S.C. § 2304(c)(2). In light of plaintiff's burden of demonstrating its entitlement to the extraordinary remedy of permanent injunctive relief by clear and convincing evidence, and after "giv[ing] due regard to the interests of national defense and national security" as required by 28 U.S.C. § 1491(b)(3), the following is hereby ordered:
1) Defendant is entitled to procure 183 "A kits" and 150 "B kits" under its current invocation of the unusual and compelling urgency exception;
2) Any procurement in excess of 183 "A kits" and 150 "B kits" must be conducted on a competitive basis unless an independent justification for invoking an exception to full and open competition is provided;
3) AFS will not be enjoined from participating in the re-instituted trade study or from participating in future competition.
The parties' cross-motions for judgment on the administrative record are GRANTED to the extent stated above, and otherwise DENIED. The Clerk of the Court is hereby directed to enter judgment in accordance with this opinion.
The parties shall notify the court by Monday, April 26, 2004, of any portion of the opinion containing proprietary information, national defense or national security concerns, or classified information, that should be redacted prior to publication. The parties shall also file with the court any proposed entitlement to costs by said date.
IT IS SO ORDERED.
Fed.Cl.,2004.
Filtration Development Co., LLC v. U.S.
60 Fed.Cl. 371

**Motions, Pleadings and Filings** (Back to top)

- 1:03cv02835 (Docket) (Dec. 18, 2003)

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Print/Deliver

Help © 2007 West

Vendors
Federal Business Opportunities

# 56 -- Construction & Building

---

---

## General Information

Document Type: Special Notice
Solicitation Number: Reference-Number-SPM500-04-D-0239
Posted Date: Sep 13, 2007
Original Response Date:
Current Response Date:
Original Archive Date:
Current Archive Date:
Classification Code: 56 -- Construction & building materials
Naics Code: 332312 -- Fabricated Structural Metal Manufacturing

## Contracting Office Address

Defense Logistics Agency, Acquisition Management, Defense Supply Center Philadelphia - Construction & Equipment, 700 Robbins Avenue, Philadelphia, PA, 19111-5096, UNITED STATES

## Description

The Defense Supply Center Philadelphia (DSCP) is a Primary Level Field Activity (PLFA) and Inventory Control Point (ICP) of the Defense Logistics Agency (DLA), Department of Defense (DoD). DSCP intends to issue a bridge Contract under PIIN (Procurement Item Identification Number) SPM500-04-D-0239 for the acquisition of 24 NSNs (National Stock Numbers), Federal Stock Class (FSC) 5680, sole source to Hesco Bastion Ltd., Leeds, West Yorkshire, England, collectively referred to as "Concertainer Defense Walls". The proposed bridge Contract will be for a base period of three months with two 90-day option periods. The estimated value for the

initial three month base period is $327,000,000.00. Each proposed option period will have a maximum contract value of $195,000,000.00.

**Point of Contact**

Lesley Fuller, Contract Specialist, Phone (215) 737-3911 , Fax (215) 737-8609, Email Lesley.Fuller@dla.mil

**Place of Performance**

Address: Unit 37 Knowsthorpe Gate Cross Green Indstl Est Leeds LS9 0NP GB
Country: UNITED KINGDOM

Register to Receive Notification

---

Government-wide Numbered Notes
**You may return to Business Opportunities at:**

- DLA J3 listed by [Posted Date]
- DLA Agencywide listed by [Posted Date]

---

[Home] [SEARCH synopses] [Procurement Reference Library]