# In the United States Court of Federal Claims

(Filed April 7, 2008)
(Originally Filed Under Seal March 14, 2008)

| | | |
|---|---|---|
| INFRASTRUCTURE DEFENSE TECHNOLOGIES, LLC, Plaintiff, v. THE UNITED STATES, Defendant, and HESCO BASTION, LTD, Defendant-Intervenor. | ) | No. 07-582 C (Consolidated Lead Case) Pre-award bid protest; subject matter jurisdiction; standing; prejudice; waiver; bridge contract; sole source supply contract; cross-motions for judgment on the administrative record; motion to dismiss; one responsible source exception to the Competition in Contracting Act; standard of review; national defense and security. |
| INFRASTRUCTURE DEFENSE TECHNOLOGIES, LLC, Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 07-695 C (Consolidated Member Case) |

*C. Joël Van Over*, McLean, VA, for plaintiff. *Jack Y. Chu*, of counsel.

*David A. Harrington* and *A. Bondurant Eley*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Brian M. Simkin*, Assistant Director.

*Douglas C. Proxmire*, Washington, D.C., for defendant-intervenor. *Elizabeth Gill*, of counsel.

# OPINION AND ORDER[1/]

**Merow**, *Senior Judge*

In this pre-award procurement protest, brought pursuant to 28 U.S.C. § 1491(b)(1), the protestor, Infrastructure Defense Technologies, LLC (hereinafter "IDT"), seeks injunctive and declaratory relief to preclude the Defense Logistics Agency ("DLA") from awarding a follow-on sole source Indefinite Delivery Indefinite Quantity ("IDIQ") contract for collapsible force protection ("Concertainer") units to Hesco Bastion, Ltd. ("Hesco").

Hesco has intervened in this action. Pursuant to RCFC 52.1, motions have been filed, by all parties, for judgment on the administrative record of this procurement which record was supplemented by the deposition of DLA official Thomas Lauersen and material submitted by plaintiff. (Order Aug. 9, 2007.) Plaintiff also protests the award of a "bridge contract" entered into by DLA to cover military requirements for Concertainers during the pendency of this litigation. The administrative record for this protest is referred to as "2nd Protest." Various other material, submitted during argument by counsel or in response hereto, has also been considered. Defendant also contests IDT's standing to bring this litigation and IDT has filed a motion for entry of a default pursuant to RCFC 55(a), which is opposed by defendant.

Upon consideration of the extensive records and the thorough briefing of the issues by all parties together with the helpful and comprehensive argument of counsel, it is concluded, for reasons that follow, that IDT's Motion for the Entry of a Default is denied, that IDT lacks standing to bring these protests, and that if, however, standing were present, IDT then has not established a basis for relief under the standards set forth in Section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, as applicable in this bid protest context. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

---

[1/] The court issued this Opinion and Order under seal on March 14, 2008, and gave the parties until March 31, 2008, to submit any proposed redactions. That deadline has passed, and no proposed redaction has been received. Accordingly, the Opinion and Order is released in its entirety.

# FACTS

From January through September 2007, DLA received requisitions from military units in Iraq and Afghanistan for more than $375 million worth of Concertainers. (AR 24 (2nd Protest).) Concertainer is the Hesco brand or trade name for a collapsible force protection barrier commonly used in hostile theaters as a substitute for sandbags. (AR 516; AR 132 (2nd Protest).)

Force protection barriers available to the United States military include sandbags, barbed concertina wire, concrete barriers and other devices including, as relevant to this litigation, earth-filled barriers – collapsible forms or components that are transported flattened on pallets to a planned site where they are assembled or unfolded, interconnected and filled with sand, soil or other native material to create barriers, walls, buildings and the like that protect, to varying degrees, from weapon fire, explosives, vehicle crashes and other hostile forces.

The Joint Forward Operations Base Force Protection Handbook ("JFOB") contains descriptions, and in some instances, specifications of many, but not all military force protection options. (AR 488-595.) Reflecting lessons learned from Operation Enduring Freedom and Operation Iraqi Freedom, and created with guidance from the Army Test and Evaluation Command and the Joint Chiefs of Staff Deputy Directorate for Antiterrorism and Homeland Defense, with significant assistance from U.S. Central Command, this handbook describes best practices and techniques to counter rocket, artillery, mortar and improvised explosive device threats in Iraq to reduce the combat casualty rate.

Earth-filled barriers are among several options addressed in the "Physical Barriers" section of Chapter Six entitled "Perimeter Security." (AR 496-513.) Instructions, diagrams, specifications and design factors are given for "[t]ypical anti-vehicular barriers" for stopping vehicles at the perimeter, including concrete walls, berms, ditches, cabled chain link fences, and "[e]arth-filled barriers (Hesco Bastions, metal revetments").[2/] (*Id.* at 502-03.)

---

[2/] These barriers are referred to throughout as revetments and/or bastions. A revetment is "an embankment or wall as of sandbags or earth, constructed to protect against strafing, shell fragments, etc." WEBSTER'S NEW WORLD DICTIONARY 1149 (3rd ed. 1988). A bastion is "any fortified place;
(continued...)

> **Earth-Filled Barriers.** Earth-filled barriers are typically employed at a JFOB to provide blast and fragment damage protection. As fragment protection, these barriers work extremely well; for blast mitigation purposes these barriers reduce structural damage only slightly by reducing reflected pressures to incident pressure levels. However, earth-filled barriers can also be effective as anti-vehicular barriers. Examples of earth-filled barriers include the HESCO bastion concertainers and metal revetments.
>
> **HESCO Bastion Concertainer**. Concertainer geo-composite materials can be used to construct anti-vehicular barriers and are often favored because of their capability to minimize transportation weight and volume requirements, while optimizing the provided level of threat protection. The geo-composite material is composed of collapsible wire-mesh cells that are lined with a geo-textile fabric. The advantage of using this material is that during transport the geo-composite is collapsed and upon arrival at the final destination is expanded and filled. This quality allows the walls to be transported at only 5 percent of the as-constructed volume.
>
> The concertainer wall sections consist of a series of large, linked, self-supporting cells constructed from geo-textile-lined wire-mesh panels. The wall cells are connected at the corners with spiral wire hinges that allow the wall sections to be expanded from a compact, folded-storage configuration. For deployment, the wall sections are expanded, positioned, and filled with available soil, sand, gravel, rock, concrete rubble, etc. (the use of gravel, rock, or concrete should be minimized due to the fragmentation caused by an explosion). The wall sections can be connected to form longer walls, separated to form shorter sections, or stacked to increase wall height.

(AR 511-12.)

---

[2/](...continued)
strong defense or bulwark." *Id*. at 116.

Three paragraphs, two pictures and a drawing are devoted to Hesco Concertainer products. Immediately following is one paragraph describing generic metal revetments described as another type of anti-vehicular barrier.[3/]

> Like the concertainer, these barriers have the capability to minimize transportation weight and volume requirements, while optimizing the provided level of threat protection. The advantage of using this material is that during transport the metal material can be collapsed and stacked and upon arrival at the final destination expanded and filled. More information on metal revetments can be found in Chapter 8 (Protective Construction). (AR 512-13.)

Following this paragraph is a photograph of metal revetment walls. (AR 513.)

Chapter Eight, titled "Protective Construction," includes a section on "Sidewall Protection and Revetments." (AR 514-33.) "[M]ost revetment designs are just variations of techniques to hold the soil in a vertical position." (AR 514.) Included is a subsection on the "Hesco Bastion Concertainer® Revetment," with specifications of nine sizes and two colors, a listing of limitations, construction procedures and considerations and diagrams, at an estimated cost of $39 per linear foot (excluding labor and fill material). (AR 516-19.)

> ***Description*:** Hesco Bastion Concertainer® is the brand name for a commonly used revetment used in Iraq and referred to as "Hesco." The Hesco wall sections consist of a series of large, linked, self supporting cells. Each cell consists of collapsible wire mesh lined with a geotextile fabric. The cells are connected at the corners with spiral wire hinges that allow the wall sections to be expanded from a compact, folded storage configuration. The advantage of using this material is that during transport the cells are collapsed, and upon arrival at the final destination expanded and filled. This allows the walls to be transported at only 5 percent of the as-constructed volume. To deploy, the wall sections are expanded, positioned, and filled. The wall sections can be

[3/] IDT asserts its Metalith is the only steel revetment system certified by the government. (Pl.'s Mot. for Discovery 3.)

> connected to form longer walls, separated to form shorter sections, or stacked to increase wall height.
>
> Pertinent Data: Hescos come in nine sizes and two colors, all of which have NSNs (National Stock Numbers) (see Table 8-1).[4/]

(AR 516 (second to the last parenthetical added).)

Immediately following is a subsection on "Corrugated Metal Bin Revetments" in three sizes which "can be utilized for supplemental sidewall protection or in the construction of protective positions." (AR 519.)

> **CORRUGATED METAL BIN REVETMENTS**
> ***Description*:** Metal revetments (see Figure 8-8) can be utilized for supplemental sidewall protection or in the construction of protective positions. Revetments are shipped flat in an unassembled state to be assembled on-site and filled to construct the desired protective structure. Each kit will consist of four (4) panel types (side, end, cross, and brace), connecting pins, flaring tools, and corner containment materials (wire mesh and poly film). Corrugated metal bin revetments come in kits of the following sizes:
>
> • 2' x 6' x 104' (NSN:TBP) Estimated fill material required: 47 cubic yards
> • 4' x 8' x 64' (NSN:TBP) Estimated fill material required: 76 cubic yards
> • 4' x 10' x 48' (NSN:TBP) Estimated fill material required: 72 cubic yards.
>
> Wall sections come either 2 ft or 3 ft high. The 2 ft high sections are composed of 16-guage [sic] material while the 3 ft high sections are 18-gauge.
>
> ***Use for Full-Height Sidewall Protection*:** These revetment systems are based on the USAF Metal Revetment Kit, Type B-1, which has been employed in some fashion since the Vietnam War era. The Engineer

---

[4/] An NSN is assigned to a product for ease of identification in procurement.

> Research and Development Center (ERDC) has developed a smaller version of this kit for use in JFOBs that will provide protection from blast loadings and shielding from primary fragments from RAMs.
>
> . . .
>
> A significant advantage of the corrugated metal wall is enhanced resistance to environmental degradation (UV, wind erosion, etc.) as compared to Hesco Bastion.
>
> . . .
>
> Cost per linear foot for a 2 ft thick, six foot tall wall is estimated at $88 for the metal bin material (excluding labor and fill material).

(AR 519-21.)

Three photographs depict field use of metal revetments and four illustrate detonation reaction. (*Id.* at 520, 522.)

Other protective construction practices described include modular reinforced concrete walls, E-glass and U-picket walls. (AR 523-26.) Use of Hesco revetments for protection of helicopters is noted with material and protection specifications with an illustrative photograph. (AR 526-27.) "Although not shown, Corrugated Metal Bin Revetments of similar sizes can be substituted for the Hesco material if desired." (AR 526.) A section on "Personnel and Equipment Bunkers," describes Hesco Bastion bunkers and has two sentences about generic metal revetments. (AR 545.) *See also* Table 8-8 (AR 547) – a bill of materials for personnel bunker using Hesco Concertainers with NSNs and noting metal bin revetments could be substituted for Hesco Concertainers; AR 555 (use of Hescos or metal revetments for bunkers to protect equipment or materials).

Detailed instructions are given for the construction of a Large Observation Post (Hesco Version). (AR 569-77.) Metal revetments can also be used with the advantage of a longer life span.

> **LARGE OBSERVATION POST (METAL BIN REVETMENT VERSION)**
>
> **Description**
>
> The metal revetment protective position is based on the Above Ground Large Observation Post (Hesco Version). One advantage of the use of the metal revetment instead of the geotextile-lined Concertainer® is the increased life span when subjected to the long-term effects of severe environmental conditions (UV, severe sand/wind loadings, etc.) as seen in Iraq and Afghanistan. Another advantage of this design is the overhead cover system has been shown through static and live-fire testing to protect from the direct hit of a 120 mm mortar. The overall footprint of the structure is 20 ft x 16 ft. The interior of the structure has 7 ft of clearance. Overhead cover is provided by 2 ft of soil contained within a 2-ft-high perimeter of metal revetments.

(AR 577.) Also, "Hescos and Metal Bin Revetments can be used to construct other fighting and observation bunkers that are similar in design and construction to the Large Observation Post." (AR 587.)

Until September 2007, requisitions for Concertainers were filled under a long-term Indefinite Quantity Contract ("IQC") with Hesco. (AR 25, 48, 417; AR 2 (2nd Protest).) That contract, awarded in February 2004, had a lifetime maximum purchase of $150 million, increased to $500 million following an unanticipated surge in demand during the first six months of the contract period. (AR 417.) In February 2007, the contract was extended to June 2007 and $70 million was added to the contract maximum. (*Id.)* The contract was then extended for an additional three months with $169 million added to the contract maximum. *(Id.)*

On February 28, 2007, the Defense Supply Center Philadelphia ("DSCP"), an Inventory Control Point of DLA, determined that the "[p]lacement of a follow-on IQC will permit continuous supply availability without the delays inherent in the administrative steps and added production lead time required to initiate new acquisitions for successive years." (AR 25.)

The items involved, for the follow-on contract were identified as follows:

> These items consist of various sizes of blast barrier walls constructed of heavy-duty galvanized wire mesh and lined with geo-textile fabric. The Concertainer defense walls are critical force protection items and are used worldwide by the Army and Marines, with incidental usage by the Air Force and Navy. Current usage is predominately in the CENTCOM area of operations.

(AR 25.)

Accordingly, on April 3, 2007, in a Presolicitation Notice, DSCP stated its intention to issue a Request for Proposal ("RFP"), for an IDIQ contract for twenty-five NSNs, Federal Stock Class 5680, "Concertainer Defense Walls," in support of the Army and Marines. The two-year sole source contract to be issued to Hesco would have three one-year options and had an estimated maximum contract value of $250 million. (Compl. Ex. E.)

The Presolicitation Notice stated that Hesco held an internationally-recognized design patent on these items which were described only by part numbers. However,

> t]echnically acceptable proposals will be evaluated for price reasonableness and award will be made to the lowest priced technically acceptable offeror.
>
> . . .
>
> The solicitation will contain the DLAD clause entitled, ?Conditions for Evaluation and Acceptance Of Offers For Part Numbered Items?.[5/] Alternate offers, if submitted, will be forwarded to the Army Corps of Engineers, the Engineering Support Activity for technical evaluation [see Numbered Note 22]. An award is anticipated no later than June 12, 2007.

(*Id*. Ex. E 2 (alteration in original).) The "Place of Performance" was Hesco's United Kingdom address. (*Id*.) Telephone, facsimile and e-mail contact information was

[5/]Apparently word processing anomalies substituted question marks for quotation marks.

given for DLA representatives Lesley Fuller, Contract and Acquisition Specialist and Mary Ryan, Contract Specialist. *(Id.)*

To comply with 10 U.S.C. § 2304(c)(1), DLA prepared Justifications for Acquisitions ("J&A") for the proposed IDIQ procurement from Hesco. (AR 48; AR 3 (2nd Protest).) To arrive at the quantity estimated for the procurement, DLA relied upon existing requisitions as reflected in their computer systems which record all demands received. (Lauersen Dep. 21-22, 24, 84-85.) There was a drastic increase in demand following the surge of American forces in Iraq. (AR 417.) Demand averaged approximately $10 million per month from December 2004 to December 2006. (Lauersen Dep. 132.) The J&As reported that Hesco Bastions are "critical force protection items" and that "[t]he only known source of the items is Hesco Bastion, Ltd." (AR 47-48; AR 2-3 (2nd Protest).) The J&As address minimum needs stating,

> [f]rom a standpoint of pricing, transportation and contingency effectiveness, the Hesco [C]oncertainers are the only available products meeting the Government's minimum needs. . . . The Government's minimum needs in selection of Concertainer Defense Walls are rapid assembly, transport mobility, ability to withstand stacking and suitability for use as temporary structures; the aggregation of these characteristics make them ideal for use in contingency operations.

(AR 48; *see also* AR 3 (2nd Protest).)

DLA, an agency of the Department of Defense, provides logistical support to the United States military and several civilian agencies, and is an intermediary between an ordering military or other entity and private suppliers. *Anderson v. United States*, 73 Fed. Cl. 199, 200 (2006). In this capacity, DLA maintains catalogs and databases that Army, Navy, Marine and Air Force personnel can review, and through which orders for needed supplies can be placed. (Lauersen Dep. 26.) A military customer places an order with DLA. DLA fills that order through supply contracts or other direct arrangements with suppliers. Costs of items obtained from DLA are borne by the ordering entity. For instance, if a military unit orders a Hesco Concertainer, the unit must pay DLA the cost of the item, plus a surcharge to cover DLA's overhead expenses. (Lauersen Dep. 71-72.) Through experience and resulting anticipation of future demand, DLA procures supply contracts to efficiently satisfy

military demands in furtherance of the safety and effectiveness of the military, in accordance with the national defense. Products may also be listed on, and purchased through, the EBS, MILSTRIP, Haystack and Total Item Record systems.

Plaintiff, as a manufacturer of corrugated metal bin revetment forms in various sizes, that like Hesco Concertainers, can be transported flat on pallets to a site, assembled and filled with native material to create the desired force protection structure, considered that competition would be promoted if the Defense Department would develop performance specifications for force protection barriers so as to permit it to bid on procurements using such specifications. Plaintiff did not consider it was obtaining fair treatment under the existing system in that, while its products were listed in the JFOB Handbook, they were being requisitioned only by a few military units who experienced difficulty in obtaining contract support from DLA. Hesco's products were heavily requisitioned and readily supplied pursuant to successive IDIQ contracts. Limited inventories of Hesco products were also stocked in military depots, located in Germany and Kuwait, for distribution as requisitioned.

On April 16, 2007, representatives of plaintiff met with the Honorable Dr. James I. Finley, the Deputy Under Secretary of Defense. (Compl. Ex. D.) Although this meeting occurred shortly after the Presolicitation Notice for the Hesco procurement at issue, the record contains no evidence that this solicitation was the subject of discussion at that meeting. Rather, at that meeting plaintiff pleads that it vigorously advocated for full competition for force protection barrier material, "inform[ing] them that [IDT] had a competing product that was equal to or superior to Hesco's security barrier products and was eager to bid on any future security barrier opportunities in competition with Hesco. During the meeting, DLA assured Infrastructure Defense that Infrastructure Defense would be permitted to compete in the upcoming unrestrictive procurement of security barriers." (Compl. ¶ 7.)[6/]

On May 18, 2007, Dr. Finley wrote to Kenneth Carlton of Corrugated Metals, Inc. ("CMI"), IDT's manufacturing affiliate, that "my staff has taken action to ensure a competitive environment exists for contracting opportunities in theater operations"

---

[6/] In a declaration, dated March 5, 2008, attached to Plaintiff's Reply Brief, filed March 6, 2008, Mr. Kenneth Carlton, a co-owner of IDT states that the meeting with Dr. Finley occurred on April 18, 2007. The Complaint, ¶ 7 and its Exhibit D confirm that the meeting occurred on April 16, 2007.

in Iraq and Afghanistan for security barriers. Dr. Finley reiterated actions discussed at that meeting, specifically that IDT seek assignment of additional NSNs for its products from DLA. Dr. Finley also stated that DLA could assist in "ensur[ing] CMI products are labeled correctly and the associated product descriptions are easily recognized by the user (customer) community to convey the product capabilities," and "designated Mr. Richard Ginman of the Defense Procurement and Acquisition Policy office as my point of contact for any future communication on this issue," providing his telephone number and e-mail address. (Compl. Ex. D.)

On May 31, 2007, DSCP issued its sole source RFP Solicitation for Commercial Items. (AR 82-147.) The RFP was for twenty-five thirteen-digit NSNs of Concertainers. Four categories of prices were solicited – base and solicited discounts depending on purchase volume. (AR 87.) Of the twenty-five items, eighteen are listed in the JFOB, with height, width and length. For example, NSN 5680-99-7866 has a height of 4'6," width of 3'6" and length of 32'.[7] Another three are complete "Approved Fighting Positions" including a roof: a Single-Bay Aboveground Fighting Position, NSN: 5680-01-501-1235, a Two-Bay Aboveground Fighting Position, NSN: 5680-01-501-1357 and an Aboveground Small Observation Post, NSN: 5680-01-501-1462. Separate photographs of all three fighting positions are in the JFOB. The deadline for proposals was June 12, 2007, later extended to June 15, 2007. (AR 81-147.)

---

[7] All eighteen are listed on one page which includes three photographs, a notice that the "NSNs listed represent a sample of items managed by DSCP," telephone and e-mail addresses for Tom Lauersen, Program Manager and Colleen Obozian, as "Point[s] of Contact." The following is the entire narrative description:

> The Concertainer Defense Wall is a rapidly built solid blast barrier wall built from heavy-duty galvanized wire mesh lined with a geo-textile fabric designed as a substitute for sandbags. The wall can be filled with any available material such as sand, mud, soil, rock using minimal manpower and a mechanical digger. The wall has been tested using small arms fire, machine guns, mortars and 30 mm cannon. It will also protect against indirect artillery fire up to 155 mm caliber. Uses include aircraft and headquarters location revetments, bunkers, observation posts, border crossings and fuel installations.

(Compl. Ex. B 2.)

On June 11, 2007, JSF Systems, LLC, submitted an "[a]lternate offer of COTS[8/] product: DefenCell, Barrier Wall System," including pricing and quantity discounts for eighteen item numbers, with width, height and length specifications. (AR 158-240.) "DefenCell is made in the USA from strong, UV resistant Typar 100% polypropylene material." *(Id.* at 240.) Lesley Fuller, the contracting officer, wrote in a July 12, 2007 file memorandum that "JSF's offered pricing for some items was lower than that of Hesco but they did not offer on the exact products contained in the solicitation." (*Id*. at 334.)

Addressing JSF System's alternate offer, the Addendum to Prenegotiation Briefing Memorandum dated July 20, 2007, stated:

> [T]he Government does not possess and cannot develop complete unrestricted technical data to be referenced in this solicitation. It must be noted that DLAD 52.217-9002 Conditions for Evaluation and Acceptance of Offers for Part Numbered Items (JUN 2006) was not included in its entirety in the solicitation. Based on consultation with the Office of Counsel (see Memo to File), this will not adversely impact deeming the offer from JSF as "technically unacceptable". In view of the above, the proposal received from JSF Systems LLC is considered to be technically unacceptable because their submitted proposal is not in accordance with the requirements in the solicitation. In addition, award will not be delayed pending evaluation of their offered product. JSF Systems LLC's technical package will be forwarded to the Army Corps of Engineers (CoE), the Engineering Support Activity for technical evaluation.
>
> Only the offer received from Hesco Bastion LTD. will be considered for award inasmuch as the items covered under this solicitation are part-numbered items for which the Government does not possess and cannot develop complete unrestricted technical data. Hesco Bastion possesses two internationally recognized design patents for these items, which are described by reference to Hesco Bastion LTD., part numbers only.

(AR 310.)

[8/] Commercial Off the Shelf.

IDT did not submit a bid or a proposal, nor file a bid protest during the proposal period which, as extended, ended on June 15, 2007.

Responding to the DOD's request for the development of performance specifications for security barriers, on June 29, 2007, DLA in a letter to the U.S. Army Engineer Research and Development Center ("ERDC") noted the extent of the demand for Hesco products "has grown exponentially since 9/11." The letter stated, "[i]n order to better support the war-fighter, and promote fiscal responsibility in managing costs associated with procuring these products, request your consideration with helping to develop a performance specification to promote competition, and allow other manufacturer's [sic] the ability to produce these items with the goal being greater availability of product to our customers in the field." (AR 394.)

On August 1, 2007, IDT initiated the instant litigation by filing a Complaint for Declaratory, Preliminary and Permanent Relief seeking:

> 1) A preliminary injunction preventing DLA from awarding a sole source contract to Hesco pending resolution of this action on the merits;
>
> 2) A permanent injunction that precludes DLA from awarding a sole source contract to Hesco under the sole source procurement at issue here;
>
> 3) A declaration that limiting competition under the sole source procurement at issue here violates statute and regulations, and is arbitrary and capricious and without rational basis[;]
>
> 4) A declaration that DLA should follow statute and regulation and conduct a proper competitive procurement for Class IV security barriers and revetments and barrier material;
>
> 5) Such other relief as the Court deems just and proper.

(Compl. 21.)

Discussion by the parties concerning the means by which force protection barrier requirements could be met until resolution of this litigation resulted in agreement that a "bridge" contract with Hesco would be utilized to cover those needs until the resolution of the instant litigation involving IDT's opposition to the proposed award of a successor two year IDIQ contract with three options.

On September 17, 2007, DLA executed a supplemental agreement with Hesco comprising a sole source IDIQ bridge contract, which provides:

> This modification establishes a bridge contract for the continued support of 24 NSNs collectively known as "Concertainer Defense Walls". The effective period of this bridge contract is from 17 September 2007 through 16 December 2007. This bridge contract also contains provisions for two 90-day extensions in the amount of $195,000,000.00 each. Total maximum value of this bridge contract including the two options is $717,000,000.00.
>
> All other terms and conditions remain the same.
>
> The estimated maximum value of this bridge contract is $327,000,000.00.

(AR 1 (2nd Protest).)

On September 26, 2007, IDT filed its Second Protest (Case No. 07-695C) addressed to the bridge contract. IDT complains the bridge contract is for more than three times the quantity of the same barrier products over a much shorter time period. IDT did not submit a bid or a proposal to supply the items covered by the bridge contract. The first option of the bridge contract was exercised on or about December 16, 2007. That option period will expire on or about March 15, 2008, and plaintiff has renewed its request for a preliminary injunction to restrain DLA's intended exercise of the second option on the bridge contract. Defendant responded that as an IDIQ bridge contract, DLA is required to purchase only the minimum and that a relatively small amount has been purchased to supply actual requisitions received.

## DISCUSSION

### A. Standing

Defendant contests IDT's standing to bring this protest litigation. To sustain the court's jurisdiction over its protest, IDT must establish as a threshold issue, that it has the requisite standing to pursue a protest concerning the award of the proposed IDIQ contract to Hesco. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002); *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005); *Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 359 (2007).[9]

To have standing to protest the contract award, IDT must be an interested party with respect to the procurement. 28 U.S.C. § 1491(b)(1). "[T]he parties encompassed by that term ["interested party"] are limited to '*actual or prospective bidders* or offerors whose *direct economic interest* would be affected by the award of the contract or by failure to award the contract.'" *Rex Serv., Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (emphasis in original) (quoting *Am. Fed. of Gov't Employees v. United States*, 258 F.3d 1298, 1304 (Fed. Cir. 2001)). *See Myers*, 275 F.3d at 1370.

In short, the "interested party" standing threshold has two parts. First, the protestor "is required to establish that it (1) is an actual or prospective bidder [or offeror], and (2) possesses the requisite direct economic interest." *Rex Serv.*, 448 F.3d at 1307 (citations omitted). The protestor must also establish prejudice to have standing to contest a proposed sole source procurement, by showing that it would have a substantial chance of receiving the award. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001); *Myers*, 275 F.3d at 1370.

[9] If IDT does not have standing to bring the initial Protest, then the Second Protest, addressing the bridge contract, which is effective only because of the pendency of the First, becomes moot.

**(1) Actual or prospective bidder**

Citing *Rex Service Corp*., defendant argues first that because IDT did not submit a proposal or file suit during the proposal period, it is not an actual or prospective bidder.

IDT did not submit a proposal nor file a bid protest showing that it intended to submit a proposal, if provided an opportunity, during the proposal period. Under Note 22, which the procurement incorporates, proposals to satisfy the requirements were due within 45 days of April 3, 2007, *i.e.,* by May 18, 2007. Under the Solicitation as extended, proposals were due by June 15, 2007. IDT filed its First Protest Complaint on August 1, 2007 which was after either period and does not indicate that a proposal to fulfill the procurement was contemplated.

In *Rex Service*, an agency protest was filed within the proposal period, but because Rex Service did not submit a proposal, it was neither an actual nor prospective bidder. "[B]ecause Rex could have bid, but chose not to, it cannot be considered a prospective bidder." 448 F.3d at 1308. "'[T]he opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends.'" *Id*. (quoting *MCI Telecomms. Corp. v. United States,* 878 F.3d 362, 365 (Fed. Cir. 1989). The Federal Circuit rejected the protestor's defense that a statutory violation in the solicitation prejudiced (but did not prevent) it from submitting a proposal. In the present case, the asserted deficiencies of which IDT complains were patent, apparent in the Presolicitation Notice and the Solicitation. IDT has not established any valid basis by which the standing requirements can be obviated.

> It is not relevant to [the protestor's standing] . . . that it alleges department "illegalities" prejudiced its ability to bid. It "could have [bid] for the contract award . . . and could have utilized the protest procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process."

*Rex Serv*., 448 F.3d at 1308 (citing *Fed. Data Corp. v. United States*, 911 F.2d 699, 705 (Fed. Cir. 1990). *See also Shirlington Limousine & Transp., Inc. v. United States*, 77 Fed. Cl. 157, 167 (2007) (dismissing protest for lack of standing for failure to submit a proposal despite GAO protest commenced during the proposal period).

Concerning its failure to submit a proposal, IDT's response is two-fold. First, it contends its keen interest in competition for earth-filled barriers conveyed to officials during the proposal period was the substantive equivalent of submitting a proposal. (Compl. ¶¶ 6-9, 23, 40.)

Secondly, IDT submits that because of the lack of performance specifications in the Solicitation, it could not respond with a proposal that met the unknown.

In support of its first defense (that its meetings and other competitive expressions were the substantive equivalent of submitting a proposal), IDT cites *KSD, Inc. v. United States*, 72 Fed. Cl. 236 (2006), which adopted the reasoning of *Cubic Defense Systems v. United States*, 45 Fed. Cl. 239 (1999), both cases holding telephonic and other expressions of interest and ability sufficient to satisfy the interested party requirement of actual or prospective bidder.[10/] In meetings and conversations in both cases the protestor informed the agency that it: (1) was interested in, (2) had the ability and (3) could qualify to submit a proposal if the agency had not improperly withheld information, with which the protestor could have submitted a bid. "Therefore, when the government's actions wrongfully prevent a bidder from qualifying for or bidding on a solicitation, the government cannot use the contractor's failure to qualify or bid on the solicitation as grounds for finding a lack of standing." *KSD*, 72 Fed. Cl. at 247.

IDT was not prevented from submitting a proposal, as defendant and Hesco point out, and as previously noted, the Presolicitation Notice specifically invited other proposals, informed that alternates would be further analyzed and incorporated Note 22. The reference and incorporation of Note 22 disposes of IDT's defense. Responses (and ability to produce the same) did not have to be for the named part numbers. Proposals submitted would be considered in determining whether to have a competitive procurement.

---

[10/] While the protesters in *KSD* and *Cubic* were found to have standing, in both cases the protestor did not prevail on the merits of the protest. *KSD*, 72 Fed. Cl. at 255-66, 268 (finding agency's sole source solicitation did not violate the Competition in Contracting Act and was not arbitrary or capricious in determining the contract awardee was the only approved source of the "Fat Boy" strap pack and *KSD* was not an approved source); *Cubic*, 45 Fed. Cl. at 258 (concluding the sole source procurement decision was not arbitrary, capricious or otherwise not in accordance with law).

> The proposed contract action is for supplies or services for which the Government intends to solicit and negotiate with only one source under the authority of FAR 6.302. Interested persons may identify their interest and capability to respond to the requirement or submit proposals. This notice of intent is not a request for competitive proposals. However, all proposals received within forty-five days (thirty days if award is issued under an existing basic ordering agreement) after date of publication of this synopsis will be considered by the Government. A determination by the Government not to compete with this proposed contract based upon responses to this notice is solely within the discretion of the Government. Information received will normally be considered solely for the purpose of determining whether to conduct a competitive procurement.

(Compl. Ex. E 4.)

A responsive submission could have resulted in what is the essence of IDT's position in this litigation – that a competitive rather than a sole source procurement should be utilized. The agency was not afforded an opportunity to respond to the argument now made in the first instance because neither a proposal nor a protest was made during the bidding period. These are the principles of *Rex Service* and now *Blue & Gold* (discussed *infra*).

IDT could have proposed supplying its Metalith units equivalent to the specific NSNs; the suggestion it did not know the products being solicited is disingenuous. The record is replete with IDT's insistence that its products and materials are similar, if not superior to Hesco's. There was no mystery – the basic difference in structure – geotextile versus corrugated metal – is acknowledged. A comparison chart with photographs, costs, assembly time, vehicle barrier rating, warranty, life cycle cost, a list of advantages and disadvantages, and a separate document listing 18 NSNs (all included in the Solicitation) of Concertainer Defense Walls with the respective length, height and width, are exhibits to IDT's Complaint. (Compl. Ex. A, B.) Reference is made to comparison of the two products on IDT's website. Comparison assumes knowledge. If the products were competitive, then there is no valid reason IDT did not submit a proposal or other response. IDT does not contend adequate notice of the solicitation was not given. Indeed, the Presolicitation Notice is attached as Exhibit E to its Complaint in the Initial Protest. IDT did not, during the proposal

period, utilize the contact information for DLA representatives provided in the Presolicitation Notice and the RFP.

The Federal Circuit's decision in *Rex Service* is binding precedent. The *Cubic* decision cited by IDT was issued seven years before the Federal Circuit's *Rex* decision. *KSD*, issued shortly after *Rex*, does not address the Circuit's ruling. However, even were *Rex Service* not controlling, *Cubic* and *KSD* are distinguishable and IDT's reliance on them is misplaced.

First, IDT does not contend its products or materials are the Hesco Concertainers in the Solicitation. In contrast, *KSD* asserted "it could have manufactured the 'Fat Boy' strap, but that the government improperly withheld the technical information *KSD* needed in order to produce the 'Fat Boy' strap pack." 72 Fed. Cl. at 247.

Second, the communications IDT assert rise to the substantive level of interest found sufficient in *KSD* are not at that level here. The protestor in *KSD* made weekly visits to the Army to express its interest in the specific procurement and had informed the Army several times that it could improve the strength of its strap packs to meet the specifications sought. IDT's expressions of interest in general performance specification type competition for barrier and revetment systems, its advocacy of the asserted advantages of the Metalith system, criticism of the asserted shortcomings of the Hesco products, and its meetings with military officials, particularly its meetings with Deputy Under Secretary, Dr. Finley (who was not one of the contact sources in the Presolicitation Notice or the RFP), differ from the communications found to establish the submission of a proposal in *KSD* and *Cubic*. The inquiries and communications, particularly the Dr. Finley letter, demonstrate: (1) there was a meeting during the relevant bid period; (2) Dr. Finley confirmed what was discussed at that meeting, that is, his staff was taking action to ensure a competitive environment exists for contracting opportunities; and (3) force protection material is being updated with additional references to IDT's products. Defendant concedes advocacy and aggressive marketing by IDT, touting the advantages of Metaliths over Concertainers. But, those communications did not: (1) refer to this procurement; (2) request to participate in or compete for, the procurement; (3) make a proposal; or (4) ask for clarification or more information as to the items subject to this procurement.

Notably, in the *Cubic* case, while accepting the protester's repeated telephone expressions of interest in procurement and ability to provide the items solicited as adequate to establish standing, the court rejected the protester's alternative position that its known prominence in the industry as a supplier of the pilot training services being solicited, coupled with its participation in a prior contract, were sufficient to communicate required interest. To establish standing, interest in the specific procurement and capability to compete, cannot be inferred. 45 Fed. Cl. at 249. Both Note 22, the solicitation and precedent require affirmative, responsive action. *Id.* "The statement of interest and capability that Note 22 contemplates affords the agency an opportunity to reconsider its sole-source procurement decision. *Id*. (citing *Fraser-Volpe Corp.*, B-240499, 90-2 CPD ¶ 397 (Nov. 14, 1990) and *Keco Indus., Inc.*, B-238301, 90-1 CPD ¶ 490 (May 21, 1990)). The agency would not be afforded an opportunity to reconsider its specific sole source decision, should interest and capability be inferred. *Id*. The same consequence follows here. Fervent expressions of interest in competition between two different members of the family of revetment manufacturers, supplying different products (fabric vs. metal), is simply not the same as affirmative expressions of interest and capability of supplying the specific product being sought. *See United States v. Aerodex, Inc.*, 469 F.2d 1003, 1008 (5th Cir. 1972).

Absent a proposal, IDT has failed to establish standing to protest.

**(2) Prejudice**

"Direct economic interest," the second prong of the interested party threshold, requires the protestor establish that the defects in the procurement process prejudiced it. "'To prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

"To establish prejudice [the protestor] was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process.'" *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (citations omitted).

In *Myers Investigative & Security Services,* the protestor claimed a sole source solicitation violated procurement regulations and should have been competitive. Finding the would-be bidder lacked standing, the Federal Circuit concluded that the protestor's allegation it *would* have submitted a bid in a competitive procurement, was insufficient. To have standing, a protestor must also establish it "'*could* compete for the contract' if the bid process were made competitive." *Myers*, 275 F.3d at 1370 (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001) (emphasis supplied)). The protestor must show that it would have been a qualified bidder. "Although it need not show that it would have received the award in competition with other hypothetical bidders, it must show that it would have been a qualified bidder." Specifically, in a "sole source procurement, the protestor 'must show that it would have been a qualified bidder.'" *Ezenia!, Inc. v. United States*, 80 Fed. Cl. 60, 65 (2008) (concluding vendor lacked standing to protest task order purchase of Adobe Breeze software because the protestor did not sell that software, and therefore could not show it would have been a qualified bidder (quoting *Myers*, 275 F.3d at 1370-71)).

In *Myers*, the protestor did not show it could have performed the guard services solicited by the sole source procurement. *Id.* Likewise, while IDT sells corrugated metal components, it does not contend it could supply any wire mesh geotextile components, much less the specific sizes in the RFP. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001), cited by IDT, involves different facts and does not alter the court's conclusion herein. The protestor in *Impresa* did submit a bid but was allegedly erroneously excluded from the competitive range. If the agency were required to rebid the contract, the unsuccessful bidder would be allowed to compete again, thus had the requisite economic interest.

Accordingly, as IDT did not establish it could have provided the materials solicited, it did not demonstrate the required economic interest in the procurement. Lacking a substantial chance to receive the contract award at issue, IDT fails to show standing to prosecute this protest litigation.[11/]

---

[11/] That IDT could have submitted a proposal to supply its claimed equivalent force protection units, other than the specific NSNs listed, for DLA consideration as to whether to make the procurement competitive rather than sole source, is not inconsistent with its failure to establish it could have received the award as solicited. Having failed to submit a proposal to demonstrate that (continued...)

**(3) File the protest during the proposal period**

Defendant also asserts that the court lacks subject matter jurisdiction because the protest was not timely filed. (Def.'s Mot. 7.) "Because [IDT] could have but did not submit a proposal for this procurement, **and because it filed its protest after the end of the proposal period, [IDT] does not come within the Court's section 1491(b) bid protest jurisdiction.**" (Def.'s Mot. 9 (emphasis added).) "Furthermore, [IDT] failed to file this protest before the deadline for submitting proposals." (Def.'s Reply 2, 3 (asserting consequences are that it does not come within the court's subject jurisdiction).) At oral argument defendant also asserted IDT did not file this lawsuit before the deadline for submitting bids; therefore, "does not have standing under the Federal Circuit's decision in *Rex*, and this protest should be dismissed for lack of jurisdiction." (Tr. 48, lines 17-21.) IDT did not respond to this point except to rely on the allegations of its Complaint and unspecified matters in the record.[12/]

The failure to challenge the terms of the solicitation prior to the close of the bidding process is a waiver of that same objection in a subsequent bid protest in the Court of Federal Claims. In *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313. In *Blue & Gold*, the protestor claimed the solicitation did not require compliance with the wage and benefits provisions of the Service Contract Act, 41

---

[11/](...continued)
the procurement should be competitive, IDT is not in a position to supply Concertainers and cannot show the required prejudice to establish standing.

[12/] I do have a couple points, especially with regard to standing. We have made factual allegations to support standing in the pleadings. Those have not been contested. However, since standing presumes all allegations to be true and all reasonable inferences therefrom to be accepted on the standing argument I don't think it [Infrastructure's request for entry of a default against defendant for failure to timely respond to the Complaint in the First Protest] has an impact. I believe that we have the allegations in the complaint to support us, as well as the record.

(Tr. 9-10, lines 21-25, 1-3.)

U.S.C. §§ 351-358. Blue and Gold submitted a proposal by the March 30, 2005 deadline. It filed a protest with the Government Accountability Office in October of 2005 and subsequently filed a bid protest in the Court of Federal Claims. Finding the substance of its protest was a challenge to the terms of the solicitation, requiring commencement of a bid protest during the proposal period, as opposed to a challenge to the evaluation of the proposals, for which suit may be brought later, the Federal Circuit observed:

> [I]t is true that the decision not to apply the Service Contract Act to the contract may have influenced the evaluation of the proposals; however, the Park Service made this decision [not to import the Service Contract Act] during the solicitation, not evaluation, phase of the bidding process . . . , [t]herefore, Blue & Gold's assertion that the proposals should have been evaluated according to the Act is a challenge to the solicitation.

492 F.3d at 1313.

"Recognition of a waiver rule, which requires that a party object to solicitation terms during the bidding process, furthers [the] statutory mandate [of 28 U.S.C. § 1491(b)(3)]" that "courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action.*" 492 F.3d at 1313 (emphasis in original). Requiring objections to the terms of a solicitation be brought during the proposal period avoids costly after the fact litigation. *Id.* at 1314.

*Blue & Gold* has been applied by the Court of Federal Claims in several situations. *See Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 8-9 (2008) (holding disqualified bidder waived objection to procurement small business set-aside by not filing protest during bid period); *Frazier v. United States*, 79 Fed. Cl. 148, 177 (2007) ("The proper time to challenge the provisions of a prospectus is before bids are required to be submitted, in a pre-award bid protest."); *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 737 (2007) (holding protestor waived objections to the terms of the solicitation by not filing protest during the time for submitting bids); *Masai Techs. Corp. v. United States*, 79 Fed. Cl. 433, 444 (2007) ("To the extent [the protestor] believed that the citizenship requirement [in the RFQ] was too stringent or otherwise improper, [the protestor] should have raised its objection with the Army prior to submitting its proposal."); *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 533 n.7 (2007) (rejecting contention of non-bidding protestor to the extent it was

challenging the terms of the solicitation, which must be raised during proposal period); *Scott v. United States*, 78 Fed. Cl. 151, 154 n.2 (2007) ("Thus, a protest challenging the terms of a government solicitation containing a patent error may never be waged post-award, because the opportunity to object to such an error ends upon the close of the bidding process and, necessarily, prior to any award being made."); *Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 184-85 (2007) (finding protestor lacked standing because protestor did not object to inclusion of terms in the solicitation concerning priority afforded to state licensing agencies under the Randolph-Shepard Act during bid period); *CC Distribs., Inc. v. United States*, 38 Fed. Cl. 771, 781-82 (1997) (dismissing protest over alleged improper "bundling" in solicitation for lack of standing that was filed after proposal period). *Cf. Knowledge Connections, Inc. v. United States*, 79 Fed. Cl. 750, 759 (2007) (declining to find waiver where protestor had no notice of the defect alleged prior to the close of the bidding period).

Whether the "error" alleged here is the lack of technical or equivalent performance specifications and/or the sole source nature of the procurement, the "error" is patent – easily recognizable or obvious. IDT does not assert these matters, of which it complains, were not readily apparent. The clear instruction of the Federal Circuit that objection to the terms of the solicitation must be protested prior to the close of the bidding process, applies with no less force here. The protestor in *Blue & Gold* had submitted a bid; nevertheless, its failure to file its protest during the bid period was found to be a waiver. Because IDT did not file a bid or proposal, the case of waiver is even stronger. As in *Blue & Gold*, judgment on the administrative record on this basis is warranted.

In the alternative, were it to be determined that standing exists and waiver does not apply, it is then concluded that IDT has not established that DLA acted arbitrarily or capriciously or in violation of law.

## B. Judgment on the administrative records

The court reviews this bid protest under the standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2000). *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (stating that the APA standard of review applies to bid protests); *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1290 (instructing that "[t]he [Administrative Dispute Act of 1996] explicitly imports the

APA standards of review into the Court of Federal Claims' review of agency decisions"). Under the APA, an agency decision is set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1329 (Fed. Cir. 2004); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000).

IDT bears the burden of proving that the agency action alleged was arbitrary and capricious or in violation of statute or regulation. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). Under the arbitrary or capricious standard, the court "may not substitute its judgment for that of the agency" if the agency's decision is reasonable. *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing *Ray v. Lehman*, 55 F.3d 606, 608 (Fed. Cir. 1995)). The challenged decision may be set aside only if "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

> When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Banknote*, 365 F.3d at 1351 (internal quotations omitted) (citing *Impresa*, 238 F.3d at 1332-33). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). *See also Chant Eng'g Co. v. United States*, 75 Fed. Cl. 62, 70-71 (gathering authorities).

These standards of review apply to sole source procurements. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1087 (Fed. Cir. 2001) (describing the review standards as "identical"). IDT must establish:

> (1) the agency's decision to conduct a sole-source procurement process lacked a rational basis; (2) the agency's sole-source requirements lacked a rational basis; or (3) based on the sole-source requirements, the selection of the sole-source awardee lacked a rational basis.

*Id*. at 1085-86. "[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id*. (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1966) and *Impresa*, 238 F.3d at 1332.). In *Emery*, the United States Postal Service awarded a sole source contract to Federal Express for the delivery of certain mail. Two of the identified minimum requirements were a shared-lift system and financial stability. *Emery Worldwide Airlines, Inc.*, 264 F.3d at 1087; *see also Emery Worldwide Airlines, Inc. v. United States*, 49 Fed. Cl. 232-23 (2001). The Postal Service determined Emery could not provide a shared-lift system and did not have the required financial independence. Emery filed a protest. Both the Court of Federal Claims and the Federal Circuit upheld the agency's determination which was found to be "a sound decision confined to agency discretion and was not irrational." *Emery Worldwide Airlines, Inc.*, 49 Fed. Cl. at 234

In addition to examining the agency's rationale (and assuming that burden is met), the protestor must also establish prejudice – "that it would have had a substantial chance of receiving the award." 264 F.3d at 1086 (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). Prejudice can be established:

> either by showing: (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award, or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award.

*Id*. at 1086 (citations omitted).

On cross-motions for judgment on the administrative record under RCFC 52.1, the court determines whether the plaintiff has met its burden of proof based on the record evidence. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). "[A] judgment on the administrative record [is distinguishable] from a summary judgment requiring the absence of a genuine issue of material fact." 404 F.3d at 1355. "[T]he existence of a fact question neither precludes the granting of a motion for judgment nor requires this court to conduct a full blown evidentiary proceeding. Rather, such fact questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, 'as if [this court] were conducting a trial on [that] record.'" *Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005) (citations omitted).

**(1) DLA's proposed award of a two-year contract to procure Concertainer Defense Walls to fill military orders was neither arbitrary nor capricious nor in violation of law**

From January through September 2007, DLA received requisitions from military units in hostile theaters in Iraq and Afghanistan for more than $375 million worth of Concertainers. (AR 24 (2nd Protest).) These orders were filled primarily under a predecessor contract with Hesco scheduled to expire in June 2007, then extended through September 15, 2007. (Lauersen Dep. at 15; AR 48.) It was not irrational for DLA to pursue a replacement contract vehicle in order to supply anticipated continuing and future needs for Concertainers. Accordingly, on April 3, 2007, DLA issued its Presolicitation Notice. (Compl. Ex. E.) The Notice stated that DLA intended to issue a request for proposals for a new IDIQ contract for Concertainer Defense Walls. *(Id.)* A sole-source award to Hesco was contemplated, but as noted, all proposals received during the next forty-five days would be considered to "determin[e] whether to conduct a competitive procurement." (*Id*. at 4.) Offers from Hesco and a third party, JSF Systems were received by the deadline. IDT did not submit a proposal either before or after the deadline.

IDT alleges DLA violated the Competition in Contracting Act ("CICA"): (1) by failing to support the conclusions reached in the J&As in violation of 10 U.S.C. § 2304(f)(1)(A) and 48 C.F.R. § 6.303-2; (2) by failing to issue performance specifications or qualification requirements in violation of 10 U.S.C. § 2305(a)(1)(A)

and 48 C.F.R. § 11.002(a)(2)(i); (3) by not engaging in advance planning as required by 10 U.S.C. § 2304(f)(5)(A); and (4) by not complying with DOD Directive 5101.12 and Defense Logistics Acquisition Directive 52.217-9002.

The court concludes the findings cited in the J&As were not arbitrary or capricious, but adequately supported by data in the administrative record and the decision to solicit a new supply contract for Concertainers was rational. Concluding that IDT has not established grounds for enjoining or setting aside the award on the base contract, the protest on the bridge contract is essentially moot. However, the claimed error in the bridge contract is addressed.

The first four of the six causes of action in IDT's Complaint assert CICA violations. CICA requires competitive contracting with seven exceptions. *See* 10 U.S.C. § 2304(c)(1)-(7). The exception cited for the procurement at issue applies to a product or service available from only one "responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency." 10 U.S.C. § 2304(c)(1). A published notice of the intention to award a sole-source contract is required and was issued by DLA. 10 U.S.C. § 2304(f)(1)(C).

**(a) Justification for acquisition by means other than full and open competition**

A sole source solicitation must be preceded and supported by a Justification for Other Than Full and Open Competition ("J&A"). 10 U.S.C. § 2304(c)(1); 48 C.F.R. § 6.302-1. The J&As for the base and bridge contract describe the Concertainer Defense Walls by specific NSNs in the following categories:

(a) rapid assembly protective walls – thirteen NSNs;

(b) rapid assembly personnel field defense protective walls – two NSNs;

(c) rapid assembly aircraft base revetment – one NSNs;

(d) rapid assembly second tier aircraft revetment – two NSNs;

(e) rapid assembly third tier aircraft revetment – two NSNs;

(f) rapid assembly fortress walls; two NSNs;

(g) fighting positions – two NSNs;

(h) observation post – one NSN.

(AR 47-52; AR 2-7 (2nd Protest).)

Both J&As state: "[t]he only known source for the items is Hesco Bastion, Ltd." (AR 47; AR 2 (2nd Protest).) As discussed hereafter, Hesco holds a patent on these items. Both J&As describe the Concertainer Defense Walls as "critical force protection items," (AR 48; AR 3 (2nd Protest)), and predict that without a replacement contract vehicle, it would take longer to fill military orders for these critical items. "The lack of a bridge Contract will result in unacceptable delays in fulfilling the Agency's Concertainer defense wall needs." (AR 3 (2nd Protest).)

It was not arbitrary or capricious for DLA to conclude Hesco was the only source of these items[13/] and it was not arbitrary or capricious for DLA to procure a contract with the flexible capacity to fill estimated military orders.

Underlying the reliance on the "one responsible source" exception to CICA are the J&As.[14/] IDT complains that DLA's statements as to minimum needs and conclusions that Concertainers satisfy those minimum needs were arbitrary and capricious, are not supported by the record, favor Hesco and, consequently, prejudice IDT.[15/] Product characteristics identified as the minimum needs for force protection

---

[13/] An other exception in CICA is when there is an "urgent and compelling need." Although discussed by counsel, this exception was not invoked in the J&As. Also, the parties did not address 48 C.F.R. § 6.302-1(c) concerning use of a brand name description.

[14/] 48 C.F.R. § 6.302-1(a)(2) provides:

When the supplies or services required by the agency are available from only one responsible source, or for DoD, NASA, and the Coast Guard, from only one or a limited number of responsible sources, and no other type of supplies or services will satisfy agency requirements, full and open competition need not be provided for.

[15/] The standards for J&As are set forth in 48 C.F.R. § 6.303-2(a).

(a) Each justification shall contain sufficient facts and rationale to justify the use of

(continued...)

barriers for contingency and expeditionary use are time to assemble in the field, cost, stackability, ease and speed of transport, and suitability for temporary structures.

> From a standpoint of pricing, transportation and contingency effectiveness, the Hesco [C]oncertainers are the only available products meeting the Government's minimum needs. . . . [with regards to] rapid assembly, transport mobility, ability to withstand stacking and suitability for use as temporary structures; the aggregation of these characteristics make them ideal for use in contingency operations.

---

15/(...continued)
the specific authority cited. As a minimum, each justification shall include the following formation:

> (1) Identification of the agency and the contracting activity, and specific identification of the document as a "Justification for other than full and open competition."
> (2) Nature and/or description of the action being approved.
> (3) A description of the supplies or services required to meet the agency's needs (including the estimated value).
> (4) An identification of the statutory authority permitting other than full and open competition.
> (5) a demonstration that the proposed contractor's unique qualifications or the nature of the acquisition requires use of the authority cited.
> (6) A description of efforts made to ensure that offers are solicited from as many potential sources as is practicable, including whether a notice was or will be publicized as required by subpart 5.2 and, if not, which exception under 5.202 applies.
> (7) A determination by the contracting officer that the anticipated cost to the Government will be fair and reasonable.
> (8) A description of the market research conducted (see part 10) and the results or a statement of the reason market research was not conducted.
> (9) Any other facts supporting the use of other than full and open competition.
> . . .
> (10) A listing of the sources, if any that expressed, in writing, an interest in the acquisition.
> (11) A statement of the actions, if any, the agency may take to remove or overcome any barriers to competition before any subsequent acquisition for the supplies or services required.

> . . .
>
> Hesco Bastion's [C]oncertainers are the only currently available products meeting the Government's minimum requirements with regard to rapid assembly, transport mobility, ability to withstand stacking and suitability for use as temporary structures. No other Concertainer products meet the strength and durability requirement for the needed Force Protection for our troops, particularly with respect to rapid deployment. The military users currently stack the [C]oncertainers; build ceiling structures off the top of the [C]oncertainers, and stack sand bags atop the structures that are built atop the [C]oncertainers. No other entity's products can be used in this manner.

(AR 48; AR 3 (2nd Protest).)

The contracting officer's decisions are presumptively proper. *Impressa Construzioni Geom, Domenico Garufi v. United States*, 238 F.3d 1328, 1338 (Fed. Cir. 2001). Solicitation terms must have a rational relationship with an agency's minimum needs,[16] must not be unduly restrictive, and must be written to enhance competition and innovation. *Wit Assocs. v. United States*, 62 Fed. Cl. 657, 662 (2004). DLA's discretion in determining its needs or more accurately its needs for a supply contract to fill military orders, "is a matter within the broad discretion of agency officials . . . and not for this court to second guess." *Id.* (internal citations omitted). *See also XTRA Lease, Inc. v. United States*, 50 Fed. Cl. 612, 625 (2001). The agency also has broad discretion in selecting the best way to accommodate those needs. *See ABF Freight Sys., Inc. v. United States*, 55 Fed. Cl. 392, 409 n.13 (2003) ("The law is well-settled that the determination of an agency's procurement needs and the best method for accommodating them are matters primarily with the agency's discretion.").

DLA's conclusions were rationally based. The minimum need analysis was not for all force protection barriers; the administrative record supports DLA's conclusion that Hesco's Concertainers meet the government's minimum needs for force

[16] *See* 48 C.F.R. §§ 6.302-1(b)(1), 6.303-2(b).

protection barriers used in contingency[17/] and expeditionary operations and are the most cost effective means of doing so. Product characteristics cited included (1) rapid assembly; (2) transport mobility; (3) ability to withstand stacking; and (4) suitability for use as temporary structures. (AR 48; AR 4 (2nd Protest).) Metal revetments were considered, but while they last longer, their initial cost is greater, they are heavier, more difficult and expensive to ship and take longer to assemble.

> [Metal revetments a]lthough designed to fill an essentially similar purpose, . . . are in fact more suitable for long term usage. These products are significantly more expensive to manufacture for a given amount of coverage, more difficult and costly to ship due to their much greater weight (they are comprised of solid steel panels; Hesco [C]oncertainers incorporate panels made of welded wire grids) and since [metal revetments] are shipped unassembled, require considerably more time to prepare for use. The Hesco [C]oncertainers arrive basically fully assembled, needing only to be unfolded before whatever fill material is available can be added, while the revetments' design necessitates their being shipped completely disassembled. Realistically, the metal revetments are better suited for use as more permanent structures rather than for contingency operations.

(AR 48; 4 (2nd Protest).)

Metal revetments are an "alternate product . . . not preferred for expeditionary usage due to their considerable additional weight when compared to the Hesco products. Since transportability and ease of assembly are intrinsic to the design of the Hesco products, the steel revetments are therefore not functionally equivalent to the Hesco items." (AR 50; AR 5 (2nd Protest).) "The Hesco bastion was designed for rapid deployment in 'contingency' operations. Most operations of this type are planned for short duration." (AR 447.) Concertainers are "expeditionary in terms of speed of setup . . . transportability, moving the units to the customers in the field that

---

[17/] Contingency is defined as "something whose occurrence depends on chance or uncertain conditions; a possible, unforeseen, or accidental occurrence [be prepared for any contingency]." WEBSTER'S NEW WORLD DICTIONARY 301 (3rd ed. 1988).

are ordering that, that are being shot at that want[] material to set up around them quickly." (Lauersen Dep. 191.) "[W]hen we developed the products for the Metalith we – the items were created as a different item. They were created based upon need by the CENTCOM user to develop a long-term solution to the Hescos. It wasn't designed to be expeditionary." (Lauersen Dep. 174.) A metal revetment "is different [from] the Hesco Bastion although its end use is similar. (AR 463.)

IDT points out that the Air Force Force Protection Battlelab found Metaliths to be superior to Concertainers in "Repairability," "Reusab[ility]," and "Vertical Compression Load." (AR 418.) While true, that same study also rated Hesco products superior in weight, assembly time and cost.[18/] The inclusion of this data in the record counters IDT's complaint that more recent data was "ignored." Again, the question is not whether the court would reach the same conclusions as the agency, but rather, whether the conclusions reached by the agency lacked a rational or reasonable basis.

---

[18/] A September 2006 comparison of Metaliths and Concertainers by the USAF Force Protection Battlelab's rated Metaliths "more advantageous" in several categories:

| Advantages | Metalith w/roof & w/anti-climb | Metalith w/o roof & w/o anti-climb | Hesco |
|---|---|---|---|
| Warranty | X | X | |
| Aesthetics | X | | |
| Reparability | X | X | |
| Reusable | X | X | |
| Anti-Climb | X | | |
| Weatherability | X | X | |
| Height Stability | X | X | |
| Vertical Compression Load | X | X | |
| Individual Cell Weight | | | X |
| Assembly Time | | | X |
| LCC for 1 year | | | X |
| LCC for 2 years | | X | |
| LCC for 5 years | X | X | |
| LCC for 10 years | X | X | |
| LCC for 20 years | X | X | |

(AR 418.)

As for "rapid assembly," there is record support that Concertainers are assembled in less time. A comparative chart in the JFOB Handbook shows a 32' L x 9' H x 17.4'/13.9' D Hesco structure takes fifty-one man-hours to assemble; a 48' L x 12' H x 12' D Metalith takes ninety hours.[19/] (AR 418.) It was certainly rational to consider a difference of forty hours or more of exposure to hostile fire in remote contingency locations such as Iraq and Afghanistan. The record also contains statements that metal revetments are "heavier" and "not as easy to set up" as Hesco Bastions. (AR 443, 463.) The comprehensive JFOB Handbook elsewhere describes these construction times to be "similar." "The estimates of the necessary equipment and soldier assets required to construct this position [addressing metal revetment] are similar to those for the Hesco Version." (AR 578.) The reference to "similar" does not make the agency recognition of a quantitative difference, reflected in several places in the record, arbitrary or capricious.

The J&A states that transportability is "intrinsic to the design of the Hesco products." (AR 50.) Concertainers are lighter; ergo apparently easier to transport into hostile territory. (AR 412-13 (metal revetments are "much heavier and more expensive to manufacture; more difficult and costly to ship due to the greater weight of the product . . . considerably more time consuming to assemble; [whereas] HESCO barriers arrive in theater basically fully assembled; needing only to be unfolded before adding fill material."); AR 413 ("HESCO product very lightweight; easier for Marines and USACE to use in theater ops . . . The METALITH may not be what the Army needs or wants to support operations in Iraq and Afghanistan."); AR 447 ("the Hesco design is quicker to set up, lighter to transport).) JFOB Handbook statements cited by IDT that both Metaliths and Concertainers are collapsed and filled on site, thus minimizing shipping efforts (revetments, "[l]ike the concertainer . . . have the capability to minimize transportation weight and volume requirements . . . during transport the metal material can be collapsed and stacked," (AR 512-13)) does not make the DLA's reasoning other than rational.

A Hesco can be reduced to five percent of its volume in a stacked state, in support of the J&A's reference to its ability to withstand stacking. Finally, DLA's

---

[19/] Hescos also compare favorably time-wise elsewhere in the JFOB Handbook. (AR 570, 578 (forty-five hours versus fifty-one hours).) That according to IDT the calculated cubic feet of these comparisons differs, does not alter the court's conclusions in this regard.

conclusion that Concertainers were suited for use as temporary structures in contingency operations is supported by the record.

As for cost, statements that Metaliths cost considerably less than Concertainers amortized over their twenty-year life does not make the agency conclusion that in the short-term Concertainers are less costly, arbitrary or capricious. (AR 446, 447 ("Overall 'initial' cost for the Hesco product, for the same coverage, is much cheaper. Corrugated Metals uses a 20 year life cycle cost to determine that their product is cheaper . . . . The Hesco design is initially cheaper, which [is a] key consideration[] while planning."); AR 398-99 ("there are also funding issues [with metal Hesco product, and be more costly to ship and construct"); AR 443 (March 2007 statement that "[p]reliminary information suggests that [the metal revetment] is not interchangeable with the Hesco Bastion – [it] is heavier, not as easy to set up, and costs more"); AR 463 ("[t]he revetments do last longer, but cost more in price and transportation"); AR 418 (listing life cycle costs of Metalith and Hesco).) While IDT suggests that this pricing comparison is artificial and would likely differ in a competitive procurement, this does not detract from the actual pricing data referenced. Also, as IDT did not submit a proposal, it can not fault DLA for relying on then available data.

DLA also identified other "fundamental differences in how and when the different barrier systems are used including possible "political" effects of using Metalith, which while longer lasting, looks more permanent, raising the question "whether the installation of longer lasting barriers (*i.e.* metal revetments) allows the perception of a more permanent (*i.e.*, "occupation"), rather than a temporary presence." (AR 398.)

While on its face, the J&As appear to compare two products with the nod to Concertainers, to which IDT strenuously disagrees, in context, that is not the result. The J&As are prerequisite to the pursuit of an IDIQ supply contract for the itemized Concertainer products listed above. No more; no less. This was not a solicitation by the end-user military customer to supply all its protective barrier needs. Rather, DLA as an intermediary, is seeking a supply contract for rapid, temporary, contingency blast protection with flexible capacity to fill future customer orders estimated to come to DLA, and that DLA must be able to honor. The J&As explain that the procurement was not for *any* force protection barrier but rather for a force protection barrier "ideal

for *contingency* operations." (AR 48; AR 3 (2nd Protest) (emphasis supplied).) Military customers still can order Metaliths or other types of barriers that can be reused and have a longer life – a reality that has not changed and will not change regardless of whether the solicitation here is upheld.[20/]

IDT argues that the J&A's statements that only Hesco's products meet the government's minimum needs lack record support. The failure of IDT to submit an item by item proposal in response to the DLA solicitation demonstrating the validity of its assertions that its products would meet the minimum needs addressed in the procurement at issue precludes any conclusion that the DLA statements were arbitrary or capricious. IDT's citation of *Magnavox Electronic Systems Co. v. United States*, 26 Cl. Ct. 1373 (1992) in support of its argument is misplaced since the Federal Circuit, in *Motorola v. United States*, 988 F.2d 113 (1993), implicitly reversed *Standard Manufacturing Co. v. United States*, 7 Cl. Ct. 54 (1987), the authority relied upon in *Magnavox*, based on the failure of *Motorola*, like IDT in the instant procurement, to submit a proposal.

**(b) Performance specifications**

Because the solicitation contained no technical or functional requirements, only NSNs, IDT alleges DLA violated 10 U.S.C. § 2305(a)(1)(A) and 48 C.F.R. § 11.002(a)(2)(i) by not including performance specifications. (Pl.'s Br. at 27 (stating there must be "pre-existing objective requirements"). The sole source exception to CICA employed did not require technical or performance specifications. 48 C.F.R. § 6.303-2(a)(3) requires that the justification simply include a "description of the supplies or services required to meet the agency's needs." That requirement was met. As noted above, the J&A listed the item descriptions and NSNs of the Concertainers, followed by a narrative that they are "various sizes of blast barrier walls constructed of heavy-duty galvanized wire mesh and lines with geo-textile fabric. (AR 47; AR 2 (2nd Protest).) Defendant remarks that IDT cannot credibly contend it was prejudiced by the product description. It was quite familiar with Hesco's products. Again, as

---

[20/] In addition to ability to order metal revetments through Haystack, MILSTRIP and other ordering mechanism, Hesco asserts that "IDT's subsidiary, Corrugated Metals, Inc. ("CMI") holds General Services Administration ("GSA") schedule number GS-07F-5738R from which federal agencies can order the Metalith products . . . ." (Hesco's Mot. for Judgment on the AR 4.)

IDT did not submit a proposal, timely inquire, nor file a protest on this alleged defect, its objection is waived.

Asserting that the one responsible source exception to competition only makes sense if there are pre-existing objective requirements to lead to the conclusion there is only one responsible source, IDT cites *Fire-Trol Holdings, LLC v. United States*, 66 Fed. Cl. 36 (2005). *Fire-Trol* was a procurement for fire retardant used in battling forest fires. There were only two possible suppliers. The retardant used by one of those suppliers contained a chemical found to possibly endanger fish; accordingly, the procurement specifications included in the solicitation banned this chemical. Fire-Trol protested that the ban caused the procurement to become defacto sole source. The court there found that it was not a "super" Forest Service administrator. "The Court's only role is to determine if the Forest Service's decision was *so wrong* that it may be called arbitrary and capricious." 66 Fed. Cl. at 38. Although the solicitation included technical specifications concerning the composition of proferred fire retardant, the ruling was that the procurement was not subject to CICA because the Forest Service procurement was for products with "qualification requirements" governed by 41 U.S.C. § 253(c) which does not require competition. The authority is inapposite.

It is asserted that DLA should have heeded complaints from the field about Hesco, and proceeded to introduce competition and develop performance specifications for barriers, rather than continue with the demand-driven supply contracts involved. The performance specification competitive procurement IDT has sought has been in development by DOD and is now in final form. DLA anticipates commencing a competitive procurement based thereon. *Cf.* Pl.'s Br. at 25-27 (asserting DLA should develop and utilize a performance specification to facilitate competition for barrier products) *with* Lauersen Dep. at 178-79, 183-84; Pl.'s Br. 16-17 (DLA is taking this action and a new competitive procurement based on these new specification is forthcoming.). The J&A for the base contract repeats the representation in the Presolicitation Notice that alternate offers would be forwarded to the Army Corps of Engineers for technical evaluation. (AR 49.) The J&A for the bridge contract dated September 11, 2007, recites the development of a competitive performance specification then in final stages of development (and subsequently finalized) "prior to the initiation of a procurement action. An aggressive timeline is being pursued to ensure completion of the specification, and award of a competitive

procurement action." (AR 5 (2nd Protest).) This specification was not in existence for the procurement at issue and DLA's actions in providing a flexible contract vehicle to satisfy specific military needs was not arbitrary or capricious in the absence of such specifications.

**(c) Directives**

IDT also alleges DLA violated DOD Directive 5101.12 and Defense Logistics Acquisition Directive 52.217-9002. (Compl. Ex. G.) Directive 5101.12 charges military departments with the responsibility of determining its requirements for barrier protection. DLA is designated as the executing agency for procuring construction/barrier materiel required by all DOD departments. *See* DOD Directive 5101.12 § 1.2, 5.2.2. The respective military departments are to communicate with DLA "regarding the types and quantities of construction/barrier materiel items to be procured for the full spectrum of military operations." *Id*. § 5.4.1; *see also id*. § 5.4.2 (instructing military departments to coordinate with DLA "to assure materiel availability during peace and war and to eliminate duplication of effort").

Under this Directive, IDT alleges the military departments, not DLA, should formulate requirements and "coordinate and resolve construction//barrier materiel related issues." (Compl. Ex. G 3.) DLA's planning to accommodate demand is not inconsistent with, nor does it violate, the Directive cited.

The cited Directive (Exhibit G to the Complaint in the base protest) prescribes authority, policy and management responsibilities for construction/barrier materiel (Class IV) in peacetime. Stated policy includes creation of a barrier material acquisition and logistics program to maintain a consistent and effective supply to support the military. Detailed responsibilities are outlined for planning and management of Class IV materials. While IDT clearly would like to be a larger part of that program, it has not established that the Directive has the effect of a statute or regulation such that acting inconsistently with its provisions would constitute grounds to set aside or enjoin this solicitation. *See Hamlet v. United States*, 63 F.3d 1097, 1105 (Fed. Cir. 1995) (articulating test); *Novell, Inc. v. United States*, 46 Fed. Cl. 601, 615 (2000) (stating that an agency procedural guide with the force and effect of law is a necessary predicate for this court to have jurisdiction over a claim that the

procurement violated the terms of that guide); *Wolcott v. United States*, 43 Fed. Cl. 581, 588 (1999) (stating personnel handbook did not have the force of a regulation); *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 839-40 (1999) (agency bulletin). *See also Hoskins Lumber Co., Inc. v. United States*, 24 Cl. Ct. 259, 266 (1991) (Forest Service Manual "does not rise to the status of a regulation"); *Stone Forest Indus. Inc. v. United States*, 973 F.2d 1548, 1551 (Fed. Cir. 1992) (finding that while the Forest Service Manual does not have force and effect of law, it was evidence of custom and practice in a breach of contract suit).

Even if the cited Directives were not followed and DLA acted in violation "of statute or regulation in connection with a procurement or a proposed procurement," which the court does not find occurred, IDT has not established it was prejudiced. Planning and coordination toward the development (and now finalization) of performance specifications in preparation for competitive solicitations (which is what IDT contends is required by the Directives), does not detract from the need for a contract vehicle such as the procurement at issue to respond efficiently to existing and ongoing requisitions from military units for Concertainers.

**(d) Lack of advance planning**

As the CICA directs, no agency may justify a sole source procurement due to a "lack of advance planning." 10 U.S.C. § 2304(f)(5)(A). An agency's justification for "using other than competitive procedures" cannot be based upon "a lack of advance planning or concerns related to the amount of funds available." 48 C.F.R. § 6.301. The J&As for the procurement at issue were not premised upon a lack of advance planning nor on the expiration of available funding. (AR 48-50.) Rather, DLA supports the proposed issuance of a sole source supply contract to Hesco on the grounds that Hesco is the only responsible source from which lightweight, easily transportable, rapidly assembled bastions, for use in expeditionary, contingency operations are available. (*Id.*)

In considering the above-cited statutory requirement for advance planning, it is well settled that, procurement planning "need not be entirely error-free or even actually successful. All that is required is that the planning actions be reasonable." *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 239, 258 (1999). While

complaining about the speed of change to performance specifications, IDT does not suggest an alternate time frame. Metal revetments were not tested by ERDC until late 2004. (AR 53-54.) IDT forwarded a draft generic specification in June of 2007 in an effort "to facilitate DLA's efforts" toward a performance specification.[21] (AR 433-35.) A performance specification was recently finalized and subjected to comment. IDT has not established that the development time period was unreasonable or an abuse of discretion. *See Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 381-82 (2004) (declining to find a decade of the Army's unsuccessful attempts to address problems of sand in the helicopter engines was a lack of advance planning).

DLA's work with ERDC and other entities demonstrate ongoing planning for competitive procurements in force protection barriers following the recent finalization of performance specifications. *Metric Sys. Corp. v. United States*, 42 Fed. Cl. 306, 313 (1998). As Hesco notes, the pendency of this performance specification may be the reason DLA proposed the contract at issue as a short term (two-year) IDIQ contract, and as noted in the J&A, the option periods may not be exercised and orders above the contract minimum may not continue once the new, performance-based specifications are established. (AR 50 ("The successful establishment of such a specification will be a major consideration when determining whether an option period will be exercised, or whether delivery orders above the guaranteed minimum will continue to be issued against this proposed contract.").)

**(e) Solicitation and marketing**

IDT asserts that DLA's action in maintaining a contract to fulfill the military demand for HESCO products serves to increase these demands, to IDT's detriment. It is claimed that if a similar contract existed for Metalith products, demand for these products would emerge and increase. IDT points to difficulty military units have experienced in ordering Metalith products in the absence of an existing DLA supply

[21] In response, DLA concluded that as drafted, the specification was not generic but favored Metalith. (AR 398.)

contract for the items.[22] The solution sought by means of the instant litigation is to enjoin award of DLA's IDIQ Hesco contract.

However, DLA's decision to contract with Hesco, in response to existing and reasonably forecasted military orders for Hesco products, was rational, not arbitrary or capricious. Critical force protection items must be made available when needed. As opposed to ending a contract with Hesco, DOD and DLA have taken the rational approach of maintaining a flexible IDIQ contract with Hesco for a two-year period to meet the need and demand for Hesco Concertainers while at the same time increasing awareness of Metalith products by adding NSNs for these products and by developing generic performance specifications for force protection needs which will enable Hesco, IDT and others in the industry to submit proposals in response to contemplated solicitations employing these specifications.

On December 21, 2007, final "Performance Specification MIL-PRF-3277" was issued. On January 23, 2008, DLA issued a Presolicitation Notice based on that specification. DLA has not, as yet, issued a solicitation based upon the specifications.[23]

**(f) Hesco's patent**

The J&As for both protests recite that the sole source contract was to be "negotiated under authority of 10 U.S.C. [§] 2304(c)(1). The items are part-numbered items for which the Government does not possess and cannot develop complete unrestricted technical data to be referenced in this solicitation. Hesco Bastion, Ltd., possesses an internationally recognized design patent for the items."(AR 49; AR 4 (2nd Protest).) Attempts by competing entities to manufacture and market "Concertainer Walls" had been thwarted by successful patent litigation that Hesco

---

[22] The record contains orders for metal revetments dated November 3 and November 15, 2006, issued by DSCP to IDT for $175,320.00 and $162,659.91, respectively. (AR 596-605, 612-21; Tr. 45, lines 8-25 (Metalith provided to Navy).)

[23] Briefing by the parties discloses that the performance specifications for expeditionary earth-filled protective barriers were developed with industry assistance, which, as noted, included comments on proposed drafts by IDT.

initiated. (AR 49; AR 4 (2nd Protest).) The record indicates that DLA had considered issuing its solicitation on a "brand name or equal basis." but opted not to do so because of the agency's concerns that "describing the product's salient characteristics would run afoul of Hesco's patents." (AR 56-57.) Both Justifications also stated that the Corps of Engineers "investigated and evaluated the feasibility of development of a Commercial Item Description (CID) or a Brand Name or Equal Purchase Item Description for purposes of solicitation on the basis of full and open competition. The use of a Brand Name or Equal was not considered viable by either ERDC or DSCP as it could infringe upon the Hesco Bastion patent." (AR 49-50; AR 5 (2nd Protest); *see also* AR 466 ("If we, or the U.S. Army Corp of Engineers, use the Hesco Bastion technical information as the basis for our development of a performance specification, or a commercial item description, or other competitive description, we will be infringing upon the patent owned by Hesco Bastion, Inc.").) In preparing the J&A for the base contract, the possibility of including descriptions was considered. "With respect to the J&A, the 'Brand Name or Equal' alternative was considered in 2004 and was determined that describing the product's salient characteristics would run afoul of Hesco's patents. This was confirmed by G&I Senior Counsel at that time. Attached is a position paper with more details prepared by current C&E Counsel." (AR 368.) Consideration of possible patent infringement was not arbitrary or capricious.

While not denying Hesco's patent rights, IDT's position is that DLA should have ignored them and failure to do so was arbitrary and capricious. IDT cites *Voda v. Cordis Corp.*, 476 F.3d 887, 902 (Fed. Cir. 2007) which reversed a federal district court's exercise of supplemental jurisdiction over a foreign patent infringement claim stating "a patent right to exclude only arises from the legal right granted and recognized by the sovereign within whose territory the right is located." Nothing in CICA or the FAR allows a procuring agency to limit competition based on a patent infringement, IDT adds, citing *Design Pak, Inc.*, B-212579, 83-2 CPD ¶ 336 ('all potential sources should be permitted to compete regardless of possible patent infringement"). Patent concerns are irrelevant to the procurement process, it is asserted, because patent holders have adequate remedies for any infringement by the government under 28 U.S.C. § 1498.[24/]

[24/] 28 U.S.C. § 1498 provides for remedies in the United States Court of Federal Claims if "an invention described in and covered by a patent of the United States is used or manufactured by or (continued...)

At oral argument, counsel for Hesco represented that it has a domestic patent; therefore *Voda* would be inapposite. (Tr. 82-83, lines 22-25, 1-7.) Also *Voda* does not prohibit the enforcement of a foreign patent in the United States, did not address the enforcement of a foreign patent in courts of other nations, 476 F.3d at 900-02, and the adequate statutory remedies IDT alludes to specifically exclude infringement in another country. "The provisions of this section shall not apply to any claim arising in a foreign country." 28 U.S.C. § 1498(c). Concluding agency caution and reliance on counsel was reasonable, Hesco reasons that even if any infringement action would have to be brought outside the United States, avoidance of costs and political embarrassment were valid considerations. IDT argues that Iraq or Afghanistan where these items would be ordered, shipped and used, do not have patent enforcement systems. However, DLA's reasoning does not have to be right – just reasonable. *See FN Mfg., Inc. v. United States*, 44 Fed. Cl. 449, 451-52 (1999) (upholding sole source supply contract of M461M4A1 carbines where proprietary data rights precluded competitive procurement); *Metric Sys. Corp. v. United States*, 42 Fed. Cl. 306, 311-15 (1998) (declining to set aside sole source contract for Mini-MUTES radar simulator for Air Force training under the "one responsible source" provision of CICA, noting the awardee had the proprietary rights to the product).

It was not arbitrary nor capricious for DLA to include in its consideration for this procurement that Hesco material was patented. The record shows the following was considered by DLA. Hesco holds a European patent (UK 0 466 72)[25/] and was successful in patent litigation against Maccaferri Limited, a competing bidder in a previous procurement. (AR 56-57 (article from Intellectual Property Resources describing the British Court of Appeals upholding the trial court's finding of infringement, referring to the product as a wire mesh structure, folded concertina-style, transported and unfolded on site and filled with sand, rock or other material to form a gabion used for shoring up).) "Additional efforts to encourage competition are planned. The sole firm that has previously attempted to compete lost a patent

---

[24/](...continued)
for the United States without license of the owner thereof or lawful right to use or manufacture the same . . . ." The purpose of this statute IDT states, is to "save the government from having its procurements thwarted, delayed or obstructed pending litigation of patent disputes." (Pl.'s Mot. for J. on AR at 29 (citing *American Sealcut Corp*., 81-1 CPD ¶ 327).)

[25/]Hesco Bastion, Ltd., a British company, obtains the geotextile material used in its products from a source in the United States, in compliance with the Berry Amendment. (AR 47.)

infringement suit to Hesco and ceased offering." (AR 411-12 (March 28, 2007 summary of issues); AR 54 ("Concerning the idea of a geo-composite specification . . . it would be very difficult to do this without infringement on the Hesco Bastion patent.").) DLA's concern about avoiding potential patent issues was rational and coherent. The question is not whether the government could be sued by Hesco for patent infringement anywhere in the world. Rather, the question is whether defendant acted arbitrarily or capriciously or in violation of law in including among the several reasons for justifying this sole source IDIQ procurement, concern about possible patent infringement and relying on advice of counsel with respect to that concern.[26/] DLA's approach had a rational basis and was not arbitrary or capricious.

## C. The bridge contract

Following agreement of counsel for a bridge contract pending resolution of the merits of this case, on September 13, 2007, DLA issued a J&A for a bridge contract. (AR 2-7 (2nd Protest).) "[N]o other Concertainer products meet the strength and durability requirements for the needed Force Protection of our troops, particularly with respect to rapid deployment." (AR 3 (2nd Protest).) DLA noted that "the lack of a Bridge contract will result in unacceptable delays in fulfilling the Agency's Concertainer defense wall needs." (*Id.*) On September 26, 2007, IDT filed its second protest.

As agreed, as part of this litigation, the bridge contract could cover actual needs of the military. IDT objects to the quantities ordered, characterizing the implementation of the bridge contract as an end run around the protest over the base contract. Like the base contract, the bridge is an IDIQ contract under which DLA is only required to purchase the stated minimum. The contract minimum for base period of the bridge contract, which is the only amount DLA is obligated to purchase, is $13.5 million. (AR 3 (2nd Protest).) Indeed, as of October 2, 2007, a little more than

---

[26/] 48 C.F.R. § 6.302-1(b)(2) provides:
The existence of limited rights in data, patent rights, copyrights, or secret processes; the control of basic raw material; or similar circumstances, make the supplies and services available from only one source (however, the mere existence of such rights or circumstances does not in and of itself justify the use of these authorities) (see part 27) [referring to 48 C.F.R. Part 27 – Patents, Data, and Copyrights].

$2 million in orders had been placed under the bridge contract. (AR 18 (2nd Protest).) By November 20, 2007, total orders had increased to $70 million. (Lauersen Dep. 47.) The minimum order amount under the base contract is approximately $4.16 million per month whereas the minimum under the bridge contract is approximately $4.5 million per month (Hesco's Reply Br. 16.) and has been fully utilized in filling actual orders, the minimum demands of the soldiers in Iraq and Afghanistan. This relatively small amount[27] is neither a cardinal change nor arbitrary or capricious. *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993); *HDM Corp. v. United States*, 69 Fed. Cl. 243, 253-54 (2005); *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 464-65 (2001).

A bridge contract is used to cover immediate minimum agency needs while a bid protest or other action is pending, or to cover a transition period between competitive procurements. *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 620 (2005) ("the Army awarded a 'bridge contract' to secure these critical services during the pendency of the protest"); *Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 183 (2007) ("While the GAO protest was ongoing . . . [the contractor] continued to perform through a series of month long bridge contracts.").

Because there was no other contract vehicle against which DLA could fill orders for Hescos that had already been placed by customers in the battlefield, DLA asserts it used the bridge contract to fill those actual customer orders. (Lauersen Dep. 54.) Defendant asserts the bridge contract has been used to fill actual needs from the field, not to create a "reserve." (*Id*. at 45-46.) In its most recent filings, IDT contests this, the premise of its litigation agreement to create this bridge contract, arguing quantities ordered are being stockpiled in warehouses where orders can then be quickly filled which perpetuates the ordering cycle – that is demand for Hesco is at least in part driven by delivery time. Additionally, it is asserted that Hesco's products are being destroyed in large numbers in Iraq. IDT has submitted declarations from a contractor employee in Iraq in support of its assertion and defendant has presented

---

[27] In contrast, actual demand filled under the preceding contract was around $10 million per month in the two years prior to December 2006; but increased four-fold from November 2006 through the end of January of 2007. Demands were approximately $10 million in November 2006, $20 million in December 2006 and $50 million in both January and February of 2007, $90 million in March of 2007, $40 million in April of 2007, $85 million in May 2007; $40 million in June of 2007 and $75 million in July 2007. (AR 417; Lauersen Dep. 132.)

a declaration from a Defense Department employee in Iraq indicating no observation of such destructions at the site concerned. IDT's assertions that the amounts ordered under the bridge contract allow or include excessive stockpiling lack support.

As a matter of contract administration it is assumed that the Defense Department will continue to analyze whether there is an over or under supply of Hescos, and take any appropriate action, but the record evidence in this procurement protest does not support a determination that there has been excessive ordering of Hescos during the bridge contract duration. Moreover, the result reached in this protest litigation serves to moot any bridge contract controversy as DLA may now proceed with the successor IDIQ contract award and supply Hesco products thereunder accordingly.

**D. Entry of default**

Because of the atypical progression of these particular bid protests (with the parties agreeing to a bridge contract pending the completion of discovery and supplementation of the administrative record, as well as the filing and briefing of merits motions, oral argument and the court's resolution) on November 8, 2007, defendant filed a Motion Out of Time for Leave to Waive the Requirement for Filing of an Answer, or, in the Alternative, for an Enlargement of Time to Respond to the Complaints.[28/] Defendant reasons that as a records review case, merits motions are filed based on the administrative record pursuant to RCFC 52.1 which governs and that the requirements of RCFC 12 should be waived.

IDT responded with a Motion For Entry of Default and Opposition to Defendant's Motion for Leave to Waive the Requirement of Filing an Answer, pointing out that for failure to timely file an Answer, under RCFC 8(d) all "averments in [the Complaint] to which a responsive pleading is required . . . are admitted." IDT requests the court consider the allegations of the Complaint be deemed admitted, and

---

[28/]The Complaint in the First Protest was filed on August 1, 2007. Under Rule 12(a)(1) defendant's response was due on September 30, 2007. Accordingly, as noted in the motion, the time for filing an answer to the Complaint in the First Protest had expired; it had not for the Second Protest.

direct the entry of a default. *See* RCFC 55(a). Because the court ordered simultaneous briefing on cross motions on the administrative record, IDT claims prejudice in that it would not know defendant's position on the some thirty-seven factual averments and six causes of action of its Complaint.

Defendant responds asserting that the pending motions on the administrative record pursuant to RCFC 52.1, address the merits of these protests, reflecting a fundamental distinction between bid protests and other motions which are decided in accordance with RCFC 56.1. Accordingly, it is argued that in general, as well as in this specific instance, the pleading requirements of RCFC 8 do not, or should not, apply.

Addressing claimed prejudice, defendant points out that before briefing the merits, IDT was served with two comprehensive administrative records, and following contested motions to supplement the record, was granted leave to take the deposition of defendant's program manager. The administrative records are the universe of facts for these bid protests and were available to all parties prior to the merits briefing. Briefs responding to opposing submissions were filed. And, as an Answer in most instances, would not require a detailed explanation of defendant's legal position, waiving an answer, at least in this case, would not be either prejudicial or a blatant disregard of the court's rules.

The facts asserted in IDT's Complaint detail communications, meetings, notice, J&A's and the like addressed in the administrative records. Likewise, allegations concerning both the similarities, differences, testing and supply catalog listings of the various products are also, to the extent noted herein, part of the administrative record. The administrative record comprises the metes and bounds predicate to the court's resolution of the merits of these protest. Under the circumstances of this case, no purpose is served in requiring that answers be filed to plaintiff's complaints. In this circumstance the filing of a default pursuant to RCFC 55(a) would be a useless act. Good cause exists to set such a default entry aside pursuant to RCFC 55(c).

**E. Injunctive relief and relative harm**

"Four factors are weighed in considering a motion for a preliminary injunction: (1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties." *United States Ass'n of Imps. of Textiles & Apparel v. United States*, 413 F.3d 1344, 1346 (Fed. Cir. 2005) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)). "In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).

IDT has not prevailed on the merits. No CICA violation has been established. IDT has not demonstrated that it would suffer irreparable harm if the contract is awarded. IDT's products are available to military units requesting them. IDT has not demonstrated that any harm it might suffer would outweigh the harm to the government or Hesco if the contracts were enjoined. In the absence of a contract vehicle to supply Concertainers, pending requisitions and current backorders would go unfilled for a considerable period of time which would endanger troops in the field. (Lauersen Dep. 174-75.) It is not in the public interest to delay the procurement of the protective barrier walls ordered by or for the troops in Iraq and Afghanistan.

The directive of § 1491(b)(3) to give "due regard to the interests of national defense and national security . . ." militates against granting the relief sought by IDT. The military determines what force protection products it requires. *North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."). The court "must give due regard to the interests of national defense and national security when considering bid protest." *SDS Int'l, Inc. v. United States*, 55 Fed. Cl. 363, 365 (2003) (citing 28 U.S.C. § 1491(b)(3) (internal quotations omitted); *Voge v. United States*, 844 F.2d

776, 780 (Fed. Cir. 1988). *See Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 521-22 (2003) (acknowledging that national security concerns were "of paramount import" and, consequently, injunctive relief that could negatively affect the military's ability to address the wartime needs of troops in Iraq was not in the public interest); *CSE Constr. Co. v. United States*, 58 Fed. Cl. 230, 262-63 (2003) (concluding that "due regard to the interests of national defense and national security" precluded an injunction barring the Army's construction of firing ranges at Fort Leonard Wood in Missouri); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 656 (2003) (denying injunctive relief on national security grounds where an injunction would necessarily delay the military's ability to get needed equipment). IDT has not established a valid basis for equitable relief.

## CONCLUSION

For the foregoing reasons, the court determines that IDT has not established that the government's actions in this sole source solicitation were arbitrary, capricious, an abuse of discretion or in violation of law or regulation.

Accordingly, it is **ORDERED**:

(1) Plaintiff's Motions for Preliminary Injunction, Motion for Judgment on the Supplemented Administrative Record, and Application for Temporary Restraining Order (previously orally denied) are **DENIED**;

(2) Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative for Judgment Upon the Administrative Record are **GRANTED**, together with Intervenor's Motion for Judgment on the Administrative Record;

(3) Defendant's Motion Out of Time to Waive the Requirements of an Answer, or in the Alternative, for an Enlargement of Time to Respond to Complaint is **GRANTED** and plaintiff's Motion for Entry of a Default is **DENIED**;

(4) Except as granted in (2) and (3), all other relief sought in this matter is **DENIED**.

(5) Judgment shall be entered dismissing the Complaints filed in this matter with no costs to be assessed.

s/ James F. Merow

James F. Merow

Senior Judge